# DUNCAN B. COOPER and ROBIN J. COOPER v. · STATE.

## (*Nashville.    December Term, 1909.*)

1. **VERDICTS IN CRIMINAL CASES.   Verdict of guilty, approved by trial judge, removes presumption of innocence, and raises presumption of guilt, and will not be disturbed upon facts, unless evidence clearly preponderates in favor of innocence.**

   A verdict of guilty in a criminal case, approved by the trial judge, removes the presumption of innocence, and raises a presumption of guilt, which the accused must overcome upon the record, in order to obtain a reversal on the facts; and such verdict will not be disturbed upon the facts by the supreme court, unless, upon an examination of the whole record, there is found to be. a clear preponderance of evidence in favor of the innocence of such convicted prisoner.   (*Post, pp.* 56-60.)

   Cases cited and approved: Kirby v. State, 3 Humph., 304; Leake v. State, 10 Humph., 145; Hill v. State, 3 Heisk., 320; Robertson v. State, 4 Lea, 427; Hardwick v. State, 6 Lea, 107.

2. **SAME.   Same. Verdict of guilty, approved by trial judge, is' entitled to great weight as to credibility of witnesses and conflicts in their testimony.**

   A verdict of guilty in a criminal case, approved by the trial judge, is entitled to great weight in considering the credibility of the witnesses, and the conflicts in their testimony.   (*Post, pp.* 59, 60.)

   Cases cited and approved:   Kirby v. State, 3 Hump., 304; Hardwick v. State, 6 Lea, 107.

3. **ASSIGNMENTS OF ERROR IN CRIMINAL CASES.   Should be that the evidence preponderates against prisoner's guilt and in favor of his innocence.**

The assignment of error in a criminal case, to entitle the accused to a review of the facts, should be that, considering the entire record, the evidence preponderates against the verdict of guilty. and in favor of the prisoner's innocence; and such assignment of error in these words: "The verdict is not warranted by the evidence", is not good in form; but the court, upon the assignment thus framed, examined the facts. (*Post, pp.* 56, 57, 60.)

4. **VERDICTS IN CRIMINAL CASES. Evidence stated, reviewed, and held to be sufficient to warrant and sustain a verdict of guilty of murder in the second degree.**

The evidence and facts are stated, examined, reviewed, and held to be sufficient to warrant and sustain a verdict of guilty of murder in the second degree, and the sentence thereon; and the evidence is held not only to preponderate against the innocence of the accused, but to preponderate clearly in favor of their such guilt. (*Post, pp.* 55, 56, 61-102.)

5. **SAME. No reversal for discrepancies and conflicts in the testimony, nor where the facts require an elaborate argument to that end.**

The supreme court, in reviewing the sufficiency of the evidence to sustain the verdict, will not go into any detailed statement or argument as to the credibility of witnesses, or slight discrepancies and conflicts in the testimony; for all these questions have been settled by the verdict. No case can be reversed on the facts where an elaborate argument of the evidence is necessary to effect that end. The very necessity of such a thing rebuts the idea that the verdict is against the clear preponderance of the evidence. (*Post, pp.* 60, 61.)

6. **EVIDENCE. Testimony of accused is competent, but must be weighted with reference to their interests.**

While the accused are, under our statute, competent witnesses, still they have the greatest interest that men could possible have, and it is proper for the trial judge to instruct the jury that in considering the weight of their testimony, and the credit to be given to it, they should look to their interest in the case. (*Post, pp.* 79.

Cooper v. State.

7. **SAME.** Weight to be given to credibility, consistency, reason-
ableness, and noninterest rather than to number of witnesses,
when.

   Issues of fact are not to be determined in accordance with the
   number of witnesses arrayed upon either side, but the crediti-
   bility of the witnesses, their interest in the case, the reason-
   ableness of their testimony, and its consistency with other
   facts, are all to be considered, and often more weight is to be
   given to one witness than to several testifying to the contrary.
   (*Post, p.* 79.)

8. **SELF-DEFENSE.** Accused cannot rely upon self-defense in
killing another who was himself acting in self-defense.

   Where the deceased, in the exercise of his right of self-defense,
   makes ready for combat, or even actually combats or shoots,
   the accused cannot successfully rely upon the defense that he
   killed the deceased in the necessary self-defense of himself;
   because self-defense can be only on one side, and the right of
   self-defense cannot be exercised by both combatants. (*Post, pp.*
   83, 84, 91-102.)

   Cases cited and approved: Irvine v. State, 104 Tenn., 148; State
   v. Hecker, 109 Cal., 463; Levy v. State, 28 Tex. App., 203,
   212; Allen v. State, 66 Miss., 385, Thomas v. State, 61 Miss.,
   65; George v. State, 145 Ala., 41; Baker v. Kansas City Times,
   Fed. Cases, No. 773, cited in 26 Cent. Dig., p. 242.

9. **SAME.** Same. Previous threats, conduct, and language of the
accused upon meeting the deceased that are equivalent to an
overt act justifying the deceased in acting in self-defense and
depriving the accused of that right.

   Where the accused threatened to kill the deceased if his name
   again appeared in the newspaper managed and edited by the
   deceased, which threat, with the knowledge of the accused, was
   communicated to the deceased, whereupon both parties armed
   themselves, the accused for the purpose of executing his threat,
   and the deceased, for the purpose of self-defense; and the name
   of the accused appeared in a humorous and sarcastic editorial

in such paper issued the next morning, and thereafter, about four o'clock in the afternoon of the same day, the accused, without having retracted such threat, or without having communicated to the deceased any retraction thereof, screened behind a woman and man, approached and came by surprise upon the deceased, first attracting his attention by addressing him by name in a threatening manner and attitude, with the statement that he (the accused) had the drop on him (the deceased), and, when the deceased surprised jumped or shrunk back, the accused, with his hand extended, denounced him as a damned coward hiding behind a woman (the same woman behind whom as a screen he approached), such threat, conduct, and action on the part of the accused, a man known to the deceased to be likely to execue his threat, was equivalent to an overt act justifying the deceased in assuming that his life was then in danger, and entitled him to exercise the right of self-defense, and the accused had no right to act in self-defense, without first, in good faith, withdrawing from the deadly assault, real or apparent, which his conduct clearly and unmistakably indicated that he was making upon the deceased, and the accused cannot successfully rely upon the doctrine of self-defense for the killing of the deceased.  (*Post*, *pp.* 61-102.)

Cases cited and approved:  Rippy v. State, 2 Head, 219; Jackson v. State, 6 Bax., 458; Allsup's Case, 5 Lea, 362; Irvine v. State, 104 Tenn., 148; Cummins v. State, 99 Ga., 662; State, v. Hecker, 109 Cal., 463; Levy v. State, 28 Tex. App., 203, 212; Allen v. State, 66 Miss., 385; Thomas v. State, 61 Miss., 65; George v. State, 145 Ala., 41.

Case cited and distinguished:  Foutch v. State, 95 Tenn., 713.

10. **CHARGE OF COURT.**  That if accused father was the wrongful aggressor so that the deceased was entitled to act in self-defense, the accused son, with knowledge, and willingly aiding his father, is equally guilty with the father in killing the deceased, is not erroneous.

A charge, in effect, instructing the jury that if they believed from the facts that the accused father separated from the ac-

Cooper v. State.

cused son, with the determination, known to the son, to go and meet the deceased, and have a talk with him, and if he (the deceased) resented the talk on his approach, that he (the accused father) intended, if necessary, to take his life, or intended to speak with him or accost him, intending to bring on a difficulty in order to give a reason or excuse for shooting and taking the life of the deceased, and that the accused son followed his father a short distance behind him, intending to second and assist him in carrying out his said purpose, and entered into the fight willingly and under such conditions, he (the son) would be equally guilty with the father, and that the jury would be warranted in finding both guilty of murder in the first degree, is not erroneous; especially is it not erroneous, where the charge further instructed the jury that if they believed from all the circumstances and conditions that the accused father had threatened the life of the deceased by message communicated to him, with the knowledge of both the father and son, and that the father sought the meeting for the aforesaid purpose, and the son was present intending to assist his father in any and all extremes and under any and all circumstances, it would be for the jury to determine whether such conduct and action, under all the circumstances, was such an overt act as would reasonably cause the deceased to believe that the accused father and son were about to carry the father's alleged threat into execution. (*Post, pp.* 102-111.)

11. SAME. Error as to higher grade of offense is not reversible error where defendant was convicted of lower grade not affected by such error.

Error in one paragraph of the charge of the court as to murder in the first degree is not reversible error, where the verdict and conviction is for murder in the second degree only, and not affected by such error; for error in the charge as to the higher grade of offense is not reversible error where the defendant is convicted of a lower offense. (*Post, pp.* 111, 112.)

Cases cited and approved: Wickham v. State, 7 Cold., 529, 530; Parham v. State, 10 Lea, 502; Tarvers v. State, 90 Tenn., 498,

Cooper v. State.

499 (and citations); Wilson v. State, 109 Tenn., 167; Powers v. State, 117 Tenn., 372 (and citations); Frazier v. State, 117 Tenn., 441, 446.

12. ASSIGNMENTS OF ERROR. Against charge of court after cutting of paragraph and disassociating it from its context is not a proper method.

In assigning error against the charge of the trial court, a paragraph should be taken as written; and to cut it up into two paragraphs, and disassociate it from its context, and then to assign error against the new paragraphs so constructed, is not a proper method of assigning errors against the charge. (*Post, p.* 111.)

13. CHARGE OF COURT. That the approach of the accused "on a mission of peace" entitled them to right of self-defense against attack is not erroneous as causing jury to understand they were the aggressors, if their mission was neither peace nor war, but to obtain a cessation of criticism by deceased.

An instruction to the jury that if the accused approached the deceased "on a mission of peace" and only for the purpose of having a conversation, with nothing in their conduct to indicate any other purpose, and with no overt act or word used on their part which would warrant the conclusion that they intended to attack him, take his life, or do him any great bodily harm, and if, under such circumstances, they were attacked by the deceased, they would have the right to use such means as was in their power for their own self-defense, is not erroneous as against the accused, by reason of the use of the term "on a mission of peace", where the theory of the defense was that the accused went neither "on a mission of peace", nor "on a mission war", but simply to induce the deceased to stop the criticism and abuse of one of the accused; for use of such expression could not have caused the jury to misunderstand the instruction to mean that if the accused went on a mission to obtain a cessation of the continued criticism of himself in the decedent's newspaper that he was the aggressor, and thereby provoked the difficulty in such sense as to deprive himself of the right of self-defense. (*Post, pp.* 112, 113.)

Cooper v. State.

14. **SAME. Too meager as to murder in first degree, but referring to a preceding paragraph, by the expression "as above set out", for a full and correct charge on the subject, is not erroneous as misleading.**

A charge that if the accused intended, "as above stated", to talk to the deceased, and if a difficulty ensued, they intended to take his life if he made any resistance, in that event the plea of self-defense would not be available, and they would be guilty of murder in the first degree, as above set out and described, is not erroneous as misleading where the expression "as above set out" refers to the preceding paragraph in which the matter was fully and correctly gone into. (*Post, pp.* 113, 114.)

15. **SAME. That is not erroneous in failing to define what would amount to "the provocation of a difficulty" so as to deprive the accused of the right of self-defense.**

A charge that if the defendant's act is an assault, or the menace of one by an overt act, or "the provocation of a difficulty" with the intent to inflict death or great bodily harm in the event it is resisted, made of malice to bring about that result, and to enable the provoking party to·wreak vengeance upon his assailant, that is an "aggression" or "fault", or "provoking a difficulty" within the legal sense and meaning of the term, and if the combat is provoked, or the occasion to kill is produced on this account, with this intent, and for this purpose, defendant cannot rely upon the plea of self-defense, otherwise he can, is not erroneous as failing to define what would amount to the provocation of a difficulty. (*Post, pp.* 114, 115.)

Case cited and approved: Foutch v. State, 95 Tenn., 711, 716, 717, 718.

16. **SAME. Special request is properly refused where the correct portions thereof had already been given in the general charge.**

A special request for further instructions is properly refused to be given in charge, where the correct portions of it had already been given in the general charge. (*Post, pp.* 117. 119, 120.)

Cooper v. State.

17. SAME. Special request containing positive errors is properly refused to be given in charge.

A special request for further instructions is properly refused to be given in charge where it contains positive errors. (*Post, p.* 117.)

18. SAME. Special request making defendants' right of self-defense depend upon their nondesign to kill and not upon their conduct giving no reasonable grounds for deceased to believe himself in danger is properly refused.

A special request for further instructions is properly refused to be given in charge, where it makes defendants' right of self-defense rest upon whether they had formed a design to kill the deceased before approaching him; whereas, a proper statement of the law would have made it rest upon whether in approaching the deceased they gave him reasonable grounds to believe himself in danger of death or great bodily harm at their hands. (*Post, pp.* 117, 118.)

Cases cited and approved: Irvine v. State, 104 Tenn., 132; Smith v. State, 105 Tenn., 305; Hecker v. People, 109 Cal., 451.

19. SAME. Special request failing to make plain that defendants giving deceased reasonable ground to fear death or great bodily harm, lost their right of self-defense against his attack in offensive defense, is properly refused.

A special request for further instructions is properly refused to be given in charge, where it fails to make plain that the defendants had no right to approach the deceased in such way as to give him reasonable ground to fear death or great bodily harm, and if they did so, they forfeited their right to rely upon the doctrine of self-defense, and where the facts make such omissions erroneous, and properly require such omission to be supplied. (*Post, p.* 118.)

20. SAME. Special request making rights of deceased and of defendants rest upon the intention of defendants, and not upon their conduct in approaching the deceased, is properly refused.

A special request for further instructions is properly refused to

Cooper v. State.

be given in charge, where it makes the rights of the deceased and of the defendants to rest upon the undisclosed intention of the defendants, and not upon their conduct in approaching the deceased. (*Post, p.* 118.)

21. SAME. Special request invading province of jury to pass upon conduct of defendants in approaching deceased is properly refused.

A special request for further instructions is properly refused to be given in charge, where it invades the province of the jury in taking from them the right to pass upon the conduct of the defendants in approaching the deceased, by stating that the things done by them in approaching him would not justify him in defending himself. (*Post, p.* 118.)

22. SAME. Special request is properly refused where it stated that the deceased was not entitled to act in self-defense, upon the defendant's approach amounting to an overt act requiring prompt action in self-defense by the deceased.

A special request for a further instruction that the deceased had no right to act in self-defense, and was in the wrong in shooting, although it appeared in the evidence that when the accused approached the deceased, he said to the latter: "Well, here you are, all right, and I've got the drop on you," if it appeared, or should have appeared, to the deceased that the accused did not have the drop on him, and had his empty hand only extended, and this, although the accused had the night before sent a message to the deceased threatening his life upon a condition which had taken place, is properly refused to be given in charge; for the law does not throw such a burden upon any of its citizens, when so accosted and threatened by a deadly enemy, to take time to investigate and see whether he has anything in the other hand, and whether he is really telling the truth about having the drop on him, but the man so threatened has the right to take his assailant at his word, and immediately defend himself. The approach under such circumstances, and with such antecedent facts, and with such a threat of an instant attack, is itself an overt act calling into prompt action the right of self-defense. (*Post, pp.* 118, 119.)

See citations under the eighth and ninth headnotes.

23. **SAME. Stating contention or theory of the State based upon some evidence is not erroneous.**

There is no error in the statement in the charge that it is a part of the State's contention, or, theory of the case, that the accused shot the deceased from the rear, where such was the contention of the State, and there was, at least, some apparent evidence to that effect. (*Post, p.* 120.)

24. **SAME. Not erroneous as giving undue prominence or emphasis to the State's theory, when.**

A charge instructing the jury that if they are satisfied that the State's theory is a fair and reasonable deduction from all the evidence, when taken as a whole, and that, when so taken, it establishes the defendants' guilt beyond a reasonable doubt, it would be their duty to so find; but that if they entertained a reasonable doubt as to their guilt, the verdict should be "not guilty", is not erroneous as giving undue prominence or emphasis to the State's theory, especially where in a preceding paragraph the jury was instructed to return a verdict of "not guilty", if they believed the theory of the defendants. The objection to the charge is overcritical. (*Post, pp.* 120, 121.)

25. **SAME. Special request as to declaration as part of the res gestae invading the province of the jury in stating the same to be absolutely immaterial is properly refused.**

A special request for further instructions as to evidence of a declaration made by a witness to the killing, and immediately thereafter as a part of the res gestae, and not introduced on the idea of an accusation made within the hearing of the defendant and not denied by him, is properly refused to be given in charge, where it invades the province of the jury by the statement that the fact that the accused remained silent under such charge would not be a circumstance tending to show his guilt, and that the evidence would be absolutely immaterial. (*Post, pp.* 121-125.)

Cooper v. State.

Cases cited and approved: Braswell v. State, 2 Shannon's Tenn. Cases, 595; Morton v. State, 91 Tenn., 443, 444.

Case cited and distinguished. Phelan v. State, 114 Tenn. 488.

26. **SAME.** Special request is properly refused where it is argumentative and assumes a fact not in evidence; and comments upon the evidence of a particular witness, when.

A special request for further instructions is properly refused to be given in charge, where it is argumentative, and assumes a fact, as to which there is no evidence, that a certain witness was of an excitable and nervous disposition; and besides, it is improper that the evidence of a single witness should be in such manner singled out by the court and commented on in the charge. (*Post, pp.* 125, 126.)

27. **SAME.** Not subject to criticism as stating contention of counsel instead of views of the court, where the insistence of counsel is adopted as the views of the court.

The charge is not subject to the criticism that the trial judge did not tell the jury what he·thought, but simply what counsel thought or insisted, where it is apparent that the court adopted the contention of counsel upon the point, and the jury must have so understood the matter. (*Post, pp.* 126, 127.)

28. **SAME.** Meagerness, without postive error, and without special request making charge fuller, is no ground for reversal.

Where there is no positive error in the charge, and there was no · competent request to make it full and more complete, the meagerness of the charge is no ground for reversal. (*Post, p.* 127.)

29. **SAME.** Special request that what was in the minds of the accused and not what was in the mind of the deceased, must determine their rights, is properly refused, where it leaves out of view the grounds of self-defense by the deceased.

There is no error in refusing to give in charge a special request for further instructions to the effect that the rights of the accused must be determined by what was in their minds, and not by what was in the mind of the deceased, where it leaves out

of view the words of the accused showing an imminent attack on the deceased, and the grounds of the apprehension of the deceased, growing out of such attack and the previous occurrences and threats, and makes the right of self-defense on the part of the deceased turn upon the real purpose of the accused; for this contention is not the law. Where one approaches another, showing distinct overt acts, indicative of a purpose to do great bodily harm, and is attacked or injured on account thereof, he cannot show that he had no real purpose of doing harm; for the assailed party must judge by appearances as things look to him. (*Post, pp.* 127, 128.)

30. **SAME. Special request embracing repetition of ruling and instruction on evidence when introduced is properly refused.**
There is no error in refusing to give in charge a special request for further instructions, where it embraces a repetition of the court's rulings and instructions made upon the introduction of evidence. (*Post, pp.* 127, 128.

31. **EVIDENCE. Inquiries, by cross-examination, into life of witness so remote as twenty-five or thirty years prior thereto is error, but if the result is harmless, it is not reversible error.**
The trial judge's permission of the cross-examination of a witness, though he be the accused defendant, making inquiries into his transactions so remote as twenty-five or thirty years previous thereto, unless followed up by other testimony showing a continuance in or habit of evil doing, is erroneous; but if the supreme court can see that no injury was done the accused by the evidence, as where the witness denied the imputation implied by the inquiry, and the court instructed the jury that the State was bound by the denial of the witness, there will be no reversal for such harmless error, because a reversal upon such ground would be a reversal for a mere technicality, or for an immaterial matter, contrary to the rule laid down by our statute. (*Post, pp.* 143-145.)

Case cited and approved: Lowry v. Railroad, 117 Tenn., 507, et seq., and citations.

Cooper v. State.

32. SAME. Admission of hearsay evidence of threats made by accused and communicated to deceased Is not reversible error, where harmless under instructions, and where not properly objected to.

The admission of hearsay evidence of threats made by the accused and communicated to the deceased is not reversible error where it wrought no harm to the accused, under the trial judge's instructions to the jury that it could be considered only in the light of interpreting the acts of the deceased, and not as to whether the accused made any such threat; and where it is admitted and not denied that the accused had the night before sent deceased a threat to kill him upon a certain condition which subsequently happened before the murder; where the objection was general, and without the statement of any specific reason therefor; and where the accused had opened the door to this form of kindred evidence by the introduction of the same over the objection and protest of the State. (Post, pp. 145-148.)

Cates cited and approved: Crane v. State, 94 Tenn., 86, 89, and citations; Pencil Co. v. Davis, 108 Tenn., 251, 254.

33. SAME. Asking accused, on cross-examination, if he knew any reason why certain witnesses would perjure themselves to deprive him of his life or liberty is not reversible error, though the question is offensive in form.

The action of the trial judge in permitting the State's attorney to ask the accused, on his cross-examination, if he knew any reason why certain witnesses would perjure themselves to deprive him of his life or liberty, is no ground for reversal; though the question should not be put in such offensive form, but should be put in the form of asking whether he knew any reason, arising out of prejudice of the witnesses against him, or by reason of the character of the witnesses, why they should testify things against him that he said were untrue. (Post. p. 148.)

123 Tenn.—4

34. SAME.. Exclusion of details of actions and conversations and admission of substance thereof is not reversible error where not injurious.

There is no error in excluding the details of actions and conversations, and permitting the witness to state the substance of what transpired, where the court can see that the defendants were not injured thereby. (*Post, pp.* 148, 149.)

35. CONSPIRACY TO KILL. Acquittal of murder in the first degree puts the question of conspiracy out of the way.

The acquittal of the defendants of the charge of committing murder in the first degree upon the deceased puts the question of conspiracy out of the way. (*Post, p.* 149.)

36. EVIDENCE. No error in exclusion of parts of letter and editorial of deceased referring to public questions and to others than accused.

There was no error in the exclusion of that part of a letter of the deceased to the accused, referring to public questions, and the exclusion of that part of an editorial attributed to the deceased upon hearsay statements, which referred to other persons connected with public affairs in the State, where that part of the letter showing the friendly relations formerly existing between the accused and the deceased, and that part of the editorial showing a spirit of animosity towards the deceased were admitted. (*Post, pp.* 150, 151.)

37. SAME. Exclusion of corroborated testimony, where the testimony of the witness was not controverted, is not reversible error.

The testimony of the witness who wrote a note for the accused to the deceased and the carbon copy of the note offered to corroborate another witness in his testimony that the note introduced in evidence was the one which the accused prepared to send to the deceased were competent evidence, but the exclusion of it was immaterial and not reversible error, where there was nothing in the record to controvert the testimony of the witness thus sought to be corroborated. (*Post, p.* 151.)

Cooper v. State.

38. **CHARGE OF COURT.** Refusal of special request giving a codefendant the benefit of his independent purpose and intent, and his apprehensions at the time of firing, testified to by him, is reversible error, when.

Where in the trial under an indictment against two, father and son, for the murder of the deceased, there was in the principal charge no instruction upon the independent purpose and intent of the son, who testified that he followed his father, because he was afraid that the deceased, resenting the message sent by the father, would attack him; that he had no apprehension that his father would attack the deceased; that he followed to give his father protection in the contingency the deceased attacked him; that he intervened only after the deceased had shot and wounded him and shot at him again, and fired three times fatally, not to help or protect his father from a deadly assault, but to save himself from threatened death or great bodily harm; and assuming such testimony to be true, there is no law, human or divine, which required the son to elect between the loss of life or limb, and the forfeit of the right to rely on the plea of self-defense, or that absolutely linked his fate with that of his father; and it was reversible error to refuse to give in charge the special requests for further instructions giving the son the benefit of an independent purpose and intent, and of his fears and apprehensions of death or great bodily harm, at the time he fired. (*Post. pp.* 221-223.)

ases cited and distinguished: Irvine v. State, 104 Tenn., 132; Smith v. State, 105 Tenn., 305.

NOTE.—Justices McAlister and Bell concurred with Chief Justice Beard in the view expressed in the foregoing headnote, and Justices Shields and Neil dissented from that view.—Reporter.

39. **SAME.** Grounds of dissent of Justices Shields and Neil from the view of the majority of the court, as expressed in the preceding headnote.

Justices Shields and Neil dissented from the view expressed in the preceding headnote, upon the ground that the law is well settled, as a sound and ancient doctrine, supported by the reported decisions of the supreme court of Tennessee, and sustained by the overwhelming weight of authority, with only a very few cases to the contrary anywhere, that a son interferes in the difficulty of his father, or intervenes in defense of his father, at his own peril and risk, and a son so intervening in defense of his father is charged or affected with knowledge of the father's wrongful aggression, whether he has actual knowledge thereof or not, and cannot rely upon the doctrine of self-defense, unless the father could rely upon such doctrine of self-defense, in his own behalf; and especially is a son deprived of the right to rely upon the doctrine of self-defense for killing in the alleged defense of his father, where the undisputed facts are (as in this case) that the son, at the time of the intervention, knew of his father's threat, communicated with his knowledge and direction the night before to the deceased, that if his (the father's) name appeared again in the newspaper, controlled and edited by the deceased, in an offensive way, that he (the father) would kill the deceased; that his father's name had appeared again the next morning in a manner offensive to him; that the deceased had not been informed of any change of purpose on his father's part; that should they meet with this impression still on the mind of the deceased, left by the threat to kill him by the father, the deceased would most naturally regard the approach of the father to him as an overt act, necessitating self-defense on his part; that his father did approach the deceased without informing him of any peaceful intent; that the son himself followed his father to the place of meeting, for the purpose of assisting him in case a difficulty should ensue, and stood by, ready for this purpose, when his father accosted the deceased, in a manner not indicating a peaceful intent; and said dissent is based upon the further ground that the fourth and tenth special requests (pp. 129, 130) for additional instructions giving the son the benefit of an independent purpose and intent, and of his fears and apprehensions of death

Cooper v. State.

and great bodily harm, at the time he fired, were properly re-
fused to be given in charge because they both omitted the es-
sential facts above stated, and such omission, and the confine-
ment of the jury's attention to a single and partial phase of
the transaction, wholly disassociating the son from the father,
with whom he went to the place, and whom he stood ready to
support in case of a difficulty arising, which he must have
known from the facts in his possession would in all human pro-
bability occur, would without doubt have confused and misled
the jury, because such omitted facts were absolutely neces-
sary to a correct understanding of the matter by them; and the
said fourth special request (p. 129), contained a positively
incorrect statement of fact, to the effect that the accused
(father and son) met the deceased at or about the poles, and
he immediately began firing upon the son, because the evidence
is to the contrary, and presents the case of a son waiting for
a difficulty, if one should occur, between his father and the
deceased, anticipating that it might occur, owing to the un-
friendly relations of the parties, and the previous threats, and
ready to assist the father if the difficulty should occur, and is
a far different situation from that suggested by the hypothesis
stated in the request, a hypothesis as to a material fact of
which there is no evidence in the record for its support; for it
is well settled that a special request for additional instructions,
as written, must be strictly accurate and applicable to the case
in hand, in order to authorize a reversal on account of the re-
fusal of the trial judge to give such instruction. (*Post, pp.*
129-143)

Cases cited and approved: Sommers v. Railroad, 7 Lea, 201; Rea
v. State, 8 Lea, 356, 361; Railroad v. Fain, 12 Lea, 44; Railroad
v. Gurley, 12 Lea, 59; Railroad v. Wynn, 88 Tenn., 332; Railroad
v. Acuff, 92 Tenn., 26, 33; Foster v. State, 102 Tenn., 33; Irvine
v. State, 104 Tenn., 132; Smith v. State, 105 Tenn., 305; Karr v.
State, 106 Ala., 1; Wood v. State, 128 Ala., 27; Shirrell v. State,
138 Ala., 3; Untrenor v. State, 146 Ala., 26; Morris v. State
(Ala.), 39 South., 608; Pratt v. State, 75 Ark., 350; State v.

Cooper v. State.

Westfall, 49 Iowa, 328; Crockett v. Commonwealth, 100 Ky., 382; Utterback v. Commonwealth, 105 Ky., 723; Chittenden v. Commonwealth (Ky.), 9 S. W., 386; Burks v. Commonwealth, 7 Ky. Law Rep. 826; Sharp v. State, 19 Ohio, 389; State v. Cook, 78 S. C., 253.

FROM DAVIDSON.

Appeal in error from the Criminal Court of Davidson County.—W. M. HART, Judge.

J. M. ANDERSON, LUKE E. WRIGHT, W. H. WASHINGTON, M. H. MEEKS, and ALBERT G. EWING, for Duncan B. and Robin Cooper.

ATTORNEY-GENERAL CATES, G. T. FITZHUGH, and J. B. GARNER, for State.

MR. JUSTICE SHIELDS delivered the opinion of the Court.

Duncan B. Cooper and Robin J. Cooper were indicted in the criminal court of Davidson county, Tenn., charged with murder in the first degree, committed November 9, 1908, upon the body of Edward W. Carmack, and later after a trial lasting some two months, were by a jury of that county found guilty of murder in the second degree, and their punishment fixed at confinement in the penitentiary for a period of twenty years, and, after their rule for a new trial was discharged, judgment was entered against them in accordance with the verdict.

From this judgment they have prosecuted an appeal in the nature of a writ of error to this court and assigned numerous alleged errors upon which they ask that the judgment be reversed and the case remanded to the lower court for a new trial.

John D. Sharp was also indicted with plaintiffs in error, but was acquitted by the jury.

The record and briefs filed for plaintiffs in error and the State are voluminous, the argument at the bar was most elaborate and marked with much ability and the case has challenged and had the most careful and deliberate consideration of the court.

Duncan B. Cooper and Robin J. Cooper are father and son. Duncan B. Cooper for some years past has been quite prominent in political affairs in Tennessee.

Robin J. Cooper is a young man and a lawyer practicing in the courts of Davidson county.

Edward W. Carmack was late a senator of the United States, and was also prominent and active in politics, and a candidate in several political contests that have occurred in the State within the past few years, and at the time of his death, November 9, 1908, was editor of the "NASHVILLE TENNESSEAN," a daily paper published in the city of Nashville.

He was a candidate to succeed himself in a general primary held for the nomination of a United States senator in 1906, and was defeated. He was again a candidate in a primary held to nominate candidate for governor in 1908, and was defeated by Gov. M. R. Patterson.

Col. Duncan B. Cooper and Senator Edward W. Carmack, previous to these contests, were friends; but the former had opposed the latter in both of these contests, and, from an estrangement at first, the feeling between them had become one of hostility, as will more fully appear from the facts to be stated.

Robin J. Cooper, while sharing in the hostility of his father to Senator Carmack, came into this unfortunate tragedy, resulting in the death of the latter, almost altogether through his father.

There is no question but that Edward W. Carmack was shot to death in an encounter with the Coopers on November 9, 1908. The tragedy occurred about four o'clock in the afternoon, upon Seventh avenue, north, a street in the city of Nashville, near and south of where Union street intersects it.

The contention of plaintiffs in error is that the homicide was committed in self-defense, or, more correctly stated, by Robin Cooper, in defense of his father and himself.

The first assignment of error is:

*"The verdict is not warranted by the evidence."*

This assignment, in form, is not good. The settled and uniform practice of this court and the law of this state is that in civil cases, tried by jury, the verdict will not be disturbed upon the facts, in proceedings in error, where there is any material evidence to sustain it.

The practice and law in criminal cases, equally well established, is that a verdict of guilty, approved by the trial judge, will not be disturbed upon the facts by

this court, unless upon an examination of the whole record there is found to be a clear preponderance of evidence in favor of the innocence of the plaintiffs in error.

In the case of *Leake* v. *State*, 10 Humph., 145, decided by this court in 1849, Judge Turley, speaking for the court, said:

"In holding ourselves not to be bound by the verdict of a jury in criminal proceedings, unless, in our judgment, the proof upon which it rests clearly preponderates in favor of its truth, we do not wish to be considered as meaning that it is wholly ineffectual and inoperative, and that we are left free to consider of the truth of the charge, upon the proof, in the same manner and to the same extent with it, as without it—very far from it. The jurors are the legitimate tryers of questions of fact in criminal as well as civil cases, and their verdict must always have great weight with a revising court. But it is not conclusive except in cases of acquittal; and we are not of those who look upon it as a thing too sacred to be touched, and, therefore, always to be approached with fear and trembling. We have seen too much of the practical uncertainty of such things to have any such feeling in regard to it, and, therefore, readily disregard it, if, in our judgment, we think it should be disregarded. But still, it being against the prisoner, the presumption of guilt is thereby fixed upon him; previously, the presumption was in favor of his innocence, and this presumption of guilt, which the verdict has attached, must be removed before a new trial can be granted. Before the verdict, the accused is entitled to the benefit of all

reasonable doubts of his guilt in his favor.     After
verdict he has lost this privilege; he cannot obtain a
new trial by insisting that there is a reasonable doubt
of his guilt, but only by shewing that there is a reason-
able ground in favor of his innocence; or, in   other
words, before verdict the testimony against him cannot
be weighed with a view of its preponderancy.  It must be
of a character to establish his guilt to a moral certainty;
but after this proof has been submitted to a jury, and
analyzed by their minds, and a verdict of guilty re-
turned, then, in order to obtain a new trial, he must show
that the weight of the evidence is in favor of his inno-
cence.   This much a verdict of guilty, in criminal cases,
produces in every case, and it is much in its operation
upon the court in relation to granting new trials.  But for
the verdict, the court, in reviewing the proof, would have
to be governed by the common law principle, that the ac-
cused is to have the benefit of all rational doubts as to
his guilt, and, therefore, could not weigh the evidence.
But upon motion for a new trial the testimony is to be
weighed, and, unless it preponderates in favor of his in-
nocence, a new trial will be refused." .

In the case of *Robertson* v. *State,* 4 Lea, 427, that
eminent jurist, Judge McFarland, said:

"My conclusion upon the testimony is that it does not
preponderate against the verdict, and, while there may
be doubt as to the defendant's guilt, it is settled that the
court does not reverse upon a mere doubt, although a
jury might have entertained a doubt, their verdict hav-
ing negatived the doubt."

In the case of *Hill* v. *State*, 3 Heisk., 320, Judge Freeman said:

"The verdict of the jury in a case of felony raises a presumption of guilt against the prisoner, and we must see that the verdict is erroneous, before we can reverse on the facts."

Another rule to be applied in connection with this, and really a part of it, is that a verdict is entitled to great weight in considering the credibility of the witnesses examined, and conflicts in their testimony.

In the case of *Hardwick* v. *State*, 6 Lea, 107, Judge Cooper said:

"The usual argument made in this court, that the evidence fails to sustain the verdict, is not based so much upon the absence of sufficient testimony as upon supposed contradictions in the testimony of the witnesses, and especially the principal witness, which tends to discredit them. These discrepancies were pointed out by defendant's counsel, and discussed with great skill and ingenuity. But, after all, the variance of the same witness, as well as of the different witnesses between each other, are precisely such as always occur in such narratives, and tend rather to strengthen than to discredit the witness, for they show that there was no collusion to make up the same tale. They were, moreover, such as fell within the peculiar province of the jury to consider, and they have shown by their verdict that they did not think them of sufficient importance to affect the result. The verdict is, in our opinion, fully sustained by the evidence."

In *Kirby* v. *State,* 3 Humph., 304, Judge Green said:
"But it is not to be understood by what the court say in the case of *Dains* v. *State,* 2 Humph., 439, that the verdict of a jury in a criminal case weighs nothing with this court, and that a new trial will be granted if upon the evidence certified in the bill of exceptions we are not convinced beyond a reasonable doubt of the guilt of the party. On the contrary, the jury are the exclusive judges of the credit of the witnesses, and in all cases much must occur before the court and jury, properly calculated to act upon their minds, which cannot be transferred to paper. A verdict, therefore, in all cases, must have great weight with this court."

The plaintiffs in error, as also appears from these authorities, have in this court no longer thrown about them the presumption of innocence; but, on the contrary, the verdict of the jury, approved by the trial judge, raises a presumption of guilt, which they must, upon the record, overcome to secure a reversal on the facts.

The assignment of error, therefore, to entitle plaintiffs in error to a review of the facts of the case in this court, should have been that, considering the entire record, the evidence preponderates against the verdict of guilty, and in favor of their innocence.

Considering the assignment as thus framed, we will proceed to examine the facts. In doing this, we will go into no detailed statement or argument as to the credibility of witnesses, slight discrepancies, and conflicts in testimony; all these questions having been settled by the verdict of the jury. It must appear to all

that, under the rules we have stated, no case can be reversed on the facts where an elaborate argument of the evidence is necessary to affect that end. They very necessity for such a thing rebuts the idea that the verdict is against the clear preponderance of the evidence; nor, as a rule, is it properly the providence of the court to make an argument, but, on the contrary, after full and exhaustive consideration, to state its conclusion, upon both the facts and the law.

The salient facts leading up to the fatal meeting on Seventh avenue, where the homicide was committed, as to which there is no serious controversy in the record, unless it be as to some things occurring in Mr. J. C. Bradford's office, as to which the version of the plaintiffs in error is here given, are these:

Col. Duncan B. Cooper and Senator Edward W. Carmack were on very unfriendly terms, and had been for some mohths previous to the death of Senator Carmack. The latter had made humorous and sarcastic allusions to the former in his public speeches in the recent gubernatorial primary, and in the columns of the *Tennessean,* some of them very cutting and approaching bitterness.

On Sunday, November 8, 1908, the day preceding the homicide, there appeared in the editorial columns of the *Tennessean* an article, parts of which referred to Duncan B. Cooper in these words:

"ACROSS THE MUDDY CHASM.

"We trust there will be no unseemly ribaldry on the part of the base and vulgar concerning the happy re-

union of long-sundered hearts which was accomplished
in the joyous reconciliation of His Excellency, Hon. M.
R. Patterson, and His Ex-Excellency, Hon. John Isaac
Cox. All honor to that noble spirit, Maj. Duncan
Brown Cooper, who wrought this happy union of con-
genial and confluxible spirits, separated by evil fates,
though born for each other. All honor to Maj. Dunc, and
may the blessing of the Peacemaker be upon him! May
he be heir to all the beautitudes, and especially to the
blessings reserved for those who do hunger and thirst
after righteousness:     *     *     *

"But no doubt the main thing was that Governor Cox
agreed to join himself with Ban Murray, Dunc Cooper
and Sparrel Hill, and aid them in their battle for the
holy cause of Local Self-Government."

This seems to have further inflamed the hostility of
Col. Cooper towards Senator Carmack, and upon the
evening of that day, after he had an interview with Mr.
E. B. Craig, a friend of Senator Carmack, about some
business matters, at the Tulane Hotel in Nashville, he
brought up the subject of his relations with Mr. Car-
mack, and denounced him with great violence, using op-
probrious epithets, and said, according to Mr. Craig, that
if his name appeared again in the *Tennessean* that
either he or Mr. Carmack must die; or, according to
Col. Cooper, if his name appeared again in the *Tennes-
sean*, "the town would not be big enough to hold them
both." It is immaterial which of these statements is
correct, as they both meant the same thing, and were so

understood by Col. Cooper, Mr. Craig, and by Mr. Carmack when communicated to him.

Col. Cooper also in that conversation said that he had a note prepared to send to Mr. Carmack "which could not be misunderstood."

. Mr. Craig offered his services to adjust the matter between Col. Cooper and Mr. Crmack, and, with the consent of the former, went to the latter and stated to him the conversation that he had had, the threat that had been made, and informed him of the note that had been prepared, and Col. Cooper's intense hostility towards him. Mr. Carmack refused to agree to cease his references to Col. Cooper, and Mr. Craig returned to the latter and told him the result of his mission. . Thereupon, Col. Cooper said, "Then, by God, this note goes." Mr. Craig again saw Mr. Carmack that night, and informed him of the anger with which Col. Cooper had received his refusal not to again use his name in the *Tennessean*.

Col. Cooper that same night borrowed a pistol, which he kept and had at the time of the fatal encounter, evidently preparing himself for the execution of the threat he had made in case his name should appear again in the *Tennessean*.

Senator Carmack understood the language of Col. Cooper, communicated by Mr. Craig, to be a deadly threat against his life, and likewise borrowed a pistol that night, which he had when he met the Coopers upon Seventh avenue and was killed.

Col. Cooper says that what he meant by stating that the town would not be big enough to hold him and Mr.

Carmack was that he intended to expose the personal and private character of Mr. Carmack; but the fact that Col. Cooper and Mr. Carmack both armed themselves that night shows that the threat was not so understood by either of them.

The next morning an editorial appeared in the *Tensessean* in these words:

"THE DIPLOMAT OF THE ZWEIBUND.

"To Major Duncan Brown Cooper, who wrought the great coalition; who achieved the harmonious confluence of incompatible elements; who welded the pewter handle to the wooden spoon; who grafted the dead bough to the living tree and made it to bloom, and burgeon and bend with golden fruit; who made the playmates of the lamb and the leopard and boon companions of the spider and the fly; who made soda and vinegar to dwell placidly in the same bottle, and who taught oil and water how they might agree—to Major Duncan Brown Cooper, the great diplomat of the political Zweibund, be all honor and glory forever!"

Col. Cooper read this editorial, and about 9 o'clock a. m. went to the law offices of Mr. J. C. Bradford and there met and conferred with his son, Robin J. Cooper, who occupied one of these offices. He told him what had occurred between Mr. Craig, Senator Carmack, and himself the night before, and showed great indignation and anger. Robin Cooper expressed fears of trouble between his father and Senator Carmack, and suggested that the matter be adjusted through mutual friends. Col. Cooper said in substance that Senator

Carmack was daily shooting poisoned arrows into him, and that it had come to a point where it was unendurable, that he had no right to use his name in that way, and that he had the right to protect himself, and demand that it cease, and exhibited the pistol with which he was armed. After his father left the office, Robin Cooper realized the condition of his mind, and also he says, fearing that Senator Carmack might resent what his father had said, communicated by Mr. Craig, with violence, became alarmed and telephoned his sister, Mrs. Lucius Burch, to try and find their father by telephone and keep him off the streets. He also telephoned Gov. Patterson concerning the trouble. After this he went upon the streets, and visted various places in the city in search of his father, during which time he procured a pistol, and finally found him about 12 o'clock at the Maxwell House.

Col. Cooper, after leaving Mr. Bradford's offices, went out to inspect a horse, and while passing Mrs. Burch's, about 11 o'clock, was called by a servant, and went in the house, where he had a conversation with his daughter in relation to his trouble with Senator Carmack, when he must have repeated his threat, as she said, "He will kill you, papa," and Col. Cooper replied, "He is as likely to get killed as I am," and "Do you expect me to lay down my manhood?" He returned to the Maxwell House about 12 o'clock. In the meantime, Gov. Patterson, after being communicated with by Robin Cooper and Mrs. Burch in regard to Col. Cooper's state of mind to-

wards Senator Carmack, went upon the streets for the
purpose of finding and remonstrating with him, and
finally did find him at the Maxwell House.   Mr. Brad-
ford also came there, and the three and Robin Cooper
had an interview.   They urged Col. Cooper not to send
the note he had prepared, and said that they would get
a mutual friend to adjust the troubles between him and
Senator Carmack.   The note unsigned was given to Mr.
Bradford, and Col. Cooper agreed to meet Mr. Bradford
at his offices at 3 o'clock that afternoon to hear the re-
sult of his efforts.

Col. Cooper in answer to the question:

"Q.   In reply to the suggestion of Mr. Bradford and
his expression of confidence that he could satisfactorily
adjust matters, what did you agree to do?"
—answered:

"A.   I agreed to meet him at the office at 3 o'clock
to have a report of what had occurred."

"Q.   Of his efforts to settle or adjust matters?"

"A.   Yes, sir."

Mr. Bradford sought Col. A. M. Shook as a mediator
in the matter, but found that he was out of the city.   He
then applied to Mr. J. J. Vertrees to act in that capacity,
but he declined to do so, saying that he did not think
the editorials to which we have referred justified the pro-
posed action of Col. Cooper.   When the hour of 3 o'clock
arrived, Col. Cooper met Mr. Bradford and Gen. Tully
Brown, whom Mr. Bradford had invited to be present at
the office of the latter, and the trouble in question was
discussed for some time, and Col. Cooper agreed not to

send the note which he had prepared, which was a repetition of the threat made and communicated the night previous, perhaps in not so strong language.

Gov. Patterson testifies that about 4 o'clock that afternoon he telephoned to Col. Cooper, at Mr. Bradford's office, in which he is corroborated by those in the office at the time, and requested him to come to the Executive Mansion, which is situated on Seventh avenue, east side, and north of Union street, to discuss some political matter. Col. Cooper then left the office to comply with this request. He was accompanied by Robin Cooper, who says he did so over the objection of his father, because he was apprehensive of a meeting with Senator Carmack, and that the latter might resent the threat that had been communicated to him by Mr. Craig. They were both armed with pistols. They proceeded up Union street toward Seventh avenue, and on the way met John D. Sharp, a friend of Col. Cooper and also of Governor Patterson, who, plaintiffs in error testify, went with them upon the suggestion of Col. Cooper that he go to the Mansion with him. The three proceeded up Union street, on the south side, Robin and Mr. Sharp going in advance, and arriving at the corner of Seventh avenue and Union street before Col. Cooper, where they stopped until he came up with them.

What occurred here is of great importance, but before we state it, we must call attention to the movements of Senator Carmack that day, and the circumstances attending his appearance upon the scene of the tragedy.

That morning he went to the office of the *Tennessean,* situated on the corner of Church street and Eighth avenue, just opposite the Tulane Hotel, where he was engaged during the day in the discharge of his duties as manager and editor of that paper.

Between 11 and 12 o'clock, he was informed that Mrs. Burch had telephoned Dr. J. A. Witherspoon to find Dr. Lucius Burch, her husband, for her; that her father was very angry and armed, and intended to kill him (Carmack) on sight.

About 4 oclock that evening, Senator Carmack left his office for the purpose of going to his room, which was in a residence on the west side of Seventh avenue, something more than a block north of Union street and beyond the Executive Mansion. Plaintiffs in error both testify that they did not know the location of his room, or that in going to and from it he passed along Seventh avenue, or that he intended or was expected to pass at or near the hour when they came upon him. When he left his office, he went into a drug store and drank a glass of coca-cola, and then proceeded to the corner of Church street and Seventh avenue, where he stopped to assist a lady upon a car. From there he proceeded up Seventh avenue on the west side, towards his room, smoking a cigar, and having in his hand an evening paper. He was armed with the pistol he had borrowed the night before. When he reached a point about opposite the gate of the Shanklin residence, near where two telephone posts stood in the outer edge of the pavement, about six inches apart at the pavement,

and . farther apart higher up, one north of the other, he met another lady acquaintance and friend, Mrs. Charles Eastman, who was accompanied by an aged and infirm gentleman relative. He was rather on the inside of the pavement from them, but partially in front of the lady. Holding his cigar in his left hand, he raised his hat and was about to engage in conversation with her, when he first saw Col. Cooper immediately behind Mrs. Eastman. The tragedy occurred here, and perhaps in less than one minute Senator Carmack was lying dead in the gutter, the result of three pistol shots either of which would have produced death.

Robin Cooper was shot in the shoulder, and another bullet passed through his clothing.

We will now state the testimony of the witness concerning matters which are controverted.

In doing so, we will omit that part of what occurred in the office of Mr. Bradford in regard to which there is a conflict. The material determinative facts, after having ascertained the relation of the parties, are those transpiring on Seventh avenue, and we will go directly to them.

Mr. Carey Folk, witness for the State, passing on the north side of Union street, testifies that he saw the three men at the corner on the other side of the street, and heard Robin Cooper say to his father, "Are you going up this way?" indicating by a motion of his head towards the Capitol, and Col. Cooper replied, "No, I will wait a while yet."

Robin Cooper testifies that when he reached Seventh avenue he looked south and saw Senator Carmack on the opposite side of the avenue, and about 300 feet distant, coming towards him, and that he said to Mr. Sharp, "There goes Senator Carmack; don't let papa see him;" that he called to his father, "Let's hurry up," and he replied, "Well, wait a minute;" that when his father arrived at the corner he (Robin Cooper) took hold of his arm, trying to hurry him, and when they were nearly across the street, going north, his father stopped and said, "That is Senator Carmack coming," and without awaiting a reply he said, "I will go over there and speak to him myself," that he (Robin Cooper) said "Papa, please don't go," or, "you can't go;" that his father replied that he knew Senator Carmack, and that there would be no trouble, pulled away from him and started diagonally towards the opposite side of the street; that he hesitated, and after his father had got twenty-five or thirty feet away, he thought he ought to follow him; that he knew the communication which Senator Carmack had received through Mr. Craig, and feared that he might resent it, but did not fear that his father would attack Senator Carmack; that he thought it his duty to go with his father and protect him, in the event he should be attacked; that his father went diagonally across the street to the sidewalk, about midway between the corner and where the tragedy took place, and walked down toward Senator Carmack, until he was within ten or fifteen feet of him; that he himself

went diagonally across the street, so as to come upon the sidewalk at the telephone posts.

Col. Cooper testifies that about the time he reached the corner his son said to him, "Come ahead," and he replied, "Wait a minute," being a little tired from the walk; that they started across Union street, Robin Cooper grabbing him by the arm and saying, "Hurry up;" that from this conduct he intuitively knew something was wrong, and turned and looked down the street, and saw Senator Carmack coming north, on the west side of the street, and he says: "The impulse formed at that moment that I should go and remove all this condition that was distressing my friends, and worrying them and my children, and I was going over and have a direct, plain talk with Carmack. He had known me well, and I had known him well, and I went there to have that talk with him, and protest against his continued attacks upon me, and see if it could not be stopped." He says he pulled away from his son, and started across Seventh avenue, and proceeded towards Senator Carmaak, following two people just in advance of him.

Mrs. Eastman, a cultured and refined woman, who is not attacked in this record, gives this account of the meeting:

She says that she and a kinsman were walking very slowly south, on the west pavement of Seventh avenue, and just as she passed a little south of the Polk Flats lot she noticed Senator Carmack a short distance in front approaching her and going north; that he came towards her with a very pleasant look of recognition on

his face, his eyes fixed on her as he approached, and
stopped in front, but slightly west, of her, and, lifting
his hat slightly off his head, holding a cigar in his left
hand, said, "How do you do, Mrs. Eastman?" and that
she greeted him likewise and that he was standing there
smiling down at her in a listening attitude, apparently
absorbed in what she was about to say, because she was
just about to speak, when she heard a voice in her rear
saying, in substance and effect: "Well, here you are all
right; I have the drop on you now." That Mr. Carmack
raised his eyes and as he looked over her shoulder in the
direction of the voice in her rear, "a look of surprised
inquiry—a great change—came over his face" immed-
iately, and he shrank backward rather more in front of
her and toward the outer part of the pavement, and, as
he did so, ran his right hand into his hip pocket "and
drew out slowly, it seemed to hitch in some way, a pis-
tol," and the voice behind her, continuing said: "You
dastardly coward, you cowardly scoundrel, hiding be-
hind that woman, are you? Get out from behind that
woman!"

Mrs. Eastman further says that, as Senator Carmack
drew the pistol out of his hip pocket he had hold of it by
the barrel, "his thumb crumpled under the barrel," and,
just as the voice behind her said, "Get out from behind
that woman," she jumped to the gate, and Senator Car-
mack, with his eyes still fixed on some one back of her,
moved eastwardly toward the curb, and as she jumped
into the gate from her position about the center of the
pavement, and several feet north of the gate, the first

shot was fired from "her rear as she stood on the pave-
ment;" that this shot was fired simultaneously with her
leap; that she got into the gate, turned around, and,
raising her hands, thought for a moment that Col.
Cooper was Dr. William White, whom he somewhat re-
sembles, and she said, "Dr. White, for God's sake, don't
shoot, don't, don't," and while she was looking north-
ward at Col. Cooper and making this appeal, "the other
two of the only three shots" which she heard followed,
and looking to her right and toward the east she saw Mr.
Carmack "reeling out, lurching forward," and his hand
touched the south side of one of the posts, and he pitched
headlong into the gutter, and then, for the first time, she
saw a young man, whom she now knows to have been
Robin Cooper, standing "just southward of where Mr.
Carmack must have stood just before he lurched forward
and out into the gutter;" that this young man was some-
what nearer the curb than the Shanklin wall or fence
and about three or four feet south of the posts. She says
that Mr. Carmack lurched from the pavement northeast,
and when he fell his head was above the posts, and his
feet south of the posts.  She did not see a pistol in the
hands of Col. Cooper, or Robin Cooper.  Nevertheless,
after jumping into the gate and looking around at Col.
Cooper, she saw his right arm stretched out in the at-
titude of one going to fire a pistol. She admits that she
was greatly agitated, and that after Mr. Carmack had
fallen she turned to Col. Cooper and said:

"I told him that he was brutal; that he was a mur-
derer; that he had taken advantage of my presence; that

he hadn't given this man a chance, not a single chance; that I would rather be the dead man in the gutter than to have been him"—to which Col. Cooper made no reply, though he was near and looking straight at her.

Col. Cooper says that when he approached Senator Carmack, just as the latter was passing Mrs. Eastman, he addressed him, "Mr. Carmack," and he (Carmack) threw his head up, and in an instant drew a pistol, and jumped back behind Mrs. Eastman, and that he (Cooper) said: "It is damned cowardly to get behind a woman with a pistol in your hand." He denies that he said, as he approached: "Well, here you are all right; I have the drop on you now."

He further says that, immediately upon Senator Carmack's moving backward and eastward toward the telephone poles, Robin Cooper passed between them to the inner side of the pavement, and the firing began; Mr. Carmack shooting the first two shots between the two poles. He says he did not draw his pistol until Mr. Carmack fired, and then he drew it to kill him if he had killed Robin, and that he had no opportunity to shoot, because Robin got between him and Mr. Carmack simultaneously with the drawing of the pistol by the latter, and that he did not shoot.

Robin Cooper testifies that his father did not address Mr. Carmack as stated by Mrs. Eastman, but simply said, "'Mr. Carmack," and that immediately the latter drew his pistol and moved toward the telephone poles; that he rushed between Mr. Carmack and his father to the inner side of the pavement, and rather below the

poles, Mr. Carmack having in the meantime moved out into the gutter behind the poles and firing between them twice, one shot taking effect in his shoulder, the other passing through his sleeve, and that he then drew his pistol and fired three times, the last while Mr. Carmack was erect and facing him, and, seeing him sinking, he ceased to fire; that he did not draw his pistol until Mr. Carmack had fired twice.

Miss Elizabeth Fort, who was in the Polk Flats about ninety feet from the place of the tragedy, sitting by her window, and who was accustomed to the use of pistols, testified that there were five shots; "first, three came almost at once, came very rapidly, then another, and between the last shot and the next to the last there was a little more space. I, of course, do not know how much."

She was asked if the tone of the first three shots was the same or different, and answered:

"Sounded as the same shot, as almost one shot— sounded from the same pistol as one shot."

There is other testimony to the effect that there were fired, first, two shots, one after the other similar in sound, and then three of a different sound, fired in rapid succession, tending to support the Coopers in their contention that Mr. Carmack first fired two shots from his Smith & Wesson pistol, and then Robin Cooper fired three from his Colt's automatic pistol.

Senator Carmack received three wounds in the encounter, two in the left side, one just below the left nipple, which ranged downward and to the right, one

just below the left shoulder, which also ranged downward and to the right, and the other slightly to the left of the median line in the back of the neck, which passed through the spinal cord and fell out of his mouth while lying in the street. There were at least five shots fired. There were two empty shells in Mr. Carmack's pistol, evidently just exploded.

John D. Sharp, who was tried with the plaintiffs in error, testified in the case, and the tendency of his testimony is to corroborate the Coopers; but it appears from the testimony of Miss Mary Skeffington, the state librarian, that he did not see the shooting. Evidently, when the Coopers started towards Mr. Carmack, Mr. Sharp started in the other direction, and could not have seen what took place. Miss Skeffington, who was coming south on the same side of Seventh avenue and met Mr. Sharp a short distance from Union street, says that, while Mr. Sharp was in sight coming towards her, she heard the pistol shots at the scene of the tragedy, and she asked him, "What is that?" That he replied, "That is shooting." She asked, "Who's shooting?" He replied, "That is Col. Dunc Cooper shooting Senator Carmack." Miss Skeffington is not in any way attacked. Her testimony not only contradicts Mr. Sharp in his statement that he saw the tragedy, but it also shows that he knew of the hostility of Col. Cooper to Mr. Carmack, and believed, from what he had just seen and heard, that his object in crossing the street and intercepting Mr. Carmack was to attack him.

In addition to the testimony of Miss Skeffington, it is also shown that the evening was so murky and smoky that he could not have seen what did take place at the distance he was from the combatants.

Mr. Sharp went almost immediately down to Church street, when he was asked by some gentlemen, among them Mr. Ed Thomas, clerk of the state senate, what he knew about the tragedy, and he replied that he knew nothing. He is also shown to have been very hostile to Mr. Carmack, and the political friend and ally of Col. Cooper. His testimony is also greatly shaken and weakened by his cross-examination, in which he was unable to sustain himself. The jury evidently discredited him and discarded his testimony, and their action cannot, under the rule, be disregarded by this court.

A witness by the name of Benning was also introduced by plaintiffs in error, who testified to some things connected with the meeting of the Coopers and Mr. Carmack; but he is so thoroughly discredited and impeached that no further notice will be taken of his testimony.

There is much in the record in regard to the relative positions of the three combatants, the order in which the several shots were fired, and the exact location and range of the wounds received by Senator Carmack and Robin Cooper; but we do not consider it material to go into these matters.

Much has also been said in regard to who fired the first shot; but this is an inquiry which we need not now pursue.

The contention of the State is that Col. Cooper approached, intercepted, and assaulted Mr. Carmack as stated by Mrs. Eastman, with the intention of executing the threats he had made, because of the use of the former's name in the editorial in the *Tennessean* that morning; and that the homicide committed, regardless of whether Mr. Carmack drew his pistol first or not, or the shots were fired by Col. Cooper or his son, the latter having intervened in behalf of his father, and therefore occupying before the law the same position, was murder, and the verdict and judgment rendered against them was and is, upon the facts, correct.

The contention of Col. Cooper and his son is that the former had relented from his announced determination to kill Mr. Carmack, and approached him for the purpose of effecting a peaceable settlement of their differences, and that Mr. Carmack made a deadly assault upon them, or Robin Cooper, which justified them, or the latter, in taking his life, and thus that their plea of self-defense is sustained.

The jury trying the case found the facts as contended for by the State, and against the contention of plaintiffs in error, and the verdict was approved by the presiding judge.

The question now presented is whether this court, considering the entire record, can say that the evidence preponderates against the finding of the jury, and in favor of the theory of the plaintiffs in error.

Before we restate the facts which the State relies upon to support its contention, we call attention to the three

witnesses, Mrs. Eastman, Mr. Cooper, and Robin Cooper, who were present and testified to the immediate facts of the tragedy.

Mrs. Eastman appears in this record to be a lady of culture and refinement, sustains herself well under cross-examination, and there is no attempt whatever to attack or discredit her. She has no interest in the case, or motive to misstate or distort what she saw and heard.

On the other hand. Col. Cooper and Robin Cooper had the greatest interest that men could possibly have, and, while under the statute they are competent witnesses, the jury were properly instructed that in considering the weight of their testimony, and the credit to be given to it, they should look to their interest in the case.

It is also a rule that issues of fact are not to be decided in accordance with the number of witnesses arrayed upon either side; but the credibility of the witnesses, their interest in the case, the rasonableness of their testimony, and its consistency with other facts, are all to be considred, and often more weight is to be given to one witness than to several testifying to the contrary.

We will briefly review the facts which are found to be established in this record.

Col. Duncan B. Cooper had for months cherished bitter enmity towards Senator Carmack. The night before the tragedy he had expressed his enmity to Mr. E. B. Craig, the personal and political friend of Senator Carmack, denouncing the latter in severe terms, and stating that, if his (Cooper's) name again appeared in the

columns of Carmack's paper, one or the other must die. This enmity and threat, with Col. Cooper's knowledge and consent, was then communicated to Sentor Carmack. Whatever the language of the threat was, Col. Cooper and Senator Carmack both understood it to be, and it was, a threat to kill the latter if Col. Cooper's name was again used by him in his paper; and on its being communicated, and Senator Carmack's refusal to be intimidated, they both armed themselves, the former to execute his threat, the latter to defend himself.

Col. Cooper's name was used in a humorous editorial the next morning. The occasion for the execution of the deadly threat had happened. Col. Cooper at 9 o'clock in the morning told his son of what had occurred, and was so violent in his language toward Senator Carmack that his son became greatly alarmed about a meeting between his father and Mr. Carmack. He searched for him upon the streets, and armed himself to take part in the conflict he apprehended. He communicated with his sister to use had efforts to quiet their father, and called upon the governor of the State for his aid in the matter in such terms that that high official left his office and searched the city for Col. Cooper, in an effort to prevent the threatening homicide.

Mr. J. C. Bradford and the governor had an interview with Col. Cooper about 12 o'clock, and persuaded him to do nothing in the matter, while Mr. Bradford made efforts to secure the services of some one to adjust his differences with Mr. Carmack. A meeting was held at Mr. Bradford's office at 3 o'clock, Gen. Brown being

present by request, and there Col. Cooper was induced to agree not to make another threat in writing by sending the note which he had prepared. The violence of his language and his determination to kill was such as to arouse all this anxiety and these strenuous efforts upon the part of these prominent gentlemen. When he left that office to visit the Governor's Mansion, his son felt it necessary to accompany him. Col. Cooper says he objerted, but, knowing the boy as he did, he expected him to do so, which is inconsistent with the theory that he did not expect to meet or attack Senator Carmack. Both were armed. The threat communicated to Senator Carmack the night before had not been withdrawn, and he had no evidence that Col. Cooper had changed his deadly purpose. When Robin Cooper saw Senator Carmack at a distance, he said to Mr. Sharp, "'Don't let papa see Mr. Carmack." He knew his father's deadly purpose, and felt that it would be executed if he saw the object of his enmity. He did not call upon Mr. Sharp to prevent Senator Carmack from seeing his father for fear of an attack upon him. He knew who would be the aggressor. When Col. Cooper discovered Mr. Carmack and pulled loose from his son, the latter appealed to him not to go, clearly because he knew what would follow in his father's state of mind. Mr. Sharp, evidently from what he had heard and seen, without looking towards the tragedy, when he heard the shots, stated to Miss Skeffington, "It is Col. Dunc Cooper shooting Senator Carmack."

126 Tens.—6

Col. Cooper walked up to Mr. Carmack, screened from his view by a lady, and said, "Well, here you are all right; I have the drop on you now," and when the latter, surprised, jumped back, denounced him as a coward, hiding behind a woman.

Mrs. Eastman says the shooting began immediately. She further testifies of the manner of the meeting as follows:

"The first thing was the movement of Mr. Carmack, and the expression of his face. He had had a perfect look of good fellowship and comradeship and pleasant anticipation of a talk up to that time. Then the face changed instantly, when the voice behind me broke in with, 'I have the drop on you now.' "

When asked how long it was from the time she saw the pistol reversed in Mr. Carmack's hand until the firing commenced, she answered:

"It wasn't a second scarcely. . . . Mr. Carmack, as he stepped out this way, still had the pistol. The last sight I saw of it was while employed in his hand this way. I was the fraction of a second making this whirl into this gateway, and the shots followed each other immediately, and Mr. Carmack was dead."

When asked on cross-examination:

"Who did you expect to do the fighting?" She answered:

"I expected the man who called him a coward in my rear, and told him to get from behind a woman, was going to do it on the one hand, and I presumed that Mr. Carmack was going to defend himself."

Cooper v. State.

Then she was asked why she did not beg Mr. Carmack not to shoot, instead of appealing to Col. Cooper, and she replied:

"Because Mr. Carmack was standing a minute before oblivious of everything but myself, smiling at me, and I knew that he was not fighting, he wasn't in a fighting mood, and the voice attracted his attention, and was in a way an assault."

And then, again:

"I didn't think of asking him not to shoot, because he was not the aggressor."

These facts, if not explained, or overcome by other testimony, undoubtedly make out a case of murder. Every element of the crime is present. It is immaterial, under these facts, whether or not Mr. Carmack was the first to draw and fire his weapon. Col. Cooper was the wrongful aggressor. All his conduct unquestionably made a case which warranted Mr. Carmack in believing, and it is clear that he did believe, that his life was in danger and about to be taken, and he had the right under the law to kill his adversary in his own defense. He was not, upon the sudden appearance of Col. Cooper, and his statement that he had the drop on him, after what had passed, required to wait for him to draw or fire his pistol; and, this being true, the Coopers had no right to act in self-defense, without first in good faith withdrawing from the deadly assault, real or apparent, which their conduct clearly and unmistakably indicated they were making upon Mr. Carmack.

We will refer to the authorities upon this question hereafter in this opinion.

The testimony which plaintiffs in error rely upon to overturn the case made out by the State is that Col. Cooper, in the office of Mr. Bradford, had agreed not to repeat the threat communicated through Mr. Craig, in writing, in a milder form; that he was on Seventh avenue for another purpose, that of visiting the governor; and that upon seeing Mr. Carmack he was seized with a sudden impulse to go to him in person and effect a settlement of their difficulties (there is no denial of all the other facts relied upon by the State occurring before this time); that, when he came upon Mr. Carmack suddenly behind a lady, he did not say that he had the drop on him, or draw a weapon, but addressed him as "Mr. Carmack;" and that when the latter drew his pistol and shrunk back, as he must have expected him to do upon such a sudden meeting, after what had occurred, he denounced him in substance as a damned coward; and the testimony of himself and Robin Cooper is that Mr. Carmack fired two shots at Robin Cooper before they drew their weapons, and thus that they acted alone in their proper and necessary self-defense.

Can this testimony of Col. Cooper and Robin Cooper, vitally interested as they are, even if it be corroborated by that of Mr. Sharp, a prejudiced witness, that Col. Cooper suddenly, as he was crossing Union street, upon seeing Mr. Carmack, forgot his deadly hostility and changed his determination to kill Mr. Carmack to a desire for a friendly interview, turned from his course,

crossed the street, and intercepted and surprised him, with no hostile intention, outweigh all the facts we have stated, tending to show the contrary?

We are compelled to say that it cannot. The jury, the triers of the facts, and whose special province it was to pass upon the credibility of witnesses and to weigh their testimony and settle conflicts in the evidence, have said by the verdict of guilty that the State's contention to the contrary is established by the evidence beyond a reasonable doubt.

Their story is inconsistent with the deadly purpose Col. Cooper had announced the night before, which he announced that morning to his son and daughter, and to prevent him from carrying into execution some of the most prominent men in the State were called on to interfere. It is inconsistent with the fact that father and son continued carrying arms, and that the latter was accompanying his father with the expectation of a difficulty, with the desire of the son that his father might not see Mr. Carmack approaching, and with the statement of Mr. Sharp of what was occurring when he heard the shots behind him. It is inconsistent with the character of Col. Cooper, and contrary to the common experience of men in such affairs.

Mr. Cooper's evidence on the trial conclusively shows that he intended to do that which would provoke a difficulty, which carries with it the necessary implication and conclusion that he would execute his deadly threat if opportunity was offered.

He says of the meeting:

"The explanation was that I intended, and the purpose of my meeting Mr. Carmack on the street that evening was, to expostulate against this, and to tell him that I would expose his own private and personal life if this continued against me any further."

He was asked:

"Q. Why did you say that the town wasn't big enough to hold you both?"

And answered:

"A. It wouldn't have been big enough after I published that, I thought."

He was further cross-examined:

"Q. So that you were going on a peaceful mission, for the purpose of saying to a man to whom you had sent this communication, with the fixed purpose to say to him, 'if you don't stop, I am going to expose your personal life.' That was the peaceful mission you were on, wasn't it?

"A. I was not on a peaceful mission. I was on a mission to stop this attack upon me."

"Q. Peace wasn't what you were after?

"A. I was not after war, either."

Can any one believe that he thought, after the threat that had been communicated, and the publication that had been made in the morning paper, that his sudden appearance before the man he had threatened to kill, personally demanding that he cease the use of his name, and threatening to expose his personal and private character

if he did not, which was not stated in the note, would be less offensive and less likely to bring about a deadly encounter than the sending of the note which he had agreed to withhold?  According to his story, he was doing a hundredfold more than he says he had agreed not to do in the office of Mr. Bradford.

Col. Cooper evidently expected Mr. Carmack to be armed, and to have a difficulty with him when they met.

In his testimony he said:

"Well, I have always believed that a man who kept a fighting tongue should keep a fighting body."

And, further, when asked, if he had received a message from a gentleman that if he did a certain thing again the town would not be big enough to hold them both, to explain how he would have construed that language, he started to answer, and, when his counsel objected, said:

"I want to answer that so bad."

The objection being overruled, he continued:

"I would either have quit offensively using it, or I would have prepared myself to meet him."

On the same point he said:

"I would prepare myself for any trouble that might come."

Further inconsistencies are found in the extraordinary statement of Col. Cooper that he only drew his pistol to shoot Mr. Carmack in the event he killed his son, and that of Robin Cooper that, notwithstanding that he went down to help his father and saw Mr. Carmack draw his pistol, he did not draw his own, or fire, until two shots had been fired at him.  These statements

are unreasonable and incredible in the light of other facts.

Again, Mr. Carmack had received notice that Col. Cooper would kill him on sight. There was no hostility between him and Robin, and it is most improbable, if Robin had not drawn a pistol, and was not endeavoring to shoot him, that he should bring his pistol to bear upon the son, with whom he had no quarrel, instead of upon the father, who, he had every reason to believe, was then seeking to destroy his life, and whom alone he saw when he drew his weapon.

Col. Cooped states he had no weapon in his hand when he accosted Mr. Carmack. Mrs. Eastman says, when she first turned around, he had his hand extended; but she did not see a pistol, nor did she see the one Robin Cooper had. It is true, she saw Mr. Carmack draw his pistol; but then there had been no cause for excitement, as there was when she turned from the gate and looked at Col. Cooper. She also says the firing began immediately after Mr. Carmack drew his pistol. And, again, if Col. Cooper and his son did not have weapons in their hands, why was it that Mr. Carmack jumped backward, drew his own weapon, and moved toward the telephone posts, and began to fire his pistol? He had made no threats, and his whole conduct, from the time he left his office to the moment when Col. Cooper first accosted him, was one of peace and quietude; and it is not probable that he had it in his mind to make a deadly attack upon any one, while in the act of courteously lifting his hat to a lady. Clearly, there was some action upon the part of the

Coopers that justified him in believing his life was in danger, and that it was necessary for him to draw his weapon in self-defense.

Was Col. Cooper's manner of approach, and his denunciation of Mr. Carmack as a damned coward, indicative of a peaceful intention? Would he have not, if his story was true, instead of suddenly accosting Mr. Carmack while he was addressing a lady, waited a few minutes, and, when he saw Mr. Carmack draw his weapon, would he not, instead of denouncing him, have said, "Mr. Carmack, I am not here for hostilities; I want to speak and reason with you about our troubles?"

We think that it must be held that the contention of the State that Col. Cooper crossed the street and intercepted Mr. Carmack for the purpose of making a deadly assault upon him is consistent with every other material fact in the case, and sustained by the preponderance of the evidence, and that Col. Cooper's statement that he approached Senator Carmack merely for the purpose of demanding that the publications cease is inconsistent with such facts, and unsupported by the weight of the proof.

Col. Cooper evidently compassed the death of Mr. Carmack that day. Soon after he reached Dr. Fort's infirmary near the scene of the tragedy, and to which Robin Cooper was carried, he telephoned to his daughter, Mrs. Burch, saying:

"Daughter, it is all over; Robin has killed Carmack."

In other words, "The deed is done."

We think, however, even if the contention of the plaintiffs in error upon the facts as to the meeting was sustained by the record, this assignment of error must be overruled. That is to say, if it be conceded that Col. Cooper entertained bitter enmity and hostility toward Mr. Carmack for months past, and had become greatly enraged because of the article appearing in the *Tennessean* upon Sunday morning; that he expressed this bitterness and animosity to Mr. Craig, and threatened, if his name was again used in that paper, that one of the two, Cooper or Carmack, would have to die, and this Col. Cooper knew, had been communicated to Mr. Carmack, and the latter refused to agree not to again use Mr. Cooper's name, who, when this was related to him, became more angry and enraged, of which Mr. Carmack was also informed; that Col. Cooper's name did appear the next morning in the *Tennessean* in a humorous and sarcastic article; that Mr. Carmack was informed that Mrs. Burch, the daughter of Col. Cooper, had stated, in consequence of a conversation with her father, that the latter would kill him on sight; that Col. Cooper, while crossing Union street, upon discovering that Mr. Carmack was approaching, suddenly changed his intention to kill him, and, without notifying Mr. Carmack, resolved to have a personal interview with him, and demand that he cease the use of his name in the columns of his paper, under penalty of exposure of his personal and private life, and with this intention uncommunicated, crossed the street, advanced upon Mr. Carmack under cover of a gentleman and lady, and suddenly appeared

before him and addressed him, "Mr. Carmack," and when the latter shrunk back and drew his pistol, with his (Cooper's) hand extended, denounced him in substance as a damned coward, and Mr. Carmack opened fire upon him and his son Robin, who in the meantime had intervened, and who then, and not until then, returned the fire and killed him—they would not be entitled to rely upon the right of self-defense.

The conduct of Col. Cooper, in the light of his enmity and threats against the life of Mr. Carmack, and his action and words at the time, constituted an overt act upon his part which authorized Mr. Carmack to believe that Col. Cooper was about to execute his threat, and that he was at his hands in danger of great bodily harm or death, and would have justified him in slaying his adversaries.

In other words, Col. Cooper's conduct made him the wrongful aggressor, which justified the action of Mr. Carmack and deprived the former of his right of self-defense.

There can be no doubt, upon Col. Cooper's own testimony, that Mr. Carmack, when he first saw Col. Cooper behind Mrs. Eastman with his hand outstretched, had reasonable grounds to believe, and did believe, himself in danger of death, and that his belief was confirmed when Col. Cooper denounced him as a damned cowardly scoundrel, and Robin Cooper suddenly appeared from the other side of him, evidently for the purpose of aiding his father.

We find this concession in the brief for plaintiffs in error:

"It might very well have appeared to Senator Carmack, in view of the threat which he had been informed that Col. Cooper had made to kill him on sight, that he was being attacked, and was therefore warranted by the unexplained approach of the defendants in opening fire on Robin Cooper, and in a certain sense we concede that by crossing the street and going down to meet him the defendants did provoke the difficulty; that is, that the killing would not have occurred at that time and place if the defendants had not so crossed the street."

There is no doubt that, under the law, a case was presented which would have justified Mr. Carmack in killing Col. Cooper, conceding the contention of the latter, upon the belief that it was necessary to protect his life. He had reasonable and well-founded ground for such belief.

In Allsup's Case, 5 Lea, 362, the doctrine of self-defense is stated in these words: "The law has been long settled on this subject in our State, and is that if a party is in real or apparent danger of death or great bodily harm, or believes himself to be so, as evidenced by circumstances justifying that belief as the facts appear to him, and he in good faith, under such apprehension, kill his adversary, it is justifiable homicide."

What is such an overt act as will authorize a party to slay his adversary in self-defense always depends upon the facts of the case on trial.

In the case of *Cummings* v. *State*, 99 Ga., 662, 27 S. E., 177, cited in *State* v. *Summer*, 55 S. C., 32, 32 S. E., 771, 74 Am. St. Rep., 725, it is said:

"An overt act, that will justify a defendant in assuming that his own life is then in danger, must depend upon the circumstances of each particular case."

The court then proceeds to state some hypothetical cases, one of which is as follows:

"Or cases might occur where the fact that the deceased met the defendant under the particular circumstances and in connection with previous facts might show that the deceased sought the meeting and with a deadly purpose, and be in itself an overt act.

"Accordingly it has been held that a person about to be attacked is not bound to wait until his adversary gets 'the drop on him' before he can take steps to defend himself, but he may safely act upon appearance and kill in self-defense."

A leading case in Tennessee upon this subject is that of *Jackson* v. *State*, 6 Baxt., 458, where Judge Robert McFarland, speaking for the court, said:

"It is said there must have been an overt act of the deceased at the time, showing his deadly purpose; but what is an overt act, and who is the judge whether or not there was such overt act? If the parties, previous to the fatal meeting, had been friends with no hostile feeling, the deceased a person with mild temper, certainly an overt act upon the part of the deceased, that would justify the defendant in taking his life upon the assumption that it was necessary to do so in order to

save his own, ought to be some demonstration of a very decided character, indicating a deadly or dangerous purpose. On the other hand, if the parties were deadly enemies, and the deceased had previously made attempts or threats against the life of the defendant, and was known to be a person of violent and dangerous character, likely to execute his threats, then in such case, upon the parties meeting, the defendant would not necessarily be bound to wait until his adversary had actually drawn a deadly weapon, or was in the very act of striking. The necessary overt act in the one case might be different from the other. It is difficult to lay down a rule strictly covering all cases. The circumstances of the cases differ so widely. The overt act that will justify the defendant in assuming that his own life is then in danger must depend upon the circumstances of each particular case. Cases may be readily supposed, and no doubt in reality often occur, when to require a defendant to wait until there would be but little chance left of successful defense. Cases where the deadly purpose of the party is so fixed and determined, his character so reckless and bloody, his use of deadly weapons so expert and skillful, that to wait his attack would be to wait almost certain death, and the result of the encounter would often depend upon which was the quicker in action. In cases of this character, where the parties meet, a very slight movement might justify either party in acting at once upon the assumption that his life is then in instant peril, or cases might occur where the fact that the deceased met the defendant, under the particu-

lar circumstances and in connection with previous facts, might show that the deceased sought the meeting with a deadly purpose, and be in itself an overt act."

Plaintiffs in error rely upon the case of *Foutch* v. *State,* 95 Tenn., 713, 34 S. W., 423, 45 L. R. A., 687; but it does not apply to the facts in this record. What occured at the time Foutch killed Malone is not stated in the opinion; but it does appear that, instead of these parties being hostile to each other, upon the day of the homicide Foutch had acted as mediator between his sister and Malone, and was upon friendly terms with the latter. What is there said must be confined to the facts of that case.

The contention of plaintiffs in error is that a man of known determined character, bitterly hostile to another, whose life he has threatened to take if a certain thing happens, which threat is communicated, and the thing immediately happens, can, within a few hours thereafter, approach him for the discussion of their differences, without communicating his change of mind, under such circumstances as justified his enemy in believing that the deadly threat was about to be executed, and his life was in danger, and, when the latter undertakes to defend himself, slay him with impunity.

Such a doctrine would be monstrous. It is not the law of Tennessee. This is admitted. In brief for plaintiffs in error, it is said:

"We do not deny the general rule that one who takes the life of his adversary in a conflict in which he is the aggressor, or which is provoked or brought about by

his unlawful act, is not excusable on the ground of self-defense.

"This proposition is too well settled to be questioned."

In *Rippy* v. *State*, 2 Head, 219, Judge Caruthers, in treating the doctrine of self-defense, said:

"It is scarcely necessary to remark that a real or apparent necessity, brought about by the design, contrivance, or fault of the defendant, is no excuse."

In *Irvine* v. *State*, 104 Tenn., 148, 56 S. W., 848, it is said:

"The trial judge in this case, with unusual ability and care, instructed the jury. After stating in general terms the respective contentions of the State and the defense, he said to them in effect, if they found that Warren and Drew Irvine, or either of them, made so violent an assault upon the deceased as to create in his mind a reasonable and well-founded apprehension that he was in imminent danger of death or great bodily harm, and, acting under this apprehension, he, with his pistol, made a counter deadly assault upon them, they would not be justified in taking his life, unless first they had abandoned the combat and notified, by words or acts, their adversary that they had done so, and, if they had not time to do this, then, being at fault, they must take the consequences; for as the deceased, acting upon the appearances created by their wrongful acts, would have been justified in slaying them, the defendants, whose fault created these appearances, could not make the legal acts of the deceased looking to his own defense, a justification for the homicide."

This was held to be correct.

And again, in the same case, another instruction held sound was in these words:

"On the other hand, with equal emphasis and intelligence, he told the jury that where the assailant, by the violence or fierceness of the attack, put the assailed party in danger of felony to life or limb, or gave him reasonable ground to suppose that he was in such danger, then the latter had a right to draw a deadly weapon and slay, if necessary, and the former could not kill in his own defense, unless he had first withdrawn from the combat, and by word or deed given the assailed notice of such withdrawal."

In *State* v. *Hecker,* 109 Cal., 463, 42 Pac., 312, 30 L. R. R. A., 407, it is said:

"For, as the deceased, acting upon the appearances created by the wrongful acts of the aggressor, would have been justified in killing him, he whose fault created these appearances cannot make the natural, legal acts of the deceased, looking to his own defense, a justification for the homicide. Before doing so, he must have destroyed these appearances, and removed, to the other's knowledge, his necessity, actual or apparent, for self-preservation.

"And if the circumstances are such, arising either from the condition of his adversary, caused by the aggressor's acts during the affray, or from the suddenness of the counter attack, that he cannot so notify him, it is the first assailant's fault, and he must take the consequences."

123 Tenn.—7

In the case of *Levy* v. *State,* 28 Tex. App., 203, 212, 12 S. W., 596-598, 19 Am. St. Rep., 826, the insistence of the defendant was that he was seeking an interview on a peaceful mission. In the course of the opinion the court said:

"If his intentions were peaceable and his mission an innocent one, why not apprise the deceased of it; and especially so when, if it be true, he saw deceased mistaking his motives and purposes and apparently preparing to draw a deadly weapon upon him? Under these circumstances, can there be the slightest doubt that the defendant intentionally provoked the occasion which produced the killing? If so, there can be no self-defense in this case."

In *Allen* v. *State,* 66 Miss., 385, 6 South., 242, the facts stated in the opinion are as follows:

"The deceased was a 'section boss' on the Illinois Central Railroad, and the accused was one of the hands working under him. On the morning of the killing the deceased had a difficulty with the accused, and cursed him and exhibited a pistol. The accused left the road, and soon afterward the deceased also left, returning in an hour or two with a gun loaded with 'buckshot.' He walked up the track, looking down on the ground, and while near the laborers engaged in work, and in a deep cut, he was accosted by the accused, who was on the bank some 40 feet above him, who said, 'Mr. Hadnott, you cursed me this morning and had a pistol, and now you have a gun.' Deceased immediately turned in the direction of the accused and raised his gun. Where-

upon, the accused shot and killed him. No witness for the State or the defendant had given any evidence of threats made by the accused at the time he left the road in the morning.

"He testified as a witness in his own behalf, and according to his own evidence, the verdict is manifestly right.

"Accepting his account of the killing this is what occurred: After the difficulty in the morning, he went to his home, loaded his shotgun, and returned to the place where Hadnott was, to compromise the difficulty, taking the loaded gun along to protect himself, as Hadnott, he says, was 'very mad when I left and a high-tempered man.' He did not go along the road, for fear Hadnott would shoot him on sight, but went on the bank, and accosted him in the words given by the State's witness. He stood with his gun on his right side, muzzle downwards, and, upon calling to Hadnott, he (Hadnott) turned and presented his gun, whereupon the de-defendant, he says, leveled his gun at his side, and without raising it to his shoulder, or taking any aim, let her go.' There can be but one construction of this conduct, and that is that the appellant purposely concealed his approach from Hadnott, secured a position of advantage, with his gun ready for instant use, called to the deceased in language not of compromise nor of peace, and, as he turned to protect himself, fired upon him. Having invited the danger in which he stood, it was murder to kill his adversary, even if his own life was in peril."

In *Thomas* v. *State,* 61 Miss., 65, according to the defendant's statement of the facts, there had been bitter animosity between him and the deceased, mutual threats of killing having been made. A compromise and settlement had been brought about, but after its acceptance by both sides, the deceased had expressed an intention of killing the defendant.

"The defendant states that, while sitting at one end of the gallery which extends along the front of the building, he suddenly perceived the deceased sitting on the steps of the gallery at the other end, his back turned toward the building. Deceased was engaged in conversing with a gentleman sitting near him on the steps. Defendant says that, as soon as he recognized the deceased, he drew his pistol from his hip pocket, placed it in a pocket of the linen duster coat which he was wearing, arose from the seat, advanced towards the deceased, until he was within a few feet of him, and then, halting behind and a little to the left of him, said, 'Now I am ready for you to shoot.' Deceased instantly arose from his seat, throwing his hand behind or to his side as he did so, and the defendant at once fired. The ball struck deceased in the back, two inches to the left of the back bone. He sprang forward off the steps, ran a distance of twenty-five yards and fell to the ground. He was taken into the house, and died the next day. This is the version given by the defendant."

The court said:

"He who by his own conduct compels another to get ready for self-defense cannot claim that the responsive

Cooper v. State.

preparation has put his own life in danger, and thereby justified him in stopping the preparation by slaying him who was making ready for a combat into which he had been forced. Taking the defendant's own testimony, therefore, as absolutely true, the verdict was manifestly correct, and any other would have been clearly against the law and the facts."

In *George* v. *State,* 145 Ala., 41, 40 South., 961, 117 Am. St. Rep., 17, the court said:

"The defendant did not have to wait until a felonious assault was made upon him. If the other elments of self-defense existed, and the deceased had made threats against him which had been communicated to him, he had the right to act upon any overt act or hostile demonstration which may have led to the honest belief that he was in imminent peril, but which said act or demonstration may not have amounted to a felonious assault."

In another case it is said:

"Where the deceased had published in his newspaper articles reflecting on the accused, and the latter, seeing the deceased on the street, crossed it and addressed him, when the fatal quarrel took place, the jury must determine whether the accused was guilty of murder, and, in considering the intent of the accused in crossing the street and addressing the deceased, take into consideration the existing feeling and apprehension of the parties, and if they find that the accused calculated thereon to bring about a personal difficulty, he being prepared and intending to make use of it, if it occurred, the killing is not justified as self-defense, and is murder." *Baker* v.

*Kansas City Times,* Fed. Cas. No. 773, cited in Century Digest, vol. 26, p. 242.

Counsel for plaintiff's in error cite a number of cases from other States upon this question, all of which we have examined; but we find the facts of them so different from those of the case at bar they have little or no application, and it will serve no good purpose to discuss them at length, and we will not do so.

Every man is bound to contemplate the reasonable and natural result of his conduct, and must answer for such result, especially when the injured party is without fault. Col. Cooper knew, as we have shown, that his appearance there would cause Mr. Carmack to believe that his deadly threats were about to be executed, and to act in self-defense, and he cannot rely upon the conduct which he induced to justify him in bringing about the death of his enemy.

A strong argument is made to sustain a separate defense supposed to exist in favor of Robin J. Cooper, because of the claim that he tried to prevent his father from assaulting Mr. Carmack, and was only present in obedience to a natural filial desire and duty to protect his father in the event of a hostile meeting. It is conceded that he did intervene to help his father, and that he fired the shots that caused the death of Mr. Carmack, and there is much to show that he did all he could to prevent a hostile meeting.

The general rule is that one who intervenes in a difficulty between others stands with, and must accept all the responsibility and liability of, the party for whom

he intervenes. We will not discuss this question here. It is the subject of the thirteenth, fourteenth, and fifteenth errors assigned, and will be treated when we reach those assignments.

This (the first) assignment of error must be overruled.

The second assignment is directed to a special portion of the charge. Before quoting the excerpt from the charge, it is necessary to say that, after the trial judge had stated the theory of the State, he said: "Now, gentlemen, if you believe this insistence to be true and fully warranted by the facts, and are satisfied of the same beyond a reasonable doubt, it would be your duty to convict all of the defendants for the crime and felony of murder in the first degree, either with or without mitigation." He then added the following matter, which is objected to:

"Or, if you further believe from the facts that Robin and John D. Sharp were standing on the corner of Union street and Seventh avenue North, as above stated, and saw Senator Carmack coming, and that defendant D. B. Cooper came up and made inquiries as to what was the matter, and, looking back, saw Senator Carmack, and thereupon determined to go and meet him and have a talk with him, and, if he, the said E. W. Carmack, resented the talk on his approach, that he, the said D. B. Cooper, intended, if necessary, to take his life, or intended to speak with him or accost him, intending to bring on a difficulty, in order to give a reason or excuse for shooting and taking the life of the deceased, E. W. Carmack, and that the defendant Robin Cooper

crossed the street with his father, or a short distance behind him, intending to second him and assist him in carrying out his purpose or purposes, as above described, and entered into the fight willingly and under the conditions above described, he would be equally guilty with the defendant D. B. Cooper, and you would be warranted in finding both of them guilty of murder in the first degree."

Then immediately follows:

"Or, gentlemen, if you believe, taking all the circumstances and conditions into consideration which had traspired between the parties, that is, the deceased, D. B. Cooper, and Robin Cooper, that the said D. B. Cooper had threatened the life of the said Carmack, that is, that he was going to kill him, or one or the other of them must die, or that the town would not be big enough to hold them both, and that he had written a note for the purpose of sending the said E. W. Carmack, stating in substance what had already been sent as a message by Mr. Craig to the deceased, and that he did not send the note at the solicitation of friends, but, on seeing Senator Carmack, his intention to take his (Carmack's) life was revived, if he ever had it, and that he formed at that time a fixed purpose to carry that intent into execution, and crossed the street for that purpose, either to open a fight directly on their getting together, or having a conversation with him, intending thereby to bring on a fight, and, if the said E. W. Carmack resisted, to take his life, and that Robin Cooper was present intending to assist his father in any and all extremes

and under any and all circumstances, it would be for you to determine whether or not the approaching of Col. Cooper and the language used by him as he approached, if any was used, was such an overt act as would reasonably cause the deceased to believe that he, the defendant D. B. Cooper, was about to carry his alleged threat into execution, and that he was approached by both of them in this manner and form, and had reason to believe that his life was about to be taken or done some great bodily harm, in that event he would have the right to defend himself from the threatened attack.

"And if the defendants D. B. Cooper and Robin Cooper thus approached him, and he (Carmack) fired the first shot or shots under these conditions and circumstances, and they returned the fire, either one or both of them, and took his life and caused his death, in that event, gentlemen, the defendants could not avail themselves of the right of self-defense, unless there was something to show the deceased, either words or actions, that they had abandoned their purpose, if they ever had any, and did not mean to carry the alleged threats into execution; but whether there was or was not an overt act of the defendants D. B. Cooper and Robin Cooper is a matter for you to determine in the light of all the proof which the court has permitted the witness to state in your hearing for your consideration.

"In other words, if you believe from the facts that the defendants D. B. Cooper and Robin Cooper approached Senator Carmack on a mission of peace and for the pur-

pose of having a conversation, and for no other purpose, and that there was nothing in their conduct to indicate any other purpose, or that there was no overt act or word used on their parts which would warrant the conclusion that they intended to attack him, take his life, or do him any great bodily harm, in that event, if they were attacked by the deceased, they would have a right to use such means as were in their power for their self-defense, as above set out and described. But if they intended, as above stated, to talk to the deceased, and, if a difficulty ensued on account of the conversation, they intended to take the life of the deceased, if he made any resistence, in that event the plea of self-defense would not be available, and they would be guilty, and you would be warranted in finding them guilty of murder in the first degree, as above set out and described."

. Then, after stating in a narrative form the theory of defendants down to the point where they had reached the corner of Vine street or Seventh avenue and Union street, the charge continued:

"That as soon as the defendants John D. Sharp and Robin Cooper reached the corner of Vine street, or Seventh avenue, and Union street, Robin Cooper discovered the deceased, Carmack, on the opposite side of Vine street, coming north on Vine street in the general direction of them. Immediately upon Robin Cooper seeing Carmack, the deceased, and realizing that possibly there might be a meeting between Carmack and D. B. Cooper, and knowing, or believing, that said Carmack had not been informed of the determination that his

father had reached not to send him the note which he (Carmack) had been informed, through the witness Craig, the night before, that the defendant D. B. Cooper intended to send, and fearing that if they did meet that there would be a difficulty between them, or that the said Carmack would attack the defendant D. B. Cooper, the said Robin Cooper at once turned to his father, the said D. B. Cooper, and said to his father, his father being some twenty-five or thirty feet down the street, 'Hurry up, Papa,' or 'Come on,' or words to that effect, and thereupon said D. B. Cooper replied, 'All right, wait a minute;' that Robin Cooper stood there until his father came up, and that Robin caught him, defendant D. B. Cooper, by the arm, and turned him, said D. B. Cooper, away from the direction in which Carmack was coming, and up toward the direction of the Governor's Mansion, to which he (Cooper) was going, and as he was hurrying him across the street, there was something in his (Robin Cooper's) manner and his manifest anxiety to get his father across the street that caused him, the said D. B. Cooper, to turn around, and upon doing so he saw the said E. W. Carmack approaching; that up to this time he had no expectation and no thought and no idea that he would meet the said E. W. Carmack at this place.

"That neither he nor Robin Cooper nor John D. Sharp knew the habits of the said E. W. Carmack.

"That they did not even know where he lived, and that they had not seen him during that day, and consequently had no reason to expect or believe that they would see

him at this place at this time, and that their meeting here was purely an accident.

"That as soon as the defendant D. B. Cooper saw Carmack, he turned back from the way that they were going, and upon an impulse which suddenly came to him he started down in the direction from which Carmack was approaching, for the purpose of having a talk with him, and to demand of Carmack that he stop the further offensive use of his name in his paper, the *Tennessean*, and he started down in the direction from which Carmack was approaching, going diagonally across the street from about the northeast corner of Union and Vine streets, towards the entrance to the Polk Flats, on the opposite side.

"That his son, Robin Cooper, after hearing his father say that he was going over to have a talk with Carmack, after a few moment's hesitation, followed his father.

"That after the defendant D. B. Cooper had gone upon the sidewalk in front of the Polk Flats, and was within about ten or fifteen feet of Carmack, his son, Robin Cooper, being out in the street, but near the curbing, at a point about opposite D. B. Cooper, and as Carmack was in the act of passing Mr. and Mrs. Eastman, and just as he had spoken to them, which he did in the act of passing, defendant D. B. Cooper raised his empty hand, and, extending it in the direction of the deceased, addressed him, 'Mr. Carmack.'

"That immediately upon being thus addressed the deceased (Carmack) looked up, saw Cooper with his empty hand extended, immediately drew his pistol from his

pocket, either his overcoat pocket or his hip pocket (it is immaterial which), and, as he drew his pistol, stepped slightly to the rear, and in the direction of the curbstone, so as to place Mr. and Mrs. Eastman between him and defendant D. B. Cooper, Carmack stepped in front of Mrs. Eastman from where defendant D. B. Cooper stood, thereby placing Mrs. Eastman between himself and the said D. B. Cooper, he, the said D. B. Cooper, said in substance, 'Why are you hiding behind that woman, you dastardly coward,' or, 'It is d——d cowardly to be hiding behind a woman with a pistol in your hand,' or words to that effect, to which the deceased (Carmack) made no reply, but continued in the direction of the curbstone, with his pistol in his hand, facing north, until finally he got off the pavement, and stepped into the gutter, behind and east of the south pole.

"That as the deceased (Carmack) made this movemnt, the defendant Robin Cooper sprang upon the pavement, seeing that the deceased had a pistol in his hand, and that he had, with his drawn pistol, gotten behind the post, sprang up on the pavement, and passed rapidly between his father and the post behind which the deceased was standing, and on down the pavement until he reached a point on the pavement about opposite the posts, and between the posts and the west side of the pavement, and as he did this Carmack fired from behind the south pole, his arm and pistol being extended between the north and south pole, this shot striking the defendant Robin Cooper, from his left, passing through the knot in his necktie, and ranging to the right, through his

collar and shirt, and finally embedding itself in the top of his right shoulder, and Carmack was at such close proximity to him when this shot was fired that the left side of his face and collar on the left side were badly powder-burned.

"That immediately upon receiving this shot Robin Cooper moved and turned slightly to the east, and in the direction from which the shot came, drawing his pistol, as he made this move, from his overcoat pocket, and that up to this time he had not drawn or attempted to draw any pistol, and as he did so, that is to say, while in the act of moving and turning in the direction of Carmack, and in the act of drawing his pistol, Carmack fired a second shot, which passed through the clothing or sleeve on his left arm.

"Immediately upon firing this second shot, Robin then passed just below the south pole, and turned, facing Carmack, who, in the meantime—that is, Carmack—had withdrawn his pistol and arm from between the poles, and was standing with his left side exposed to Robin Cooper, facing him with Mr. Carmack's pistol pointed at Robin.

"That immediately upon getting in position, as heretofore indicated, just below or south of the south pole, and very close to it, Robin Cooper began firing upon Carmack, and fired three shots, when he realized that his shots had taken effect, and that Carmack was falling; that he then fired no more, and Carmack fell instantly as the result of these shots.

Cooper v. State.

"Now, gentlemen of the jury, I charge you if, in view of all the evidence in this case, you are satisfied that the killing occurred under these circumstances, or have in your minds a reasonable doubt as to whether it occurred under these circumstances or not, then the defendants would be entitled to the benefit of the doubt, and your verdict should be as to all of these defendants 'not guilty.'"

If there be any error in the first paragraph quoted above, as is complained of by the plaintiffs in error, it is fully cured by what immediately follows in the charge as set forth above. But we do not think there is any error in the paragraph, when properly understood. The plaintiffs in error, instead of taking the paragraph as written, have cut it up into two paragraphs, dissociated it from its context, and then assigned error against the new paragraphs so constructed. This is not a proper method of assigning error against the charge of the trial court.

Moreover, the paragraph complained of contained an instruction as to what would make the defendants guilty of murder in the first degree, and if there was any error in this, it is not reversible error, because the defendants were convicted only of murder in the second degree. Where a defendant is convicted of a lower grade, error in the charge of the court as to the higher grade is not reversible. *Wickham* v. *State,* 7 Cold., 529, 530; *Parham* v. *State,* 10 Lea, 502; *Tarvers* v. *State,* 90 Tenn., 498, 499, 16 S. W., 1041, and the cases cited: *Frazier* v. *State,* 117 Tenn., 441, 446, 100 S. W., 94;

*Powers* v. *State,* 117 Tenn., 372, 97 S. W., 815, and cases cited; *Wilson* v. *State,* 109 Tenn., 167, 70 S. W., 57.

The third assignment of error is directed to the fourth paragraph, which we have quoted from the charge in disposing of the preceding assignment. That paragraph reads:

"In other words, if you believe from the facts that the defendants D. B. Cooper and Robin Cooper approached Senator Carmack on a mission of peace and for the purpose of having a conversation, and for no other purpose, and that there was nothing in their conduct to indicate any other purpose, or that there was no overt act or word used on their part which would warrant the conclusion that they intended to attack him, take his life, or do him any great bodily harm, in that event, if they were attacked by the deceased, they would have a right to use such means as was in their power for their own self-defense, as above set out and described. But if they intended, as above stated, to talk to the deceased, and, if a difficulty ensued on account of the conversation, they intended to take the life of the deceased, if he made any resistance, in that event the plea of self-defense would not be available, and they would be guilty, and you would be warranted in finding them guilty of murder in the first degree, as above set out and described."

It is assigned as error to the first sentence of this paragraph that the jury may have been misled by what is there said upon the subject of "a mission of peace;" that is, by the use of that expression, since Col. Cooper testified that he was going to tell Senator Carmack in the

proposed conversation that, if he did not desist the offensive use of his name in the *Tennessean,* he would expose the record of his public and private life; that this was not a mission of peace, in the sense that these terms are ordinarily understood; that is to restore their former friendly relations, nor was he going on a mission of war, in the sense of provoking a combat; that he was going to demand neither a retraction nor an apology, but a cessation of Mr. Carmack's continued criticisms and abuse; that the jury may not have regarded this as a mission of peace, and, if they did not, they were in effect instructed that in undertaking to make this demand, Col. Cooper was the aggressor, and thereby provoked the difficulty in such a sense as to deprive him of the right of self-defense.

We do not think there is any force in this objection that the jury could have had such a misunderstanding of the matter as is suggested by counsel.

The second division of this assignment is addressed to the last sentence of the paragraph above quoted, which sentence is:

"But if they intended, as above stated, to talk to the deceased, and, if a difficulty ensued on account of the conversation, they intended to take the life of the deceased if he made any resistance, in that event, the plea of self-defense would not be available, and they would be guilty, and you would be warranted in finding them guilty of murder in the first degree, as above set out and described."

123 Tenn.—8

It is observed that the clause "as above stated" appears in this sentence. This refers to the preceding paragraph, in which the matter had been fully and correctly gone into. The jury could not have been misled by what was said in this sentence.

The fourth assignment of error is based upon the failure of the trial judge to define or tell the jury what would or would not amount to the provocation of a difficulty. What his honor said upon this subject was as follows:

"A defendant cannot be denied the right to rely on the plea of self-defense merely because he was in any sense, justly or unjustly, the 'aggressor,' or 'in fault,' or 'provoked the difficulty' in which another was slain. In order to deny him the right to rely upon the plea of self-defense, it must appear that he was the 'aggressor,' or 'in fault,' or 'provoked the difficulty' in such way and with such intent as the law contemplates in the use of these terms. It is not every 'aggression' which produces a difficulty that is an unlawful one within the meaning of this phrase; nor is it every fault which a man might commit that precludes him from defending himself when violently assaulted or menaced; nor is it every 'provocation of a difficulty,' which robs him of the right of self-defense. His right depends upon the character and intent of his act. Language used, however opprobrious, is not sufficient to deny him the right. If defendant's act is an assault, or the menace of one by an overt act, or the provocation of a difficulty with the intent to inflict death or great bodily harm in the event it is resisted, made of

malice to bring about that result, and enable the provoking party to wreak his vengeance upon the assailant, that is an 'aggression,' or 'fault,' or 'provoking a difficulty,' within the legal sense and meaning of the term, and if the combat is provoked, or the occasion to kill is produced on this account, with this intent, and for this purpose, defendant cannot rely upon the plea of self-defense; otherwise, he can."

This was sufficient. *Foutch* v. *State,* 95 Tenn., 711, 716, 717, 718, 34 S. W., 423, 45 L. R. A., 687.

The fifth assignment rests upon the refusal of the trial judge to charge defendant's request No. 1, which is as follows:

"Gentlemen of the jury, it is insisted by the State in this case that the difficulty, in which the deceased, Carmack, lost his life, was provoked or brought about by the fault or contrivance of the defendants, or some one of them, and particularly of the defendant D. B. Cooper, and consequently that these defendants, although they may have been assaulted and shot at by Senator Carmack, had no right to shoot him; for, having provoked the difficulty, having produced the necessity for Carmack shooting at them, under the law they would not have the right to shoot at Carmack, and would be deprived of the doctrine of self-defense.

"Now, in this connection I charge you this: In order for this doctrine to apply, and before these defendants can be deprived of the right of self-defense, if you find that the deceased, Carmack, at the time he was killed, was making a deadly assault upon Robin Cooper, or

upon D. B. Cooper, it must appear to your satisfaction, and beyond a reasonable doubt, that these defendants, or some one of them, must have sought or provoked this difficulty with the deceased, with the intent of killing him or doing him some great bodily harm. In order to deny the defendants the right to rely upon the plea of self-defense, it must appear that they were the aggressors, or in fault, or provoked the difficulty in such way and with such intent as the law contemplates by the use of these terms; and in this connection I charge you, gentlemen of the jury, that the defendant D. B. Cooper had a right under the law to seek out, or had a right under the law, when he saw deceased, Carmack, approaching him, to go across the street and meet him and have a talk with him, and to protest, and, if necessary, to demand that the said Carmack should cease the offensive use of his name in his paper; and I charge you further in this connection that the fact that Cooper and his son both may have been armed, and the fact that Cooper may have the night before, through Ed Craig, said that one or the other of them, either he or Carmack, had to die if his name was used any more in an offensive way, and the fact that he sent this threat to Carmack, his name again appeared in the paper in such a way as to be offensive to Cooper, that nevertheless, and without regard to all this, Cooper still had the right under the law to approach Carmack, and to make the demand upon him that his name be no longer offensively used in the paper, and the mere fact that he did approach him for this purpose, if this was his purpose, would not be such an ag-

gression upon Cooper's part, or such provocation by Cooper or his son and codefendant, Robin Cooper, of exercising the right of self-defense, and of shooting and of killing Carmack, or shooting except in their necessary self-defense, and all that they did was simply to walk across the street to meet him, and, as they approached him, defendant D. B. Cooper, with his empty hand extended, addressed him as 'Mr. Carmack.' If, under these circumstances Carmack immediately drew his pistol, he himself put these defendants upon the defensive, and in that event either or both of these defendants had the right to kill him, if it appeared necessary to kill him in order to save either of them from death or great bodily harm at his hands; and this would be none the less true, although it may appear to you from the evidence that defendant D. B. Cooper said in substance, 'Well, here you are all right; I have got the drop on you,' if at that time it appeared or should have appeared to the deceased that the defendant D. B. Cooper did not have the drop on him, and had his empty hand only extended."

This request was properly refused. So far as correct, it has already been given in the portions of the charge which we have quoted, heretofore in this opinion. In addition, it contains certain positive errors. It makes defendants' right of self-defense rest upon whether they had formed a design to kill Carmack before approaching him, whereas a proper statement of the law would have made it rest upon whether, in approaching Carmack they gave him reasonable grounds to believe himself in danger of death or great bodily harm at their hands. *Irvine* v.

*State,* 104 Tenn., 132, 56 S. W., 845; *Smith* v. *State,* 105 Tenn., 305, 60 S. W., 145; *Hecker v. People,* 109 Cal., 451, 42 Pac., 307, 30 L. R. A., 407. Again it is nowhere made plain in this request that the defendants had no right to approach Carmack in such a way as to give him reasonable ground to fear death or great bodily harm, and that if they did so they forfeited their right to rely upon the right of self-defense. On the contrary, both the rights of the deceased and of the defendants are rested upon the intention of the defendant, and not upon their conduct in approaching Mr. Carmack. Moreover, the request, if given in the charge to the jury, would have taken from them the right to pass upon the conduct of the defendants in approaching Mr. Carmack, since it states to the jury that the things done by them in approaching Mr. Carmack would not justify him in defending himself, thereby invading the province of the jury.

In addition, the foregoing request asked the court to charge that the deceased had no right to act in his self-defense, and was in the wrong in shooting when he did, although it might appear in the evidence that, when defendant Col. Cooper approached Mr. Carmack, he said in substance to the latter, "Well, here you are all right; I've got the drop on you," if at that time it appeared, or should have appeared, to Mr. Carmack that the defendant Col. Cooper did not have the drop on him, and had his empty hand only extended; and this, although Col. Cooper had the night before sent a message to Mr. Carmack that, if his name appeared in the *Ten-*

*nessean* again in an offensive way, one or the other of
them must die, and although, after he had sent his threat
to Mr. Carmack, Mr. Cooper's name had again appeared
in the paper in such way as to be offensive to him.   This
was in substance a request to instruct the jury that, al-
though a man has threatened your life, and soon there-
after approaches you, and the first you learn of his pres-
ence is, "Here you are all right, and I've got the drop on
you," if he has one hand extended with nothing in that
hand, you are to take time to investigate and see whether
he has anything in the other hand, and whether he is
really telling the truth about having the drop on you.
We do not think the law throws such a burden upon any
of its citizens, so accosted and threatened by a deadly
enemy.   If one man has sent a threat to another that
he will take his life, and suddenly appears in the pres-
ence of that other saying, "Here you are all right, and
I've got the drop on you," or anything equivalent there-
to, the man so threatened has the right to take his as-
sailant at his word, and immediately defend himself.
The approach under such circumstances, and with such
antecedent facts, and with such a threat of an instant
attack, is in itself an overt act, calling into prompt ac-
tion the right of self-defense.

We have stated the authorities upon this question in
disposing of the first assignment of error, and will not
here repeat them.

The sixth assignment of error is based on the refusal
of the circuit judge to charge defendants' second request.

This instruction was sufficiently covered by the general charge.

The seventh assignment is based upon the fact that the trial judge stated as a part of the State's contention, or theory of the case, that Robin Cooper shot Mr. Carmack from the rear. Such appears to have been the contention of the State, and there is at least some apparent evidence to that effect, since the record shows that one of the shots fired entered in the back of Mr. Carmacks neck and passed through to the front. There was no error in the matter complained of.

The eighth assignment is that the trial judge gave undue prominence or emphasis to the State's theory in his charge. This contention is based upon the following passage, immediately following the statement of the respective theories of the State and of the defendants:

"Remember, gentlemen of the jury, that the above are merely the insistences of the State and of the defendants, which they claim is a reasonable and fair deduction from all the proof, as insisted on by both the State and by defendants; but remember, further, that they are merely the insistences of the State and of the defendants, and that you, as judges of the law and the facts, are not bound to accept either or any part of them, but may reject any portion or all of either or both of these insistences, and it is your duty to do so in so far as you believe, if you do, that they are not supported by the proof as deposed to by the witnesses; but if you are satisfied that the State's theory is a fair reasonable deduction from all the evidence, when taken as a whole, and that, when so

taken, it establishes the defendants' guilt beyond a rea-
sonable doubt, as to either one or more of them, it would
be your duty to so find; but if you have a reasonable
doubt as to their guilt, that is, as to either one or both
of them, or more of them, you should give them the
benefit of the same, and 'not guilty' should be your ver-
dict."

In the preceding paragraph, the trial judge had just
told the jury that, if they believed John D. Sharp's
theory of the case, they should find "not guilty," and, in
the paragraph next preceding that, that they should find
the Coopers "not guilty" if they believed the theory of
the latter, or had any reasonable doubt in respect
thereof.

We do not think the jury could have attached any
significance to the passage complained of as indicating
the opinion of the trial court as to the soundness of the
plaintiff's case. The objection is overcritical.

The ninth assignment is based upon the refusal of
the trial judge to charge defendants' fifth request, as
follows:

"Among the other evidence the court has permitted
you to hear in this case is the testimony of Mrs. East-
man as to certain accusations and denunciations she
made against the defendant D. B. Cooper immediately
after the shooting, while she was standing in the Shank-
lin yard, to the effect that he (Cooper) had murdered
Carmack. This evidence has been admitted to your con-
sideration as a circumstance tending to show the guilt
of the accused, provided you believe in the first place
that if this language was used or accusation made by

Mrs. Eastman that Cooper heard and understood it at the time; and, second, that it was incumbent upon D. B. Cooper, under all the circumstances surrounding the parties at the time, to make a denial of her statement. If you have a reasonable doubt in your mind, even though you may be satisfied that Mrs. Eastman made such a statement, as to whether D. B. Cooper heard it, or understood its import, or if it appears that D. B. Cooper simply regarded what she was saying as the exclamation and outburst of an excited woman, then, under these circumstances, he would not be called on to deny it, even if he heard it, and the fact that he made no denial could not be looked to as a circumstance tending to show his guilt, even if he heard it, if in view of all the circumstances, the condition of his son, the fact that he was wounded, the fact that D. B. Cooper at that time did not know the extent of the injury to his son, the further fact, if such be a fact, that D. B. Cooper had not shot Carmack, if in view of all these conditions, and the general excitement which prevailed at the time, D. B. Cooper could not reasonably be expected to make any denial of these charges, then the fact that he remained silent would not be a circumstance tending to show his guilt in this case, and in either of these aspects of his testimony, any such accusation or denunciation that Mrs. Eastman made would be absolutely immaterial."

We are referred to *Phelan* v. *State,* 114 Tenn., 483, 88 S. W., 1040. If the evidence referred to could be ranged within the principle of the case mentioned, still the request would be an improper one, because, instead

of directing the jury to consider the various matters or points.suggested as going to the weight of the evidence, the province of the jury is invaded by the statement that the fact that Col. Cooper remained silent would not be a circumstance at all tending to show his guilt, and that the evidence would be absolutely immaterial. But the testimony in question does not fall within the principle of the case mentioned, since it was not introduced on the idea of an accusation made within the hearing of the defendant and his failure to deny it, but, on the contrary, as a part of the res gestae. The rule is different in the two classes of cases. This distinction is indicated in *Braswell* v. *State,* 2 Shannon's Tenn. Cas., 595. In that case the court said:

"It is insisted on behalf of the prisoners that there are certain errors of law in the record for which a reversal is demanded. And, first, that the court erred in allowing the declaration of the deceased, made directly after the mortal wound was given, to the effect that these prisoners had killed him, to go to the jury. The testimony of Mrs. Isbell thus gives the circumstances under which this declaration was made: 'After some firing, I don't know how many shots, Russell, the deceased, ran into the dining room. As he went through the door, Joseph Braswell fired at him. He returned in a little time, and as he came in the Braswells went out, and a pistol or two fired out of the doors. As he came in from the dining room, he said: "Angie, I'm shot. Teak and Joe Braswell are the ones that shot me." When Russell came in at the door and told me he was shot, he said he

was hurting. Defendants could have heard him. They were right about the door.' This declaration was so near to the main fact as to make it a part of the transaction. We think it was properly admitted as the res gestae."

Further on in the opinion the court said, quoting from Chief Justice Shaw:

"The doctrine does not presuppose that the assailing party heard the declaration, or that it was at all necessary that he should hear it, in order to have an opportunity of denial. The proof of an accusation in the presence of a party accused of crime stands upon a different principle. The declaration in the other case is admitted, not because it is an accusation, but because it is a part of the transaction which is undergoing investigation."

Again the court said upon the same subject:

"We apprehend that whatever was then and there said and done, immediately before or after the transaction, which is inseparably identified with and calculated to explain it, may be properly classified as part of the res gestae. The declaration in such a case is a verbal act, and does not stand for accusation, but stands for a fact. If the deceased had been shot by the prisoners with a rifle or shotgun within full view, and had immediately cried out that the prisoners had shot him, this would be a fact inseparable from the transaction itself, and would be admissible as part of it—not conclusive against the prisoner, but for what it was worth as a verbal act constituting a part of the res gestae. The illustration

presents an extreme case. In the case of the defendants, the declaration was made immediately after the fatal shot, and in the presence, and no doubt in the hearing, of the prisoners. We have no doubt upon the point of the admissibility of this declaration."

The statement of a third party at the time of the transaction, and growing immediately out of it, is a part of the res gestae. *Morton* v. *State,* 91 Tenn., 443, 444, 19 S. W., 225.

The tenth assignment is based upon the refusal of the trial judge to charge request No. 9, which was as follows:

"In determining the credibility of witnesses and the weight to be given their testimony, you, gentlemen of the jury, should look, not only to the integrity of the witnesses and their purpose and intention to testify truthfully, but you should also look to all the circumstances immediately surrounding the witnesses at the time of the events about which he or she testifies transpired. It is no impeachment of the integrity of a witness to state that his or her memory is defective, or that by reason of the exciting circumstances with which the witness was surrounded he or she incorrectly understood or remembered the words used. Now, it is not insisted by the defendant in this case that Mrs. Eastman, in undertaking to state what occurred, has testified corruptly or intentionally false; but it is insisted that the suddenness with which the encounter occurred between the deceased and the defendants, the fact that the encounter was not anticipated or expected by Mrs. Eastman, the very short

time in which the whole transaction occurred, the ex-
citable and nervous disposition, are all circumstances
that can be and should be looked to by you upon this
question, not whether Mrs. Eastman has intended to
tell the truth, but whether she has been able to correctly
understand what was said by D. B. Cooper, or has been
able to remember accurately what he did say. I instruct
you, gentlemen of the jury, that it is the law that the
testimony of any witness, in undertaking to repeat the
words or language of a third person, especially when
heard under exciting circumstances and conditions, is
the most unsatisfactory evidence known to law, by rea-
son of the fact that they are always liable  to be
mistaken and misremembered, and their meaning is
liable to be misunderstood and exaggerated; and, there-
fore, the court instructs you that evidence of this char-
acter should be received with great care and caution."

This request was properly refused, because it is argu-
mentative, and it assumes as a fact, as to which there
is no evidence, that Mrs. Eastman was of an excitable
and nervous disposition, and, besides, it is improper
that the evidence of a single witness should be in this
manner singled out by the court and commented on in
the charge.

The eleventh assignment of error is based upon
the action of the trial judge in charging as follows:

"The court further charges you that it is insisted on
by counsel that extrajudicial conversations are the
weakest of all contradictory processes; that is, conversa-
tions had out of court by witnesses with persons not

under oath and spoken in a general way—the reason being, first, the fallibility of the human memory as to the exact language used in a particular conversation. The slightest change in the language used may alter the whole sense of the conversation or a portion of it; but you will take these, if any appear in the proof, and consider them along with the other evidence, and, after having done so, give them such weight as you may think they deserve."

The criticism on this portion of the charge is, in substance, that the court did not tell the jury what he thought, but simply what counsel thought, or insisted. It is apparent, however, that the court adopted the contention of counsel upon the point, and the jury must have so understood the matter. He told them, in effect, that, taking all of these infirmaties into consideration, they should give evidence of this character such weight as they think it deserved. There was no positive error in the excerpt quoted, and there was no competent request to make it fuller and more complete.

The twelfth assignment is based on the refusal to charge defendants seventh special request, which was as follows:

"Although Senator Carmack may have believed that D. B. Cooper and Robin Cooper were approaching him for the purpose of killing him, yet, if the proof shows that the said Robin Cooper and D. B. Cooper had no such intention, Carmack would not have been justified in drawing his pistol and attempting to shoot them on account of what he believed their intention to be. In other

words, the right of these defendants must be determined by what was in their mind, and not by what was in Mr. Carmack's mind at the time, and in this connection I again remind you, as I did at the time that that evidence was introduced, that you cannot look to the testimony of witnesses Witherspoon and Landers as to what Landers says he told Carmack about Cooper intending to kill him on sight as proof that defendant D. B. Cooper ever made such statement as that, nor can that testimony be considered by you at all in determining what Cooper's intention was. It may be regarded in determining what Carmack's was; but, as Cooper cannot be charged with Carmack's intention, it would be incompetent and unfair to defendants to consider it as evidence against him."

There is no error in refusing this request. As to the first branch of it, it leaves out of view the words of Col. Cooper showing an imminent attack on Mr. Carmack, and hence the grounds of apprehension on the part of the latter, growing out of such attack and previous occurrences and threats, and makes the right of self-defense on the part of Mr. Carmack turn upon the real purpose of Col. Cooper. This is not the law. If it were, a man might approach another, showing distinct overt acts indicative of a purpose to do great bodily harm, and, when injured on account thereof, show that he had no real purpose of doing harm. The assailed party must judge by appearances as things look to him.

As to the second branch, there was no error in refusing to repeat rulings in evidence.

We shall consider together assignments Nos. 13, 14, and 15.

They present the point, speaking generally, that the trial judge erred in failing to charge as to the separate criminal responsibility of Robin Cooper, as distinguished from his father. The complaint is that they are in the charge linked and bound together; the case of the son being made to depend upon that of the father. The point is particularly presented in requests Nos. 4 and 10, and error is assigned upon the refusal of the trial judge to give these in charge to the jury.

Request No. 4 was as follows:

"If you believe, from all that transpired during that day, as well as what occurred at the corner when Robin first discovered the deceased, that Robin in good faith believed, when his father left him and started down to meet Carmack, that defendant D. B. Cooper was going for no other purpose than that purpose for which said D. B. Cooper said he was going, to wit, to have a talk with him, and if in this belief Robin accompanied his father, and when they met Carmack, at or about the poles, Carmack immediately began firing upon Robin, Robin Cooper, under the law, had the right to shoot and kill Carmack, if necessary for his own protection, although defendant D. B. Cooper may have gone there for the purpose of provoking a difficulty."

Request No. 10 was this:

"If you find from the evidence that Robin Cooper crossed the street and went to where the deceased was

123 Tenn.—9

without any intention of killing the deceased, or doing the deceased great bodily harm, or without any intention of bringing on a difficulty with the deceased, for the purpose of killing the the deceased, or doing the deceased great bodily harm, that is, if Robin went to the place of the meeting without any criminal intent, and if you further find from the evidence that the deceased, without any hostile demonstration on the part of Robin Cooper, drew a pistol and fired at Robin, or made any hostile demonstration such as would reasonably induce the belief in Robin's mind that the deceased intended to do him great bodily harm, and if you further find that Robin then killed the deceased, a case of self-defense is made out, and you should find all the defendants not guilty."

In order to properly dispose of this matter, it is necessary that we should refer to the evidence of Robin Cooper, to ascertain whether there was any basis of fact upon which to predicate the matters contained in the request.

On examination in chief, he said:

"Q. Now, why was it you went with him, or followed him, if you believed that was his mission?

"A. After he had gotten about halfway across the street, I felt that it was my duty, as he was my father, and I believed that he was unable to protect himself if he should be attacked, to go with him, and be there if Carmack should attack him."

After relating how they went down to the point where his father stopped and spoke to Mr. Carmack, he says:

"Papa said, 'Senator Carmack,' and immediately when papa said it, he looked, and in an instant had drawn a pistol.

"Who drew the pistol?

"A.   Senator Carmack.

"Q.   Well, what did he do with the pistol when he drew it?   Go on and tell what occurred.

"A. Well, it came out just like that (illustrating).   It paralyzed me for a moment, and Senator Carmack crossed the sidewalk, backing slightly towards the two posts, and intuitively I jumped forward to the sidewalk between my father and Senator Carmack.

"Q.   When?   At what time?

"A. When he was getting behind the posts.   I had hardly gotten on the sidewalk, and right at the north post, probably two or three feet inside of the north pole.

"Q. You mean inside, back from the posts towards the fence?

"A.   Towards the fence; I think even with the north pole, but about two or three feet towards the fence.

"Q.   Which way were you facing then?

"A. Facing south, and a shot exploded, it seemed to me, almost in my face, coming between the posts.   I could see the pistol and Senator Carmack's arm.   He was standing right in the gutter, at the lower or the south post.

"Q.   Well, where did the shot hit you?

"A.   That shot hit me here."

Again, he says:

"Yes, sir; I was on a terrible nervous tension and excitement and strain, and I didn't see anything after I intuitively jumped forward between papa and Senator Carmack."

Again:

"Q. Did you move rapidly?

"A. I don't know, sir; I know I just jumped between them."

He further says on cross-examination:

"Q. Now, where were you when your father said—addressing him as Senator Carmack?

"A. I was in the street there just about even, probably slightly behind papa, right near him. I had got up there to intervene, if I could; if I could help papa."

Also this:

"Q. And you sprung in between him and your father?

"A. Yes, sir."

It is an undisputed fact that Robin Cooper, at this time, knew of his father's threat, communicated by Mr. Craig the night before to Mr. Carmack, that if his name appeared again in the *Tennessean* in an offensive way, one or the other must die, or that the town would not be big enough to hold them both, which was the same thing; that his father's name had appeared again the next morning in a manner offensive to him; that Mr. Carmack had not been informed of any change of purpose on his father's part; that if they should meet with this impression still on Mr. Carmack's mind, left by the threat to kill him by Col. Cooper, he (Mr. Carmack) would most naturally regard the approach of Col. Cooper

to him as an overt act, necessitating self-defense on his part; that his father did approach Mr. Carmack without informing him of any peaceful intent; that he himself followed his father to the place of meeting, for the purpose of assisting him in case a difficulty should ensue, and stood by, ready for this purpose, when his father accosted Mr. Carmack.

All of these facts are omitted from request No. 4, and the single point presented that if Robin Cooper really believed that his father intended to go down and meet Mr. Carmack for the sole purpose of talking with him, and if he went with his father in this belief, "and when they met Carmack, at or about the poles, Carmack immediately began firing on Robin Cooper, Robin Cooper, under the law had the right to shoot and kill Carmack, if necessary for his own protection, although defendant D. B. Cooper may have gone there for the purpose of provoking the difficulty." The ommission of these facts referred to, absolutely necessary to a correct understanding of the matter by the jury, and confining their attention to a single, partial phase of the transaction, would without doubt have confused and misled them. Moreover, the request, as written and submitted, contained a positively incorrect statement of fact, to the effect that they met Mr. Carmack at or about the poles, and he immediately began firing upon Robin Cooper. There is no evidence in the record to this effect. The undisputed evidence is that Col. Cooper and Robin Cooper did not immediately meet Mr. Carmack; that Col. Cooper went down to the point where Mr. Carmack

was talking to Mrs. Eastman, Mr. Carmack standing with his hat in one hand, and his cigar in the other, and there stopped, and Mr. and Mrs. Eastman being then between Col. Cooper and Mr. Carmack; that Robin was then standing in the street just about even with his father, to intervene in the fight, or to assist his father in the fight, if one should occur; that, when they were in this position, Col. Cooper addressed Mr. Carmack; and then Mr. Carmack changed his position to the poles, and then firing began. These facts present the case of one waiting for a difficulty, if one should occur, between the two principals, anticipating that it might occur, owing to the unfriendly relations of the parties, and the previous threats, and ready to assist one of the principals if it should occur, and is a far different situation from that suggested by the hypothesis stated in the request, a hypothesis as to a material fact of which there is no evidence in the record for its support. To give such a request in charge to the jury would have been positive error, and the trial judge acted correctly in refusing it.

The tenth request is open to the same objection of ignoring the essential facts just referred to, and of presenting for the consideration of the jury a partial view, wholly dissociating Robin from his father, with whom he went to the place, and whom he stood ready to support in case of a difficulty arising, which he must have known from the facts in his possession would in all human probability occur.

To authorize a reversal on account of the refusal of the trial judge to give an instruction requested, that

instruction, as written, must be strictly accurate and applicable to the case in hand. *Railroad* v. *Acuff,* 92 Tenn., 26 33, 20 S. W., 348; *Sommers* v. *Railroad Co.,* 7 Lea, 201; *Railroad* v. *Fain,* 12 Lea, 44; *Railroad* v. *Gurley,* 12 Lea, 59; *Rea* v. *State,* 8 Lea, 356, 361; *Railway Co.* v. *Wynn,* 88 Tenn., 332, 14 S. W., 311.

These requests really present the question of the rights and responsibility of one who intervenes in the quarrel of another, and it is necessary to discuss the law applicable thereto.

The rule applicable to this subject is an ancient one, and is supported, not only by the text-books, but by the weight of judicial opinion as well.

In Hale's Pleas of the Crown, vol. 1, p. 484, it is said: "The like law has been for a master killing in the necessary defense of his servant, the husband in the defense of his wife, the wife of the husband, the child of the parent, or the parent of the child; for the act of the assistant shall have the same construction in such cases as the act of the party assisted should have had, if it had been done by himself, for they are in a mutual relation one to another."

In Wharton on Homicide (3d Ed.) sec. 332, it is said: "The doctrine of freedom from fault in bringing on a difficulty as a condition precedent to a plea of self-defense applies with equal force to a case in which one person interferes in a difficulty between two others in behalf, or to protect, one of them; and, generally speaking, a person who does this will not be allowed the benefit of the plea of self-defense, unless such plea would have

been available to the person whose part he took in case he himself had done the killing, since the person interfering is affected by the principle that the party bringing on the difficulty cannot take advantage of his own wrong. If the person sought to be protected provoked or brought on the difficulty, he must have clearly manifested a desire and intention to retire from the conflict; and even then the person interfering would not be justifiable if he struck the fatal blow in pursuance of a previous design to assist his friend in the event of a personal difficulty. And where one person interferes in behalf of another, who was the aggressor, and there is opportunity to retreat after the interference and advantage is not taken of it, the person interfering can claim no greater right than the other, and neither of them can invoke the doctrine of self-defense. Thus, if a son fight in defense of his father, his act in doing so will receive the same construction as that of the father, and if the latter was the aggressor in bringing on the difficulty, and could not plead self-defense, the same rule applies to the son. And the son cannot rely upon his freedom from fault in bringing on the difficulty as a defense, where he knew the father had provoked the attack. Both must have been without fault in bringing it on. Nor is a father justified in killing the adversary of his son, where the son had provoked and brought on the conflict in which he was placed in imminent danger. And the plea of self-defense cannot be interposed by a father, who kills an officer rightfully seeking to arrest his son, to prevent such arrest, nor can one strike to relieve a brother from

Cooper v. State.

peril, unless the brother was free from fault in bringing on the difficulty which placed him in peril. And if a person in whose defense a brother engaged was in fault, and had not retreated or attempted to retreat, the interference is not justifiable or excusable."

In *Karr* v. *State*, 106 Ala., 1, 17 South., 328, it was held that the right of a son to defend his father is coextensive with the right of the father to defend himself, and whatever the father may do rightfully in repelling an assault, actual or threatened, the son coming to his assistance may do rightfully, but that a son has not the right to take life to save his father from the consequences of an assault he knows the father has provoked. See, also, *Pratt* v. *State*, 75 Ark., 350, 87 S. W., 651; *State* v. *Westfall*, 49 Iowa, 328; *Chittenden* v. *Commonwealth* (Ky.), 9 S. W., 386. In *Burks* v. *Com.*, 7 Ky. Law Rep., 826, it was held that a son has the right to kill in defense of his father, where the father is not at fault, and where the son has reasonable grounds to believe that his father is in danger of great bodily harm at the hands of an assailant.

In *Morris* v. *State*, (Ala.), 39 South., 608, it appeared that the defendant's father had an altercation with deceased, who knocked him down, and was shot by defendant. The court held that his right to kill in defense of the father depended upon the same conditions as would be necessary to excuse the father under a plea of self-defense.

In *Utterback* v. *Com.*, 105 Ky., 723, 49 S. W., 479, 88 Am. St. Rep., 328, it was held that a father who shot in

defense of his son was excusable or not, according as the son would have been innocent or guilty, had he fired the shot in his own defense.

In *Sharp* v. *State*, 19 Ohio, 389, there was held to be no error in a charge that it was true, as a principle of law, that a son might justify an assault in defense of his father, if his father was not in the wrong. But if the father had wantonly made the first assault, and this fact should appear from proof, the son could not avail himself of this relation in his defense, if it appeared from the proof that he came into the conflict for the purpose of aiding his father in an unlawful assault.

In *Foster* v. *State*, 102 Tenn., 33, 49 S. W., 747, 73 Am. St. Rep., 855, it appeared that a father and son were jointly indicted for the killing of one Woodard; that Woodard made a sudden, unprovoked, and violent assault upon the father of a character likely to produce death or great bodily harm, and thereupon the son intervened and killed Woodard. The father was acquitted, but the son was convicted, and the case was appealed to this court by the son. In disposing of this matter, the court said: "The acquittal of the father raises a conclusive presumption that he was guilty of no wrong in this difficulty with deceased. This being so, if the son really believed on reasonable ground that a deadly assault was being made upon his father, and that owing to the superior power of his antagonist he would be killed or receive great bodily harm as the result of the assault, it was his legal right, as well as his filial duty, to interfere and prevent the killing or maiming of his father,

and to use such means as were necessary under all the circumstances to effect this purpose."

In *Crockett* v. *Com.,* 100 Ky., 382, 38 S. W., 674, it was held that where one believed, and had reasonable ground to believe, that his brother was in immediate danger of losing his life or suffering great bodily harm at the hands of a third person, and killed this person solely to prevent or avert the danger or apparent danger of his brother, and in doing so used no more force than appeared to him at the time to be reasonable and necessary for the purpose, he was excused, unless his brother, to whose assistance he went, had sought and brought on the difficulty in which the killing was done, and thereby made the danger to himself necessary or excusable on the part of the deceased, in which case the slayer could not avail himself of the danger to his brother as an excuse for the killing.

In *Untrenor* v. *State,* 146 Ala., 26, 41 South., 285, where the evidence showed that the difficulty resulting in deceased's death was the continuation of a quarrel between him and defendant's brother, and that defendant came in response to his brother's call, it was held competent to show whether the brother was free from fault in bringing on the difficulty, since his fault might become material as bearing upon the action and conduct of defendant.

In *Wood* v. *State,* 128 Ala., 27, 29 South., 557, 86 Am. St. Rep., 71, it was held that one who interferes in a pending difficulty in behalf of a brother and takes the life of the other combatant stands in the shoes of the

brother in respect of fault in bringing on the difficulty; and he cannot defend upon the ground that his brother was in imminent and deadly peril, and could not retreat, unless the latter could have defended upon that ground had he killed his assailant. It was also held to be of no consequence that the defendant, when he interferred, was not aware of any fault on the part of his brother in bringing on the difficulty.

In *Tom and Robert Smith* v. *State,* 105 Tenn., 305, 60 S. W., 145, it appeared that these two were brothers; that Tom Smith was unlawfully shooting at Bud Fowler; that thereupon Henry Fowler lawfully intervened to aid his brother and Bud Fowler, and that then Robert Smith intervened and shot Henry Fowler. It was held that this last intervention was unlawful, and that there was no error in the failure of the trial court to instruct the jury that, if Robert Smith went to the place of meeting with the purpose to fight only in the defense of his brother Tom, he would not be guilty of any offense; "for," continued the court, "Bob cannot excuse himself as a guilty participant in the affray, if his brother Tom brought it on with a view to, or was at the moment engaged in, a felonious assault on Henry Fowler. In such event, as has already been seen, Tom Smith could not justify himself for slaying his adversary, and no more could Bob Smith excuse himself for his unwarranted interference."

In *State of South Carolina* v. *Vincent Cook,* 78 S. C., 253, 59 S. E., 862, 15 L. R. A. (N. S.), 1013, 125 Am. St. Rep., 788, it appeared that the trial judge charged the

jury as follows: "If your brother, or one near and dear to you, provokes a difficulty, or puts himself in the wrong and brings it on, the law does not allow you to go there, take his place, and kill that man, and say you are guilty neither of murder nor manslaughter. . . . The law does not give the person who is near and dear to you the right to provoke a difficulty, and then let you come in and kill some one, when he has brought it on himself, and get out of it by your saying he was near and dear to you, and you did the killing on that account. But if he was without fault in bringing on the difficulty, and the law would justify him in defending himself, you have a right to go in and defend him. But if he brings on the difficulty, and you take part, you do it at your own risk; and if he took life under similar circumstances, and would have been guilty of murder or manslaughter, and you go in, take his place, and take life under those circumstances, then you are guilty of murder or manslaughter." The exception raised to this charge was thus worded: "The error being that the said charge held one striking in defense of a brother bound and affected by a fault on the part of the brother defended in bringing on the difficulty, although he may have acted without knowledge of such fault, or may have had no opportunity to ascertain who was at fault in bringing on the difficulty, before being compelled by the pressing necessity to act in defense of his brother, and he may be without fault himself; whereas, it is respectfully submitted that, in order for one to be affected by the fault of another, he must at least have some knowledge or opportunity to

know it." The court said that this exception raised the important question whether one who undertakes to assist a near relative, who is in danger of death or great bodily harm at the hands of an antagonist, acts at his peril, if the person assisted was actually at fault in provoking the difficulty. After discussing the question, the court overruled the exception and sustained the charge of the trial judge, closing the opinion with these remarks: "We have endeavored to show the law as laid down by the circuit judge is firmly established. It is true the rule may in exceptional cases work hardship; but the opposite rule would allow the innocent man, who had been forced to strike in self-defense, to be killed with impunity, merely because appearances happened to be against him at the moment a partisan of his antagonist reached the scene of conflict. The duty seems urgent to enforce rather than to relax the rule, which admits of no excuse for taking human life except necessity."

The same rule was applied in *Shirrell* v. *State,* 138 Ala., 3, 35 South., 129, where it appeared that defendant's wife dared the wife of deceased to come into a lane, and, upon her doing so, knocked her down with a stick, when deceased took the stick from her, and while holding it, and remonstrating, the defendant ran up and struck the blow which resulted in deceased's death. The court said here: "The defense that the act was done to prevent the homicide of the wife would be valid only where she, as well as defendant, was in a condition to invoke the doctrine of justifiable homicide."

The doctrine is an ancient one, and a sound one, is sustained by the overwhelming weight of authority, is supported by the decisions of this court contained in our published reports, and there are only a very few cases to the contrary anywhere. In this view it is the undoubted duty of the court to apply the doctrine to this case. The undisputed evidence is that Robin Cooper was present for the purpose of intervening to aid his father in the difficulty, should one supervene upon his father's approach. Robin Cooper himself says, in answer to the question where he was when his father addressed Senator Carmack: "I was in the street there, just about even, probably slightly behind papa, right near him. I had got up there to intervene, if I could; if I could help papa."

And he says that he did intervene; that he sprang in between Mr. Carmack and his father. It appears, therefore, that there is no basis of fact upon which requests Nos. 4 and 10 could have been predicated, that they would have been misleading if given, and were properly refused.

We are of opinion, therefore, that there was no error in the action of the trial judge in refusing requests Nos. 4 and 10, above set out.

The sixteenth assignment of error is based upon the action of the trial judge in permitting the cross-examination of Col. Cooper upon certain irregularities in the conduct of his office as clerk and master of the chancery court of Maury county, happening many years prior to the date of his examination. The reason assigned is that the period is too remote, the transac-

tions referred to having happened from twenty-five to thirty years prior to the date of the examination of the witness. The authorities are to the effect that inquiry into transactions so ancient should not be permitted by the trial judge for the purpose of impeaching the credibility of a witness, since it is to the interest of society that men reform, and live down their past, if an evil one, and the witness stand should not be made a place of torture, for probing into occurrences long forgotten, and perhaps forgiven before forgotten, and for dragging them forth anew, to the distress of the person who is subjected to the ordeal, and to the injury of the public morals. We should not hesitate to sustain the trial judge in refusing to permit counsel to go into transactions so remote, or reverse for permitting such a course of action, if we could see that any injury had been wrought by the evidence. In the nature of things, however, matters so far back in the past can have no practical effect, no weight upon the standing of a witness, unless followed up by other evidence showing a continuance in or habit of evil doing, and for that reason, as well as the others indicated, such evidence should be excluded; but, having been admitted, it by no means follows that a reversal should be entered therefor, since if the evidence has no weight, and could have no effect upon the verdict, if the verdict would have been the same with it or without it, to reverse on that ground would be to reverse for a mere technicality, or for an immaterial matter, contrary to the rule laid down for our guidance in the Code, and in numerous decisions of this court,

and of other courts, many of which are referred to in the case of *Lowry* v. *Railroad,* 117 Tenn., 507 *et seq.,* 101 S. W., 1157. But in the present case the further reason appears that the trial judge instructed the jury, as the evidence was delivered, that the State would be bound by the testimony of Col. Cooper upon the subject, in case he denied there had been any embezzlement or misappropriation of moneys in his office. He testified there had been no willful misappropriation, that there had been irregularities caused by want of business habits, but no dishonesty in the office, and that "every human being" that had a dollar in that office got it out. In view of this evidence, the attack upon Col. Cooper's veracity based on the transactions in his office was completely nullified, and certainly there could be no reversal under such circumstances.

The seventeenth assignment is based upon the action of the trial judge in admitting the testimony of Dr. Witherspoon and Mr. Lander. The testimony of the former was simply that Mrs. Burch, the daughter of Col. Cooper, made a communication to him by telephone, which he in turn communicated to Mr. Lander, to the end that the latter might tell Mr. Carmack. Dr. Witherspoon was not permitted to tell what this communication was; so his evidence, without that of Mr. Lander, was a blank, and even if there had been a proper exception to it, no error could have been assigned upon overruling the exception, since no harm could have been wrought by such evidence. So that the merit of the ex-

123 Tenn.—10

ception really turns upon the evidence of Mr. Lander. He testified in substance that the communication which was made to him by Dr. Witherspoon as having come from Mrs. Burch (made by her to be communicated to her husband, Dr. Burch, who occupied the same office with Dr. Witherspoon, in order that he might be told, and so restrain Col. Cooper, if he could, Dr. Burch being out of the office at the time) was that Col. Cooper, her father, was then (Monday morning, November 9th) armed, and threatening to kill Senator Carmack on sight, and that he communicated this statement at once to Mr. Carmack. This evidence was introduced in rebuttal, and was but following the lead of the defendants, when they introduced hearsay evidence to the effect that Mr. Burch had told Col. Cooper that Mr. Carmack had written a certain very offensive editorial in the *Memphis Evening Scimitar*, in March, 1908, which evidence was introduced over the objection and protest of the State. Having opened the door to this form of evidence, the defendants could not properly object if the State should bring in other evidence through the same door. In addition, the court so limited the evidence as to tell the jury that it was alone to be considered "for the purpose of showing, if for any purpose, the condition of Mr. Carmack's mind on that date, and," continued the court, "is not evidence as to Col. Cooper's condition, and may be looked to in the light of interpreting any of Senator Carmack's acts, but is not evidence as to whether or not Col. Cooper was in that mood, or had made any statement." That is to say, the jury were not to under-

stand from this evidence that Col. Cooper was really
armed, or had really made any such threat, but simply
that Mr. Carmack believed he had, and they might in-
terpret Mr. Carmack's subsequent actions in the light of
that impression resting in his mind.  So limited, the evi-
dence could have added nothing to the situation, because
Col. Cooper had sent word the night before to Mr. Car-
mack that if his name appeared again in the paper in an
offensive way either he or Mr. Carmack must die, and Mr.
Carmack thereupon sent for a friend, and procured a
pistol from him, and in the next issue of the paper con-
tinued the use of Col. Cooper's name, and, when he went
upon the street thereafter, wore the pistol on his person,
and had it when he encountered Col. Cooper at the time
the fatal meeting occurred.  Col. Cooper himself says,
in his testimony on pages 1296, 1297, of the record that if
he had received such a message from a gentleman as he
sent Mr. Carmack on Sunday night, that if he did a cer-
tain thing again the town would not be big enough to
hold  them both, that he would either have quit doing
the offensive thing, or, to use his own language, "I would
have prepared myself to meet him."  This was the nat-
ural thing, and nothing that was said by Mr. Lander to
Mr. Carmack, limited in its effect, as it was by the trial
judge, could have done more than had already been done
by Col. Cooper's threat, interpreted as he has interpreted
it, and as common sense and sound reason interpret it.
But, aside from all this, there was no sufficient objec-
tion offered to the evidence in the trial court.  The ob-
jections were in this form:  "We object to that." "That

is not competent." "Defendants object to this testimony." No reason for the objection was assigned. The rule is undoubtedly that the trial judge cannot be put in error in this manner. A reason for the objection must be stated, so that he may have the opportunity to consider and pass upon it, and avoid the mistake, if any is being made. *Crane* v. *State,* 94. Tenn., 86, 89, 28 S. W., 317, and cases cited; *Amer. Lead Pencil Co.* v. *Davis,* 108 Tenn., 251, 254, 66 S. W., 1129.

The eighteenth assignment of error is based upon the action of the trial judge in permitting the attorney for the State to ask Robin Cooper, on his cross-examination, if he knew any reason why certain witnesses named would perjure themselves to deprive him of his life or liberty, to which questions he replied that he did not. The questions should not have been put in this offensive form, but it is no ground for reversal, since it was only to ask in another way whether he knew any reason, arising out of prejudice of the witnesses against him, or by reason of the character of the witnesses, why they should testify things against him that he said were untrue.

The nineteenth assignment makes the point that the trial court erred in excluding parts of Gov. Patterson's testimony. The governor was first introduced before the jury and his examination began. Some controversy arising over a question asked, it was suggested to court and counsel that the jury be retired and that his evidence be heard before the court. This was done. He then gave in detail how he came to go in search of

Cooper v. State.

Col. Cooper, his finding him at the Maxwell House, his
sending for Mr. Bradford, the conversation that then en-
sued between the three, and Robin Cooper also, concern-
ing the threatening difficulty, and the sending of a note
which Gov. Patterson found Col. Cooper dictating to a
stenographer, the conclusion not to send the note, but to
leave the matter in the hands of Mr. Bradford to settle
by some third party, or mutual friend, and his return to
the capitol, and, his subsequent call of Col. Cooper to
the Governor's Mansion to confer about political mat-
ters.  All this was given with some detail.  The court de-
cided that he would not permit the witness to give the de-
tails of the conversations, but that he might state the
substance of what transpired.  The jury returned, and
the governor did state before them the full substance of
his previous statement, in so far as it bore upon the pres-
ent controversy, and we do not think the defendants
were injured by the action of the trial judge.

It is said that certain particulars of the conversa-
tion would be important, as showing the absence of a
conspiracy to kill Mr. Carmack.  The question of con-
spiracy is out of the way, since the jury acquitted the de-
fendants of the charge of committing murder in the
first degree upon the person of Mr. Carmack.

It is said that there was one specific item of
evidence omitted from the general statement of Gov.
Patterson, which was included in his more particular
statement given in the absence of the jury, to the effect
that Gov. Patterson, after leaving the presence of Col.
Cooper, being accompanied by Robin Cooper, on leaving

the latter near the Arcade, on Cherry street, advised
him to be with his father as much as he could that day,
and that Robin thanked him with tears in his eyes for
what he had done towards composing or quieting his
father. We do not think there was any injury done by
the omission of this evidence. It fully appears in the
record that from the very first information which Robin
received of the state of his father's mind on Monday
morning, down to the close of the meeting at the Max-
well House, he did all he could do to quiet his father
and prevent the difficulty. The omitted statement of
Gov. Patterson as to Robin Cooper's sentiments or feel-
ings at the time indicated would only have been cumu-
lative evidence of a fact already fully proven in the
record. Nor is it claimed in behalf of Robin Cooper that
Gov. Patterson's advice caused him to accompany his
father on the way to the Mansion. He says that he ac-
companied him, in substance, because he feared that, if
Senator Carmack and his father should meet, the former
would attack his father, and that he went along to pro-
tect his father, if need for such protection should arise.

Assignments Nos. 20 and 21 are based upon the
refusal of the trial judge to permit the introduction of
the whole of a certain letter written by Mr. Carmack to
Col. Cooper, when the former was in Washington and
the latter in New York, and when they were on terms
of perfect amity, and an editorial in the *Memphis Even-
ing Scimitar*, printed in March, 1908, when their rela-
tions had become strained; the latter having been attri-
buted to Mr. Carmack on hearsay statements from a

third person made to Col. Cooper. We have examined both the letter and the editorial, and think there was no error in the action of the trial judge. So much of the letter was permitted to be introduced as showed a most friendly relation existing, and that portion left out referred only to public questions arising, which Mr. Carmack indicated that he wished to talk over with Col. Cooper. So much of the editorial as was permitted to be heard by the jury showed a spirit of animosity to Col. Cooper. So much as was excluded referred to other persons connected with public affairs in the State, or supposed to be so connected, and they were written of in a most caustic vein. There was no error in these exclusions.

The twenty-second assignment of error is predicated upon the exclusion of the evidence of Mrs. Sperry and the carbon copy of the note which she wrote for Col. Cooper, and which was offered to corroborate Mr. Bradford in his testimony that the note introduced in evidence was the one which Mr. Cooper had prepared to send Mr. Carmack. The evidence was competent; but, as there was nothing in the record to controvert the testimony of Mr. Bradford, the exclusion of it was immaterial, and not reversible error.

Justice NEIL concures in all the conclusions of this opinion, and Justice McALISTER concurs in all the conclusions concerning and affecting Duncan B. Cooper, and therefore the judgment of the lower court is affirmed as to Duncan B. Cooper. But Justice McALISTER does not concur with this opinion in overruling and disallowing the thirteenth, fourteenth, and fifteenth assignments

of error filed on behalf of Robin J. Cooper, but agrees with the Chief Justice and Justice BELL that those assignments should be sustained, which is done, and the result is to reverse the judgment as to Robin J. Cooper.

Judge BEARD will present the views of Judge BELL and himself, and those of Judge MCALISTER so far as he agrees with them.

MR. CHIEF JUSTICE BEARD delivered the following opinion:

About 4 o'clock in the afternoon of Monday, November 9, 1908, Ex-Senator Edward W. Carmack, in an encounter occurring on Seventh Avenue North, in the city of Nashville, was shot to death with a pistol in the hand of Robin Cooper, who at the time was in the company of his father, D. B. Cooper. Soon thereafter an indictment was found, containing in substance and effect two counts, in the first of which these two persons, together with John D. Sharp, were charged with the commission of murder in the first degree upon the person of the deceased, and in the second it was alleged that the "said Sharp . . . unlawfully, feloniously, willfully, deliberately, premeditatedly, maliciously, did move, incite, counsel, hire, command, and procure the said D. B. Cooper and Robin Cooper" "to do and commit" this murder. Upon this indictment all these parties were brought to the bar of the court, where, being arraigned and pleading not guilty, a trial was had, beginning on the 20th of January, 1909, and covering a period of practically two months. As the result of this trial the jury returned

1. Opinion of Chief Justice Beard, revised and corrected by him, and published by direction of the court.—Reporter.

a verdict of not guilty as to Sharp, and on the following day they found the Coopers guilty of murder in the second degree, and fixed their punishment at confinement in the penitentiary of the State for a term of twenty years. From the judgment pronounced on this verdict, the case has been brought to this court for review, and a number of errors are assigned, upon which it is insisted the plaintiffs in error are entitled to a reversal.

Among these alleged errors, the one most earnestly pressed upon the attention of the court is "that the verdict is not warranted by the evidence."

However the rule may be in the supreme court of the United States, and in many of the courts of last resort in the several States, as to the conclusiveness upon controverted facts of the verdict of a jury in a criminal case, it is otherwise in this State. From an early day, in the history of our jurisprudence it has been consistently held that while a verdict, approved by the trial judge in such a cause, is entitled to great weight, yet it is not conclusive, and this court, out of tenderness for human life and liberty, will for itself search the record, and, if it be found that there is a clear preponderance of evidence against the verdict, will reverse the judgment of the court below; but the burden of showing such preponderance rests upon the party appealing. *Leake* v. *State,* 16 Humph., 145; *Hill* v. *State,* 3 Heisk., 317; *Robertson* v. *State,* 4 Lea, 425.

This record shows the theory of the State in the trial court to have been that the killing of Senator Carmack was the result of a conspiracy to take his life, entered

into by and between plaintiffs in error and John D. Sharp, and that D. B. Cooper and his son Robin, at least, armed themselves to that end. At the bar of this court we do not understand this theory to be urged, but rather that the father (in the words of the attorney-general), "Col. Cooper, having threatened the life of Mr. Carmack, armed himself and went out of his way to find him; that Robin Cooper, knowing of his father's hostility and threats, also armed himself and went with his father to 'help him;' that the father brought on the difficulty; and that Robin Cooper, carrying out his purpose 'to in-- tervene' and 'to help,' did engage in the difficulty precipitated by his father, and fired three shots, which took fatal effect upon the body of the deceased."

Upon this hypothesis it is insisted, as a matter of law, that the father being the aggressor, cannot avail himself of the plea of self-defense, and, therefore, that such plea is not available to Robin Cooper, the son, who thus, it is assumed, unlawfully interposed. For this proposition sections 332 and 521 of Wharton on Homicide (3d Ed.) are cited as authority. In the first of these sections the author lays down the law as follows:

"The doctrine of freedom from fault in bringing on a difficulty as a condition precedent to a plea of self-defense applies with equal force to a case in which one person interferes in a difficulty between two others in behalf of or to protect one of them; and, generally speaking, a person who does this will not be allowed the benefit of the plea of self-defense, unless such plea would have been available to the person whose part he took, in

case he himself had done the killing, since the person interfering is affected by the principle that the party bringing on the difficulty. cannot take advantage of his own wrong.  .  .  .  Thus, if a son fight in defense of his father, his act in doing so will receive the same construction as that of the father and if the latter was the aggressor in bringing on the difficulty, and could not plead self-defense, the same rule applies to the son. And the son cannot rely upon his own freedom of fault in bringing on the difficulty, as a defense, where he knew the father had provoked the attack. Both must have been without fault in bringing it on."

In section 521 is found the following statement of the same principle:

"The general rule, as ordinarily  stated,  is that  a brother or other relative, assisting another in resisting a wrongful act directed against the latter, can use no more force than the person he assists would be entitled to use, and that interference to protect a relative is not justified where the relative was the aggressor in the difficulty. A person has a right to use violence in defense of another only when the imperiled person would have been justified in using it in his own defense. Both must have been free from fault in bringing on the difficulty."

On the other hand, the theory of the plaintiffs in error was, and is, that they had no motive or reason to kill Senator Carmack; that their meeting with him on the occasion in question, in a sense, was accidental, and having met him, without any attack upon him by either of these parties, he made a deadly assault upon Robin

Cooper, and thus forced the latter to kill in defense of his own life.

To a correct understanding and just determination of the issue presented in the court below and here by these two hypotheses, as well as for other reasons which will later appear, we deem it proper, if not essential, to consider to some extent, the earlier as well as the later relations existing between Senator Carmack and Col. Cooper, and especially the conduct of these two, as well as that of Robin Cooper, within the twenty-four hours preceding the fatal meeting. The record discloses that Col. Cooper and Senator Carmack, until about 4 years prior to the homicide, had been close and confidential friends. When the Senator was quite a young man, Col. Cooper, who then controlled the *Nashville American,* a daily newspaper, brought him to Nashville and placed him in charge as its editor. This place he retained for several years, when he abandoned it to become the editor in chief of the *Commercial Appeal,* published in Memphis, in this State. In the card announcing the severance of his relations with the *American,* and the taking up of his new work, among other things, he said; "I desire especially to acknowledge the debt I owe and the regard I feel toward Col D. B. Cooper, under whose management I first became connected with the *American* and with journalism. It is a pleasure at this time that I cannot recall one word, act, or incident which has marred the harmony of our relations during the whole time of our intimate association."

The pleasant relations indicated by this card continued between these gentlemen until Mr. Carmack became a

candidate for succession to his seat in the United States Senate, opposed by former Governor, and now Senator, R. L. Taylor. The espousal of the cause of the latter, in this race, produced a coolness upon the part of the former to Col. Cooper, but no open rupture. Subsequently, in the heated canvass which occurred in the State, in 1908, between Mr. Carmack and Gov. Patterson, in which the former contested with the latter his renomination as governor, Col. Cooper becoming the open supporter of Gov. Patterson, there resulted a cessation of all intercourse, even of the most formal nature, between them.

In the course of the public debates between himself and Gov. Patterson during the canvass, the record shows that Mr. Carmack frequently referred to Col. Cooper by name, first, as the latter testified, "in a spirit of ridicule," then with "veiled insinuations of corruption." Upon the termination of this canvass, Mr. Carmack became the editor of the *Tennessean,* a leading daily newspaper, published in Nashville, in this State. In the editorial columns of that paper frequent use of Col. Cooper's name was made, and in a way which was evidently both galling and exasperating to him. Perhaps there has been no man in public life in Tennessee, for certainly a half century, who was more brilliant in intellect and more eloquent in speech or in the editorial chair, one more the master of vigorous English, than Mr. Carmack, and when so disposed he was equally trenchant with both tongue and pen. It was the frequent use of Col. Cooper's name, by this greatly gifted man, that at

least remotely led to the deplorable tragedy of November 9th.

In the issue of the 8th of November, 1908, of the *Tennessean*, there appeared an article in the editorial columns, entitled "Across the Muddy Chasm," in which ironical reference was made to Col. Cooper and recent work attributed to him, in the character of "peacemaker." It is very evident that by this time the latter became angered to a degree of intense indignation. It happened that on the evening of that day he met Mr. E. B. Craig at the Tulane Hotel in Nashville, by previous arrangement, to talk with him on a matter of business. The meeting occurred as agreed upon, and when the business which brought them together was dismissed, the subject of these newspaper references to Col. Cooper was discussed. Mr. Craig testifies as follows: "Col. Cooper commenced speaking of some editorial in the *Tennessean* in which his name was used. I soon discovered that Col. Cooper was very much agitated, very angry, and very threatening. He stated that his name must not appear in the *Tennessean* again. In that connection he said: 'I am an old man, a private citizen, and it makes little difference whether I go or not. My name must not apear in the *Tennessean* again.' I discovered, as I stated before, that Col. Cooper was very much agitated, and he was very violent in his denunciation of Senator Carmack. . . He denounced him as an ingrate, a scoundrel and soon said that if this article again appeared or his name appeared again in the *Tennessean* that he or Senator Carmack must die."

A little later in his examination he was asked questions and made answers thereto as follows:

"Q.  What, if anything, did you do, and why?

"A.  Well, I stated to Col. Cooper that I regretted that such a condition existed, and I would like, if he did not object, of seeing—I would like to see if I could do anything to relieve the situation.  I think Col. Cooper asked me what.  And my reply—

"Q.  Asked you what?

"A.  Asked me what meaning I had in my mind and my reply was 'Nothing only a short conference with Mr. Carmack himself.'  .  .  .

"Q.  What, if anything, did he say in the conversation about any note he had?

"A.  In the conversation, exactly at what point I do not remember, sir, he stated that he had written Senator Carmack a note that could not be misunderstood."

Mr. Craig further testified that he went, as he had proposed, to the office of the *Tennessean,* where he had a conference with Mr. Carmack, and communicated to him, in substance, the conversation he had just had with Col. Cooper.  The witness was not permitted to state what Mr. Carmack said in reply, but he testified that he returned to the Tulane Hotel and found Col. Cooper there, reported to him that he "could accomplish nothing," and that he (Cooper) said, "Then, by G——d this note goes."

The note referred to, according to Mr. Craig, was the one mentioned by Col. Cooper in their "previous conversation."

In reference to this interview, Col. Cooper, after agreeing with Mr. Craig as to the manner of their meeting at the Tulane Hotel, on Sunday night, and as to his knowledge of the close and intimate friendship that existed between Mr. Craig and Mr. Carmack, testified as follows: "I was very indignant at the constant attacks upon me, and I expressed it to Mr. Craig, and very forcefully, as far as that is concerned. There was no doubt about my indignation in the matter, and he then asked, 'Would you object to my seeing Senator Carmack and trying to put matters in better shape than this?' I said, 'Not at all; would be very glad if they were in better shape; would be glad if you would see him, if you think you can accomplish any thing.' He left me for a little while, . . . and came back. . . . He came to me, and this was a very brief interview that we had the last time, and he stated to me that Mr. Carmack—that nothing could be done, that he was in an ugly humor, or words to that effect, and that he was sorry to tell me that he could accomplish nothing. . . . "

In regard to the first interview between himself and Mr. Craig, when the latter proposed to see Mr. Carmack, with the view of putting "matters in better shape," the witness was asked if he demanded an apology "from Senator Carmack for any of the past denunciations he had made," and his answer was, "I specifically disclaimed demanding any. . . . I told him specifically I demanded no apology; that I wanted no further personal relations with him at all. I simply wanted this matter to cease, that they must cease, and in substance I stated that, and

said to him that the town was not big enough to hold us both unless it did cease; that I wouldn't have my face spit in every morning of the world that I got up from my bed; that it had to cease. I had my own method by which it should cease, of which I will tell you when you want later."

With regard to the note mentioned by Mr. Craig in his evidence, the following questions were asked the witness, and answers to the same were made by him:

"Q. When Craig brought you the information that Carmack was in an ugly humor, or mood, and he could do nothing, . . . what did you say, if anything?

"A. I told him just what I said a moment ago, that it had to cease.

"Q. I understand, but did you say anything further about the note?

"A. Oh, yes; . . . the note was spoken of in the first interview between Mr. Craig and myself, that I had prepared a note that I was going to send him, and that was one of the reasons why Craig proposed to interview and see if matters couldn't be put on a better basis, and—

"Q. You have stated—

"A. Well, sir—

"Q. I beg your pardon.

"A. Well, I was going on to state that that note came up in the second interview, do you understand? That alone referred to again, that if it was not stopped I would send this note. . . .

"Q.   Was that not addressed to Senator Carmack about these denunciations?

"'A.   It was a note addressed to Senator Carmack about these editorials: yes, sir."

It will be recalled that Mr. Craig testified that in their first interview Col. Cooper had said, "if his name appeared again in the *Tennessean,* that he or Senator Carmack must die." In the course of his cross-examination Col. Cooper denied the making of this statement, and repeats that what he did say was "that if his name appeared in the paper again the town would not be big enough to hold both of them." His explanation of this threat was that if the use of his name was not discontinued he purposed to expose the private and personal life of Senator Carmack, and that after this was done the town would not "have been big enough to hold the two."

It is argued with much force and plausibility that the statement of Col. Cooper as to what he uttered in the way of a threat with regard to Mr. Carmack is entitled to much credence, by reason of the fact that, according to Mr. Craig, as has already been seen, upon reporting to Col. Cooper that nothing could be accomplished, instead of replying, as would have been most natural, if it had been he had said in the earlier interview, that if the use of his name was not discontinued "he or Senator Carmack must die," his reply was, according to the testimony of both, "Then this note goes," striking his hand at the same time upon his person, as if to indicate that he then had with him the note referred to. It may be said, in passing, that the note referred to, it seems, was pre-

pared by Col. Cooper during the afternoon of that Sunday after reading an editorial in which his name was again used in that morning's edition of the *Tennessean.*

We regard it, however, as immaterial as to whether Mr. Craig or Col. Cooper be right as to the exact character of the threat made in their first interview. There can be no doubt that Mr. Carmack understood, from what Mr. Craig said to him with regard to the violent mood of Col. Cooper, that in the event of the use of Col. Cooper's name again in the editorial columns of that paper, he might expect a personal attack. So it was that, a short time after Mr. Craig left on Sunday night, Mr. Carmack borrowed a pistol from a friend to defend himself in case of such a contingency.

Unfortunately for all these parties, there appeared in the Monday morning's issue of the *Tennessean* another editorial, which Col. Cooper evidently regarded as an open defiance of him. Upon reading it he went immediately, and in a state of great anger, to the office of his son, Robin Cooper, reaching there about 9 a. m. At that time the son was living with his uncle, Mr. J. C. Bradford, about three miles from the city, and since he began to practice law, in 1902 or 1903, had his office with Mr. Bradford, a leading member of the bar of Nashville. It is evident from the record that intimate relations existed between the father and the son, and that the latter entertained for the father the most tender filial affection. It was not unnatural, therefore, that Col. Cooper should have gone, first of all, to his son to talk with him about this matter, which had assumed so grave a condi-

tion that it threatened a serious crisis.   So far as the record discloses, Col. Cooper had not communicated to his son Robin, up to the time of this interview, his sense of outrage under what he esteemed to be continued af-fronts put upon him.

The record further discloses that Mr. Bradford's law office consisted of three rooms, opening into each other. One of these was occupied by him as a private office, the one adoining by Miss Daisy Lee, his stenographer, and the third by Robin Cooper.   About 9 o'clock Monday morning the latter reached his office, and, as has just been stated, soon afterwards his father came and joined him.   Evidently the father was greatly excited, and, no doubt, in the course of the conversation which ensued, in speaking of Mr. Carmack, as Miss Lee (who was a wit-ness for the State) testified, he did say that "he (Mr. Carmack) has no right to use my name," and "I have a right to protect myself."

Before it was made known to him in this interview, it is apparent that Robin was ignorant of the meeting be-tween his father and Mr. Craig, and of the message which the latter had borne to Mr. Carmack with the con-sent of Col. Cooper.   Leaving out the questions ad-dressed to the witness, and giving Robin's testimony, as to what was then said and done, in a narrative form, it is as follows: "My father stated to me that he was afraid that he would have trouble with Mr. Carmack, and I asked him why. . . .   He stated to me in substance that Mr. Carmack, ·in his paper, . . .  had been publishing editorials day after day attacking his character, and, as

Cooper v. State.

he expressed it, shot poisoned arrows into him; that it had come to a point where it was unendurable, and that the night previous . . . he had seen Mr. Ed Craig at the Tulane Hotel. He stated to me the substance of his conversation with Mr. Craig, to the effect that he had told him that Mr. Carmack was an ingrate and a coward to use his name and attack his character in his newspaper when he would not say what he had said to his face; that he felt outraged, and had sent word by Mr. Craig that he (Mr. Carmack) must cease using his name in his paper. He further stated to me that Mr. Craig had come back to him, and had told him that he had seen Carmack and that he would agree to nothing. As I remember it, he said, 'Mr. Craig said that Carmack was in an ugly humor, or mood, or a vicious mood, and would agree to nothing.' Papa also told me [that] in the statement to Craig he told Mr. Carmack that if he didn't cease using his name in the *Tennessean* in the manner which he had done, that the town wasn't big enough to hold them both. I was very much distressed when my father told me that. I told him I was very sorry indeed that he had sent Mr. Carmack any such message; that I believed my uncle, Mr. Bradford, could bring influence to bear on Senator Carmack, or send friends to him, mutual friends, who could explain to him papa's indignation that he should so use his name, and get him to stop it. It was then that my father said to me, as I remember the words, that 'he has no right to use my name,' and in justification of his message to him he said, 'I have a right to protect myself —to send a demand that he stop publishing his name."

This interview covered a period, according to the witness, of about fifteen minutes. At the end of this time Col. Cooper left the office, saying that he would be back later in the day to see Mr. Bradford.

That the son was alarmed by this conversation with his father, and set about at once seeking to save him from a possible street meeting with Mr. Carmack, we are satisfied. That this alarm was occasioned by the belief that his father, rather than Mr. Carmack, would likely be the victim of a hostile meeting between the two, we think is beyond question. The disparity in age and physical condition between them would naturally, in the son, have been the occasion of great concern. His father, a man sixty-five years of age, with a crippled right hand, might well have seemed to this son no match in a street encounter with Mr. Carmack, then in the full vigor of physical, as well as intellectual, manhood. Robin Cooper called his sister, Mrs. Dr. Lucius Burch, over the telephone, and spoke to her with regard to the conversation that he had just had with his father, and asked her to try and reach his father over the telephone, and to keep him off the street. Foregoing an engagement which he had to meet Maj. W. O. Vertrees at the chancery court room, for the purpose of trying a cause, in which they were engaged as adversary counsel, he started in search of his father, his alarm growing with continued thought over the critical relations then existing between Mr. Carmack and Col. Cooper, he went to the Maxwell House, in search of the latter, then to the Tulane Hotel, where the State Democratic executive

committee had its headquarters, which were frequently visited by Col. Cooper, and, failing to find him, returned to his office, where he called Gov. Patterson over the telephone, to inquire of him if he knew anything of this impending trouble. Restless and unhappy, he remained in his office but a few moments, when he again left it and once more went to the Maxwell House in his search, and from there to the office of his uncle, Robin Jones, in the Steger Building, on Cherry street, for the purpose of getting his assistance in an endeavor to overtake his father. He walked the streets in this quest, and went once more to the Tulane Hotel, reaching there, according to his testimony, about 11 o'clock, and again failed. About 12 o'clock he secured from his uncle Robin Jones the pistol with which he afterwards killed Mr. Carmack. In explanation of securing the weapon, he made the following statement: "In the conversation in my office that morning, my father had related to me the message that he had sent to Carmack. It was strong and very direct, and I thought, knowing what I did of Mr. Carmack, that he would resent it. I feared it very much, and I didn't want my father on the streets until some adjustment could be made of it, and I was looking for him and trying to get him off the streets, and I couldn't find him, and I believed that I ought to get a pistol, so that if I did find him, and it was necessary for him to be on the streets, that I could be with him, and, in case he were attacked, protect him."

As has been stated, this pistol was secured about 12 o'clock. About the same time he ascertained that his father was at the Maxwell House, and at once followed him to that place. Upon reaching there the witness asked him if he had seen Mr. Bradford, and, in reply, Col. Cooper said that he had seen him, and had an engagement to meet him at his office at 3 o'clock. In explanation of this meeting, fixed for that hour, the witness states that Col. Cooper told him that Mr. Bradford was going to adjust this matter, and that he (Cooper) was to meet him at his office with a view to this adjustment.

In this conversation at the Maxwell, the witness states that his father told him that he would not go on the streets, but would stay at the Maxwell House until the hour arrived for this meeting.

Evidently this conversation relieved the son of the tension which had followed his interview with his father at his office in the morning, for he went at once from the Maxwell House to the chancery court and entered upon the trial of the cause, which has been already referred to. He was there engaged until about 2 o'clock and left the courtroom about that hour, and lunched with Maj. Vertrees at the Utopia Hotel. As additional evidence that this young man regarded the danger as having been averted, he took from the courtroom, when he left it, the papers in the cause which he had been trying to his office, intending to work with them that night in the preparation of his brief. The search for his father, his engagement at the chancery court room, and his lunch at the Utopia, had practically taken up all the time between

the leaving of his office by Col. Cooper, a few minutes af-
ter 9 o'clock in the morning, until about fifteen minutes
to 3 p. m., when, parting with Maj. Vertrees, the witness
went immediately to his office, where he found his uncle,
Mr. Bradford. A conversation between the two then
ensued with regard to the trouble between Col. Cooper
and Mr. Carmack. In this conversation, Mr. Bradford
said to Robin that he need not longer worry about this
trouble; "that he was sure he could fix it up all right."
Continuing, the witness said: "He told me that my
father would be back in the office at 3 o'clock, which I
knew, and that he was then going to insist that he (Col.
Cooper) should not send a note, which my father had
written, and that he knew my father would follow his ad-
vice. Resting on this assurance from Mr. Bradford,
Robin went into his own office and began his professional
work with papers that he had upon his desk.

At, or about, 3 o'clock, according to his engagement,
Col. Cooper came and entered the private office of Mr.
Bradford, and these two were shortly after joined by
Gen. Tully Brown. Within a few minutes, Robin
Cooper, passing from his office through the room of the
stenographer, entered that in which these three parties
had their meeting.

In the course of her testimony, Miss Lee has stated
that after the meeting between Col. Cooper and his son,
occurring, as already seen, soon after the latter had en-
tered his office, in the early hours of the morning, Col.
Cooper returned between 10:30 and 11 o'clock a. m., and
had another with Robin in Mr. Bradford's office. She

states the door was open between the room occupied by her and that in which these two parties then met, and that she distinctly heard the conversation which ensued, and that in the course of the same Col. Cooper denounced Mr. Carmack in both violent and obscene language. This interview is expressly denied by Col. Cooper and by his son, and if the narrative of Robin's movements, as given by himself and set out above, is to be believed, then Miss Lee is in grave error in this part of her testimony.

But, independent of the testimony of Robin Cooper as to his own movements, the record, we think, otherwise shows that beyond all question Miss Lee was in error as to this second interview between Col. Cooper and his son. It will be remembered that Miss Lee fixed it as occurring between 10:30 and 11 a. m. When Col. Cooper left the office of Robin Cooper, a little after 9 a. m., he testified that he went at once to the livery stable of Sandy Brown, for the purpose of purchasing a horse for his son-in-law, Mr. Chas. N. Burch, of Memphis. Mr. Brown fixed this visit to his stable as having been made between 9:15 and 9:30 o'clock, a. m. He states that after Col. Cooper arrived, the horse, which he had in view to purchase, was brought out and saddled, and then was ridden up and down the street in front of the livery stable, that he was then unsaddled and taken to a blacksmith shop in the near neighborhood and shod, and that from 20 to 30 minutes were consumed in shoeing. After this had been done the animal was harnessed and hitched to a buggy, and that Col. Cooper and Dr. Brown, the son

of the witness, drove off, and this was as late as 10:15 a. m.   The blacksmith, Mr. O'Brien, testifies that he shod the horse, and that at least twenty-five minutes were used in this work and that it was finished about 10 o'clock.   Dr. Brown corroborates his father and Col. Cooper in stating that it was about 9:30 when the latter reached the livery stable.   He agrees with his father about the trial that the horse was subjected to, in being ridden up and down the street in front of the stable, and with Mr. O'Brien as to the fact that the animal was shod by him, and as to the time consumed in this service.   He further states that the horse was then harnessed and hitched to a buggy, and, as the harness had to be fitted to the animal, about ten or fifteen minutes were consumed in this way.   After this was done Col. Cooper and Dr. Brown got into it, and drove slowly down Front street to Broad, then out Broad street to a point a little beyond Dr. Burch's residence.   In passing the residence, Col. Cooper was called by a servant.   In answer to this call, the buggy was turned around and driven back to the gate, where Col. Cooper got out and went into the house. Dr. Brown, sitting in the buggy, remained at the gate for a few minutes, when Col. Cooper came out and told him he would not detain him longer, and that he could return to the stable, which the witness says he did do, reaching there about 11 o'clock a. m.

As has already been stated, Robin Cooper testified that immediately after his father left Mr. Bradford's office, Monday morning, in his anxiety to prevent a meeting between his father and Mr. Carmack, he telephoned his

sister for aid in accomplishing this. That his testimony
in this regard is true we have no doubt. Col. Cooper
states that when, in answer to the call, he left the buggy
in which he and Dr. Brown were riding and went into the
residence of his son-in-law, Dr. Burch, he found his
daughter, Mrs. Burch, greatly agitated, as the witness
expressed it, "almost hysterical in manner," on account
of the message which she had received from Robin about
"the supposed difficulty that might occur between Sena-
tor Carmack" and himself; "that she was alarmed lest he
[her father] might be shot down on the street." That
this was her condition of mind, and that she took steps
to prevent this apprehended difficulty, is made clear on·
the record. Among others, she called Gov. Patterson over
the telephone and informed him of the impending
trouble, and, it is clearly inferable, begged his interven-
tion to prevent it. Acting upon the information, Gov.
Patterson and his secretary, Mr. Scruggs, immediatly
started in search of Col. Cooper, going to the various
places in the city where it was known he was in the habit
of resorting. About 11 o'clock Gov. Patterson found
him at the Maxwell House, where, according to Col.
Cooper, he had gone directly after leaving the home of
his daughter. Gov. Patterson was examined as a wit-
ness in the case with regard to what occurred at that in-
terview, as well as afterwards. Much of his testimony,
while brought into the record, was, on objection from the
state, excluded from the consideration of the jury. The
action of the trial judge in this regard is made the sub-
ject of an assignment of error, which will be considered

hereafter. It is sufficient to say, at this point, that he was only permitted to show the result of the conference that then took place. He states that upon reaching the Maxwell House, and finding Col. Cooper there, in answer to his (the witness') request, Mr. Bradford was sent for, and that upon his reaching there, a few minutes thereafter, he, Col. Cooper, and Mr. Bradford had a consultation, or conference, with regard to the threatening aspect of the trouble between Col. Cooper and Mr. Carmack. At this conference Robin Cooper was also present. Gov. Patterson stated that the result was "that Col. Cooper turned over to Mr. Bradford a note which he had written to Senator Carmack, and which he had not signed. Mr. Bradford was to take this note and call upon a mutual friend to see if an honorable adjustment could not be had of this matter. Col. Cooper was to meet Mr. Bradford at 3 o'clock at his office." Gov. Patterson further states that Robin Cooper concurred in this result.

Evidently regarding all immediate danger as averted, and the difficulty in process of honorable adjustment, Gov. Patterson left the Maxwell House to go to the Mansion, as it was then about his lunch hour. At his suggestion, Robin Cooper accompanied him a part of his way.

Mr. Bradford also testified as to this meeting. He states "that upon reaching the Maxwell House, in answer to the telephonic message sent," "I learned that the subject-matter of discussion was the sending of a note by Col. Cooper to Senator Carmack, protesting against the

publication of his name in the *Tennessean.* Gov. Patterson was opposed to his sending the note, and I asked Col. Cooper to hand it to me. I read it. It was not signed." The witness was then about to state what he said to Col. Cooper, when he was interrupted by the following question: "Well, without stating the language, what was the result of that? What was finally agreed on there?" To which he replied, "It was agreed— I stayed a very little while there. I took the note and put it in my pocket, and it was agreed that the note should not be sent, but that I should go off and try to find a friend, I had in mind, of Senator Carmack, to ask him to see Senator Carmack and talk the matter over with him, and ask him to cease the publication, and Col. Cooper was to come to my office at 3 o'clock." With this understanding, he (Mr. Bradford) carried the note away with him and had in his mind, as the person whom he would seek as a mediator between these two parties, a gentleman who was his client, and an intimate friend of the witness, and a strong supporter of Mr. Carmack. Having accomplished this much, and evidently believing that the trouble could be satisfactorily adjusted, he left the place of meeting.

It is not improper to set out, at this place, the note which had been prepared by Col. Cooper, though unsigned by him, which was taken by Mr. Bradford when he left the conference. It is as follows:

"Nashville, Tennessee, Nov. 9, 1908.

"E. W. Carmack, City—Sir: I am a private citizen. I am neither an office holder, nor an office seeker. I have violated no law, and, consequently, am not a legtimate

Cooper v. State.

subject of public attack or discussion. For many months, on the stump and through newspapers, you have seen fit to offensively use my name and vent your malignity. You have no more right in this manner to annoy, insult, or, injure me than you would have to do so to my face. I notify you that the use of my name in your paper must cease."

The record shows that Col. Cooper, having an engagement with a lady friend, and in compliance with a suggestion made to him by Gov. Patterson, remained at the Maxwell House in her company until 3 o'clock, when, according to agreement, he went to the office of Mr. Bradford. Soon after getting there, Gen. Tully Brown came in. In a little while Robin Cooper joined these three gentlemen in Mr. Bradford's room, where a conference took place, which lasted from fifteen to thirty minutes. The result of this was, according to the testimony of all these gentlemen, that an agreement was reached that Col. Cooper should not send the note, but would leave the whole matter in the hands of Mr. Bradford with a view to its settlement. This being arranged, Col. Cooper remained a few minutes in the room, and the conversation that ensued was upon indifferent subjects. In a short while he left, as is testified to by Mr. Bradford and Gen. Brown. No doubt satisfied that the danger was passed, Mr. Bradford said to Robin Cooper that he need not worry any more with regard to it. Thus assurred, Robin returned to his own room. Gen Brown remained with Mr. Bradford, in the latter's office. The conversation between these two gentlemen, which followed, was

with regard to matters suggested by Mr. Bradford's recent sojourn in Europe.

So, notwithstanding the fact that Col. Cooper armed himself on Sunday night, in anticipation of a possible difficulty with Mr. Carmack, in the event they met, and that Robin Cooper secured a pistol, during the morning of Monday, to protect his father, if necessary, yet, at 3 o'clock, when this conference broke up, it was with the understanding that no hostile demonstration would be made by Col. Cooper and that bloodshed would be avoided. This we are satisfied was confidently believed by these parties, with whom he had been in counsel. What occurred, upon what we regard as indisputable testimony, repels the suggestion made by the state in the trial court that there was then, or had been, a conspiracy to murder Mr. Carmack. On the contrary, the evidence points, inevitably, as we think, to the conclusion that, up to this point, the friends of Col. Cooper, as well as his son, Robin Cooper, had set in motion every influence of which they had command to bring about a peaceful solution of the trouble between himself and Mr. Carmack, and believed that this result would be reached. The conduct and conversation of these parties we regard as irreconcilable with any other view.

Returning now to the record, as to the movements of Col. and Robin Cooper and their purpose as there disclosed, it will be recalled that, soon after the agreement had been reached that the note should not be sent, Col. Cooper left Mr. Bradford's office. Mr. Bradford had communicated with Gov. Patterson, who was then at the

Capitol, by telephone, and, we think it clearly inferable, in doing so had advised him of the agreement. A few minutes later Gov. Patterson called over the telephone Mr. Bradford, to get him to have Col. Cooper meet him in a half hour with Mr. Austin Peay, his friend and late campaign manager, at the Governors Mansion, to which he was about to go from the Capitol. At the instance of Gen. Brown, who found Col. Cooper with Robin, he (Col. Cooper) returned to Mr. Bradford's room, and, taking up the receiver, talked with the Governor and arranged to go to the mansion for the purpose of seeing him. This request for a meeting was foreign to the subjct of the difficulty, as testified to by these two parties to the conversation, and no suggestion is, or, as we suppose, could be, made that this testimony is to be discredited. According to the evidence of Messrs. Brown and Bradford, Col. Cooper sat with them for some little time after the engagement was made, and the matter of his trouble with Mr. Carmack was not again alluded to. After sufficient time elapsed to enable him to reach the Executive Mansion at the hour appointed, Col. Cooper made ready to go.

Apprised of this engagement, and seeing his father in the act of going to meet it, the son proposed to bear him company. Without absolutely declining to permit this, yet Col. Cooper did suggest that there was no necessity of his doing so, in view of the result of the conference which had just terminated. Robin Cooper, no doubt realizing that an agreement on his father's part to adjust the

123 Tenn.—12

trouble, not communicated to Mr. Carmack or acceded to by him, was not the equivalent of an adjustment, and feeling that until this point was reached, his father was in some danger of a chance encounter with Mr. Carmack, and acting under the influence of that affectionate solicitude, which had marked his course from his first knowledge of a possible impending crisis, persisted in his purpose. This natural impulse would have been sufficient to explain his conduct, but Gov. Patterson, when on the witness stand, stated that when he parted company with Robin, after leaving the Maxwell House meeting referred to, he said to him, 'Robin if I were in your place, I would stay with my father as much as I could to-day." This, however, though in the record, was not permitted to go to the jury, and its exclusion is made the subject of an assignment, which will be hereafter considered. This suggestion, coming from such a source, of itself, without more, would have afforded sufficient reason for his insistence. So it was his father yielded.

It happened that Miss Daisy Lee, the stenographer of Mr. Bradford, who, as has been seen, was a witness for the State, and Mrs. Blake, her friend, were in the room of the former when these two passed through, on their way to the meeting with the governor. Miss Lee states that as they went out she noticed on Robin's face "an expression" she had "never seen before." "It seemed," according to this witness, "almost spotted over [with] some big excitement." It is evident that this curious facial phenomenon was not observed by Mrs. Blake, who knew him well, and saw him often, as she was a

Cooper v. State.

stenographer in a nearby office in the same building.  At
least she did not mention it, when examined; and the
statement of Miss Lee is contradicted by Gen. Brown and
Mr. Bradford.  In addition, it is difficult to understand
why so strange and well-marked a metamorphosis should
have been exhibited by this young man, when he had
only a few minutes before been assured by his uncle that
the "danger was over" and "he need worry no more."
That he might have been sufficiently absorbed, by the
sense of duty which impelled him to insist on being on
the streets with his father, as to go by Mrs. Blake with-
out giving her his usual courteous recognition, as she
testifies, under the circumstances was not remarkable.

Returning now to the movements of Col. and Robin
Cooper, as shown in the record, we find that on reaching
Church street, after leaving Mr. Bradford's office, they
chose the "least frequented route" to the Executive Man-
sion.  They went west on Church  to Fourth avenue,
and, halting only a moment for Robin to take a "glass
of coca-cola," they proceeded north on this avenue to
the Arcade, and, turning west, they went until they
came upon John D. Sharp, engaged in a business conver-
sation with one Roscoe Mathews about midway the Ar-
cade.  Mr. Sharp was a strong friend of Gov. Patter-
son, both politically and otherwise.  They exchanged
salutations with him, and Col. Cooper, telling him he
was on his way to see the Governor, invited Mr. Sharp
to accompany him.

That this meeting was purely accidental, we have no
doubt.  Sharp had been out of Nashville for several days,

and, we are satisfied, had no knowledge of what had transpired the night before, or the efforts made during that day to avoid trouble between Col. Cooper and Mr. Carmack. When he accepted the invitation, thus extended, we are satisfied he was still in ignorance of these things.

After a short delay at the point of this meeting, Col. Cooper and Robin, joined now by Mr. Sharp, continued their way through the Arcade to Fifth avenue, and, turning north, walked to Union street, and then west on this street to its intersection with Seventh avenue. From Sixth avenue to Seventh avenue there is a considerable grade. In ascending it Robin Cooper and Mr. Sharp were in front, so that when the intersection, referred to, was reached by them, Col. Cooper, who, on account of his age and comparative corpulence, walked more slowly, was some little distance behind. Happening to look south, Robin Cooper saw Mr. Carmack on the other side of Seventh avenue, walking north from Church street, and, according to the testimony of Sharp and himself, turned to Sharp and said, "There goes Senator Carmack; dont let papa see him," and immediately called to his father, who was about twenty-five feet behind, saying, "Let's hurry up." To this his father replied, "Well, wait a minute." When Col. Cooper reached the corner on which Robin and Sharp stood, this being the southeast corner of Union and Seventh avenue, the three turned toward the Governor's Mansion. Robin took hold of his father's arm, in order to hurry him. When nearly across Union Street, his father, his at-

tention evidently attracted by Robin's nervous effort to
speed his movement, stopped and said. "What's the mat-
ter?" and, turning, looked south along Seventh avenue.
Seeing Mr. Carmack, he said, "That is Senator Carmack
coming. I will go over there and speak to him myself."
To this Robin replied, "Oh, papa, please don't go," or,
"you can't go." Pulling away from his son, however,
Col. Cooper, as testified to by Mr. Sharp and Robin, said,
in effect, "I know Senator Carmack and there will be no
trouble." Suiting the act to the word, he crossed the
avenue to the side on which Mr. Carmack was approach-
ing. Robin soon followed his father, moving, however,
along a more diagonal line, and Mr. Sharp proceeded
north along the east side of Seventh avenue, in the direc-
tion for his home, which was adjoining or near to the
Governor's Mansion.

As stated in the outset, the theory of the State, in the
trial court strenuously pressed upon the jury, and based
on the indictment, was that the Coopers and Sharp had
feloniously conspired to murder Senator Carmack. The
trial judge, in his charge, distinctly tells the jury that
the insistence of the State was that "E. W. Carmack
. . . came to his death as the result of a conspiracy
entered into between the defendants D. B. Cooper,
Robin Cooper, and John D. Sharp to take the life of
him, the said E. W. Carmack, and that the plan entered
into by and between the said defendants to take the
life of the said E. W. Carmack was done and entered
into with coolness and deliberation and special malice
toward him, the said E. W. Carmack, on the part of the

said defendants, D. B. Cooper, Robin Cooper, and John D. Sharp, and that the death of said Carmack was the result of said plan entered into by and between the defendants in manner and form above set out and described."

Two matters of evidence, introduced by the State as tending to support this insistence, will now be mentioned. One of these is found in the testimony of Johnnie Tindall, and the other in that of Mr. Carey Folk.

The first of these two witnesses, Johnnie Tindall, was a young newsboy, about 12 years old, who had come to know Robin Cooper by selling him newspapers, and had also known Col. Cooper for about three months before the day of the tragedy. He testified that in the afternoon of November 9th he was on the corner of Church and Cherry streets, plying his trade, when the two Coopers turned from the former into the latter street, and as they passed him, he heard the father say to the son, "We will get him," or, "We will catch him." He was not certain which expression was used. He further testified that about a half hour afterward he heard the men on the street talking about the killing of Mr. Carmack.

It is positively denied by both Col. Cooper and Robin that this remark was made, or any other that was at all like it, and the whole body of the proof sustains this denial. The remark was idle and meaningless, unless it referred to Senator Carmack, and indicated a step in the alleged conspiracy against his life. This cannot be true, as we are satisfied, upon the evidence already detailed, that at the moment it is said this remark was

made, Col. Cooper and his son were on a peaceful mis-
sion to the governor, and that as to the father, for the
time being, at least, his difference with Mr. Carmack
was dismissed from his mind.

Mr. Carey Folk testified that a little after 4 o'clock
in the afternoon of November 9th, he passed west up the
north side of Union street, and that he observed Col.
Cooper on the opposite side going in the same direction;
that he was walking more slowly than the witness; that
he observed at the same time, standing on the southeast
corner of Union street and Seventh avenue, two persons,
whom he did not then know, but afterward recognized
as Robin Cooper and John D. Sharp; that these two
seemed to be engaged in conversation, though as to this
the witness could not tell; that when Col. Cooper was
still about twenty-five feet away from the two persons
on the corner, he heard one of them, whom he later iden-
tified as Robin Cooper, ask Col. Cooper a question, which
was "exactly, or in substance," this, "Are you going up
this way?"  indicating, as the witness remembered by
a movement of his hand, "Up Seventh Avenue North, to-
ward the Capitol;" that to this question (to use the
language of the witness) Col. Cooper replied, "exactly
or in substance," "No, I will wait awhile yet;" that
witness passed on, and did not see these parties move
from their position on the corner.

At the time this was transpiring, this witness, ac-
cording to his statement, was "walking rapidly" on his
way to the Carnegie Library, where he had "business,"
with his mind "very intent" on this matter of business,

for which he was a "little late." In explanation of the fact that he could only be "sure" of the meaning, and not of the "exact language" used by Col. Cooper and his son, he says that, "not being aware at the time the words were uttered of the importance of such language, I did not absolutely attempt to fix the words in my mind."

The version given by the witness of what was said at that time is flatly denied by the two Coopers and Mr. Sharp. Their testimony as to this matter, in substance and effect, is that Robin said to his father, who had not reached the corner, "Let's hurry up, father," and that the father's reply was, "Wait a minute; I will be there."

It is insisted, with much force of argument, that the statement of what did occur at that time, as given by these witnesses, under well-settled rules of evidence, and in the light of this record, must be accepted as the truth.

It is urged for the plaintiffs in error that as Mr. Folk, at the time, had no reason to attach to what was said by these parties any significance, or to give to their words any particular attention, giving him full credit for honesty, yet his testimony on this point is of little probative force, especially, in view of his admission that he was walking rapidly, with his mind absorbed with his own business.

There is no doubt that testimony in which one undertakes to repeat what another has said is not regarded by the authorities as of the greatest value, and is correspondingly decreased in reliability where it appears that the witness who undertakes its repetition concedes that there was nothing in the occasion or the circum-

stances to fix the language in his mind. The reason for
so regarding such testimony, given ever so honestly, is
so apparent that it need not be stated, nor the cases on
this point cited.

In addition, it is insisted that the version of the plain-
tiffs in error of what was said is the more reasonable.
Robin and Sharp both testify that, on discovering Mr.
Carmack, Robin called to his father, "Let's hurry up,"
and that this was consistent with his conduct and pur-
pose throughout the day, in that "he was urging his fa-
ther on" lest the meeting, of which he stood in fear and
had sought to avoid, might then take place, and that Col.
Cooper's reply, coming from him as he was advancing
slowly up the incline, "Wait a minute," was equally
natural.

The inference evidently drawn by the State, from the
reply attributed, "in substance," by Mr. Folk to Col.
Cooper, "No, I will wait awhile yet," was that it indicat-
ed a purpose to wait for Senator Carmack. But the evi-
dence negatives the idea that the Coopers knew where
Mr. Carmack lived, or had any reason to believe that he
would be on Seventh avenue at that time. The record
shows that the route taken by the Coopers, in order to
reach the Governor's Mansion, was chosen because it was
the "less frequented," and we are satisfied it was an acci-
dent that they and Mr. Carmack were on the avenue at
the same hour that afternoon—a fact as unexpected as
it was tragical in its consequences.

Taking the whole record, we have no hesitancy in say-
ing, that there was no evidence which pointed to J. D.

Sharp as a conspirator against the life of Senator Carmack, and that the jury were right in their verdict of "not guilty" as to him. We are equally satisfied that there is none which supported the contention of the State on the trial below that the two Coopers—father and son—entered into a conspiracy to murder, or assasinate, and that, if held, it must be on the theory, presented by the attorney-general at the bar of this court, and which, in the language of his brief, is set out in the early part of this opinion. For convenience, however, we will repeat the same at this point. It is as follows: "Col. Cooper, having threatened the life of Carmack, armed himself and went out of his way to find him; that Robin Cooper, knowing of his father's hostility and theats also armed himself and went with his father 'to help him;' that the father brought on the difficulty; and that Robin Cooper, carrying out his purpose 'to intervene' and 'to help,' did engage in the difficulty precipitated by his father, and fired three shots, which took effect in the back of Carmack's neck and in his left side, killing him."

It is argued that the testimony of Mr. Craig, with regard to what was said and done at their Sunday night interviews, strongly supports this theory.

It will be recalled that Mr. Craig had two interviews on that occasion with Col. Cooper—the first leading to a visit by him to Mr. Carmack with a view of arranging, if possible, "to relieve the situation," and the second, in which he reported that his effort in this matter had been unsuccessful. The versions of what was said and done

in these interviews, as given, respectively, by these two parties, when on the witness stand, has already been set out at length.   It is sufficient for our purpose now to state that Mr. Craig places the threat of Col. Cooper, that "if his name appeared again in the *Tennessean* that he or Senator Carmack must die," as having been made in their first interview. The making of this threat, in the words attributed to him, is denied by Col. Cooper. He admitted that he did say that the use of his name in the *Tennessean* "must cease," and unless it did cease "the town was not big enough to hold" himself and Mr. Carmack.   These two witnesses, however, agree that in this interview the subject of Col. Cooper sending a note was mentioned.

It is insisted by the counsel of plaintiff in error D. B. Cooper that his version of what was then said is indirectly, but none the less strongly, corroborated by Mr. Craig, in his testimony as to the second interview, in which he repeated his ineffectual effort "to relieve the situation" between these parties.   Upon receiving this information, in his then state of mind, it is said that it would have been natural for him to have repeated this threat, if theretofore made; but instead, according to Mr. Craig, Col. Cooper, striking a pocket in the breash of his coat, said, "Then, by God, this note goes;" and this, in effect, is what Col. Cooper testifies he did say.

Further, it is urged by the State that arming himself, after this interview, followed by the angry and denunciatory conversation which he had with his son Robin in

Mr. Bradford's office at 9 o'clock the next morning, tends strongly to support this theory.

That Col. Cooper intended, as threatened, to send a note, prepared by him Sunday afternoon in the Wautaga Club, of which the one already set out, we are satisfied, is a copy, modified only by the omission of the words, "and thus far you have not had the temerity to do this," (which in the original concluded the next to the last sentence to the close made by him after his interview with Mrs. Burch, on Monday morning), we see no reason to doubt. That he armed himself with a pistol, secured from a friend, after parting from Mr. Craig, with the belief that the sending of this note would probably result in a hostile meeting between himself and Mr. Carmack, we have as little doubt. That he still had the purpose to send the note, with the same idea as to its effect, when he had his interview with his son at 9 a. m., and with his daughter, Mrs. Burch, at 11 a. m., we are satisfied. But the counsel for the plaintiff in error insists that this purpose had been abandoned and the whole matter turned over to Mr. Bradford, for adjustment, if possible, at the conference occurring at 3 p. m. in Mr. Bradford's office. As we have already said, in dealing with the theory of a conspiracy, we think that the record incontrovertibly shows that this agreement had been reached, and in good faith, by all the parties concerned. So, if it be, as insisted by the State, that "Col. Cooper, having threatened the life of Mr. Carmack, armed himself and went out of his way to find him," then it is to be found in the facts beginning with his crossing Seventh

Avenue North to the side on which he discovered Carmack walking, and culminating in his death.

As to the inducing cause of this movement of Col. Cooper, he testifies that on discovering Mr. Carmack "the impulse, formed at the moment, was that I would go and remove all of this condition that was distressing my friends and worrying them to death, and worrying my children and me, and I would go over and have a direct plain talk with Mr. Carmack. He had known me well, and I had known him well. I went over to have that talk directly with him, to protect against this constant attack upon me, and see if it couldn't be stopped." He further testified as follows: "Well, I saw Senator Carmack coming up, as I told you, upon the west side of Seventh avenue, going north. As I started I turned and went across, and my impulse was to go right across the street and wait for him. It flashed across by mind that this might bear significance not intended, and that I would walk naturally down the street meeting him."

While in view of the estrangement between Mr. Carmack and Col. Cooper, and especially of the abortive effort of Mr. Craig to bring about a cessation of Mr. Carmack's editorial references to him, it was no doubt exceedingly unwise for him to thus seek to intercept Mr. Carmack for an interview, but it cannot be said to have been altogether unnatural, considering the former intimate personal relations between the two, severed as they were only by political differences. At any rate, his purpose, if it was as avowed by him, was not criminal, though there can be but little doubt that Mr. Carmack,

recalling the interview with Mr. Craig, would regard Col. Cooper's approach, under the circumstances, as an act of hostility.

Reaching the north side of the avenue, Col. Cooper walked south, while Mr. Carmack was moving to the north, and they came approximately together at a point about 109 feet south of the southeast corner of Union street and Seventh avenue.

Leaving these two for a moment, we will now turn our attention to Robin Cooper. As has been stated already, soon after his father pulled away from him, in disregard of his earnest appeal, and started across the avenue, the son followed. In regard to this action of his, questions were put to and answered by him, as follows:

"Q. Did you follow him immediately?

"A. No; I didn't know what to do. I hesitated. I didn't know whether I ought to go or not. When he had gotten twenty or thirty feet away—some little distance —I thought that I ought to go with him, and I followed.

"Q. Why is it that you thought you ought to go with him?

"A. I knew the message papa sent to Senator Carmack, and I was afraid he would attack him—would resent it.

"Q. Afraid who would attack him—who do you mean by 'he' and 'him?'

"A. I was afraid that Senator Carmack would attack papa.

"Q. Well, what did you understand? Were you afraid at that time that your father would attack Senator Carmack?

"A. Not in the least."

Later, along the same line, in the course of his examination the witness stated that after his father "had gotten about half way across the street I felt that it was my duty, as he was my father, and I believed that he was unable to protect himself, if he should be attacked, to go with him and be there if Senator Carmack should attack him."

It is true that Col. Cooper testified that he said to Robin, as he was moving away from him, in answer to the latter's protest, that he should not cross the avenue, that his (the father's) only purpose was to talk to Mr. Carmack and protest against the further offensive use of his name editorially, and his son testified that he believed this to be true, still it is not unnatural that this did not allay the fears of the son. That this apprehension was real, and not simulated, we are satisfied. The son knew of the Craig interview with Mr. Carmack and its result. He also knew that Mr. Carmack was ignorant of the understanding looking to a peaceful adjustment of the differences between himself and Col. Cooper, reached only a few minutes before at the conference in Mr. Bradford's office. Having this knowledge, he could hardly be without serious fear as to the result of this meeting, which his father was thus seeking. Under the influence of fear he had been laboring for hours to prevent that which now was imminent. His apprehension would nec-

essarily increase under the very shadow of the danger. The strong affection for the father, which, the record shows, this son had, it is evident at that moment strongly dominated him, intensifying his apprehension, and that, acting under the sense of filial duty, he followed him.

The parties met, and the killing of Mr. Carmack occurred, at, or near, two cedar poles standing just inside of the curb of the sidewalk, on the west side of Seventh avenue, and at a point about opposite the south boundary line of the Polk Flats property. The poles just mentioned stood on the same parallel line with the curb, which, with the avenue, ran north and south. Up to a point about seven feet above the pavement they stood about a foot apart. The north pole was eight inches, and the south pole eleven inches, in diameter.

As to the tragedy itself, the State relies, to sustain its contention as to its immediate facts, on the testimony of Mrs. Charles Eastman, in whose presence it occurred. The record shows this witness to be the wife of a citizen of Nashville of high character, and herself to be a lady of admitted intelligence and refinement. She states that she and a kinsman, who was aged and infirm, were walking very slowly south, on the west side of Seventh avenue, and that, having passed a little south of the boundary line of the Polk Flats property, and in the immediate neighborhood of the two poles referred to, they met Senator Carmack, who gave her a smile of recognition, and then, stopping in front, but slightly west, of her, and lifting his hat from his head with his right hand, while holding a cigar between two of the fingers of the left

hand, said, "How do you do, Mrs. Eastman?" and that in reply she greeted him; that he was standing there smiling and in a listening attitude, apparently absorbed in what she was to say further, when she heard a voice in her rear saying, "Well, here you are, all right; I have the drop on you now." She further testified that Senator Carmack at once raised his eyes and, looking over her shoulder in the direction the voice came from, "a look of surprised inquiry, a great change, came over his face," and immediately he shrank, or flinched backward, rather more in front of her and toward the outer part of the pavement, and as he did so ran his right hand in his hip pocket, and drew out slowly—it seemed to hitch in some way—a pistol, and the voice behind her, continuing, said: "You dastradly coward, you cowardly scoundrel, hiding behind that woman are you? Get out from behind that woman!"

She states that, seeing the pistol of Mr. Carmack, and alarmed "by that voice," she became "panicked," and jumped a distance of five or six or seven feet into a gateway of the Shanklin residence, which lay immediately south of and adjoining the Polk Flats property.

She further testified that as Mr. Carmack drew his pistol he had hold of it by the barrel, "his thumb crumpled under the barrel," and that, as she jumped from her position near the center of the pavement into the gateway, the first shot was fired "from her rear as she stood on the pavement;" that, turning after getting inside the gate, she saw the party from whom the voice

had proceeded, and, mistaking Col. Cooper for Dr. White, she exclaimed, "Dr White, for God's sake don't shoot, don't don't;" and that, while she was looking northward at this party and making this appeal, "the other two of the only three shots" she heard followed, and then, looking to the east, she saw "Senator Carmack reeling out, lurching forward," and that as he did so his hand touched the south side of one of the poles, and he pitched from the pavement northeast into the gutter, falling with his head north and his feet south of the two poles. She states, as Mr. Carmack was thus pitching forward, for the first time she saw a young man, whom she did not then know, but at the time of giving her testimoney knew to be Robin Cooper, "standing just south of where" (giving her words) "Mr. Carmack *must* have stood just before he lurched forward and out into the gutter," and she places him nearer the curb than the Shanklin wall or fence and about three or four feet south of the poles.

Mrs. Eastman stated that she did not see a pistol in Col. Cooper's hand, but he had his right arm extended in the attitude of one going to fire a pistol. She admits that she was greatly agitated by this terrible tragedy, and that, turning to Col. Cooper, she denounced him "as brutal and a murderer, as having taken advantage of her presence, and killed Mr. Carmack without giving him a single chance." To this denunciation, she says, Col. Cooper made no reply, though he was near and looking at her, while she was thus denouncing him.

The plaintiffs in error, through their counsel, do not, in the slightest degree, reflect upon Mrs. Eastman, but rather, at the bar and in their brief, join with the attorney-general in paying tribute to her refinement, intelligence and integrity.  They do insist, however, that this unusual, and, in fact, terrible, scene which passed under her eyes, where the positions of the parties were rapidly shifted, and the whole was over within from 30 to 60 seconds, so wrought upon her nervous system that it was in the nature of a phantasm to her mind.  For these reasons, and others, they contend her testimony is not sufficient upon which to rest conviction. Attention is called by them to the fact that, while she had said that the voice in her rear uttered the words, "Well, here you are, all right; I have the drop on you now," yet, of her own accord, she states that the words used were "to that effect; but she could not say that those were the identical words positively, but these were about the words in substance." It is insisted that her impression as to this must be an error, because Col. Cooper *did not,* as a matter of fact have the "drop" on Carmack, and, therefore, could not have said that he did, either literally or in substance." For at the moment these words were uttered which are attributed by her to the man in her rear, Mr. Carmack was in her front—in other words, she was between him and the person whom she believed was his assailant.   It is insisted this derives additional emphasis from a statement, made further along in her testimony, that she thought this man could not see Mr. Carmack draw his pistol.   In reiterating this, she said: "I don't think

that he could have seen it as he stood, because he was slightly to the west of me, and any one back of me could only have seen the arm of Mr. Carmack and part of the shoulder." So it is urged that, as it appears from these statements her body formed a complete barricade at that moment, it could not be that Col. Cooper said that he had the "drop" on the deceased.

It is further insisted that much of her testimony consisted of mere impressions, as this tragedy passed with lightning-like rapidity before her eyes, rather than of actual facts, forming parts of the same. As examples of this, attention is called to her statement as to the first shot, which is as follows: "As I jumped into the gate, as I made this leap and whirled into the gate—the pistol—the firing began; I *think* the first shot began. I had a flinching at the time. I believe it was from the rear as I had stood on the pavement." And, further, her "opinion" was that Mr. Carmack, whose hand was "crumpled up under the barrel of his pistol" when he drew it from his pocket, at the time the firing began, never had time "to straighten it out until he was shot."

In further confirmation of this contention of the counsel of the plaintiffs in error, stress is laid on the fact that though only three persons were engaged in this scene, occurring within a narrow space of time and place, yet Mrs. Eastman did not observe that Robin Cooper was one of the three, but "thought he was a passer-by" —"like herself caught there"—when in fact he was, as is contended by the State, one of the principal actors in the scene.

Again, in corroboration of the same contention, reference is made to the following questions asked Mrs. Eastman on cross-examination, and answers made by her to them, viz. :

"Q.  The question is, considering that Col. Cooper was where he was, when you heard the voice and when you saw him, did or not that movement to the east, after Mr. Carmack had drawn his pistol, put Mr. Eastman" (her aged companion, who was outside and east of the witness) "exactly between him and Col. Cooper?

"A.  That is why I say I will have to make an explanation.  I cannot answer that in a monosyllabic way.  I will tell you that Mr. Carmack— I jumped into this gate in an instant of time.  I made my appeal—

"Q.  Well, now?

"A.  Wait; I must answer.

"Q.  Go ahead.

"A.  Then Mr. Carmack during that time was making a movement outward.  I *imagine* he hadn't stepped immediately in front of Mr. Eastman, because the shots were immediately fired, and at that time I *thought* Col. Cooper was firing, though afterward I knew they were halfway back of Mr. Carmack, and that Mr. Carmack was going between Mr. Eastman and Mr. Robin Cooper."

In view of these matters, and of her statement that she did not see a pistol in the hand of either of the Coopers, and was not able to state that either fired a shot, but evidently believed that Mr. Carmack was mortally wounded, before he had "straightened" his pistol and without discharging it, the counsel for plaintiffs in

error say her evidence falls short of warranting the verdict against the Coopers. In their argument they make a resume of her testimony, in perfect deference to her, and only, as stated by them, "for the purpose of showing how little she saw of what really did happen, and how much occurred which entirely escaped her, or which she had forgotten, and how much of that which was stated by her as an 'opinion,' or which she 'imagined' as having happened, never took place at all."

Turning now to the evidence of Col. Cooper as to the recounter, we find the following:

"We met at a point near the posts, that have been so often described. Ahead of me were two people that I did not know at the moment, and never did know one of them except by hearsay. And as he (Mr. Carmack) came by he spoke to these people. He was on the inside next the lot, not next the curbing—on the inside, between those people and the lot. Mrs. Eastman, who it turned out afterwards to be—I didn't know at the moment—she was also upon that side as relating to her companion, the old man who was with her. About the time she passed, just in the act of passing, I will say, as nearly as I can, directly in line with them, I spoke to him, 'Mr. Carmack,' and he threw his head up and in an instant he drew the pistol. That is—

"Q.  What was his movement when you called his name?

"A.  Just as I have described; he threw his head up as though he hadn't seen me, and then the—

"Q. What was the movement of his person? Did he keep his feet still, or did he move?

"A. No; as he drew the pistol, in the act of drawing it, it was simultaneous, the drawing and the act, and he got between Mrs. Eastman and myself.

"Q. What do you mean?

"A. What say, sir?

"Q. I didn't quite understand?

"A. Well, he passed in front of Mrs. Eastman, having her between he and I, and he passed then across Mrs. Eastman and the man who was with her—it turned out to be Mr. Eastman—going towards the curb.

"Q. How was he facing as he made that movement?

"A. Facing me all the while, going more sideways, diagonally a little. We were a little north of the post, as it turned out.

"Q. What was the width of the sidewalk there?

"A. Well, the width I have seen on the diagram here and on the diagram my counsel have shown me, about 9 feet. I didn't know and couldn't have guessed—10 or 12 feet.

"Q. Well, as he was a little past the center of the sidewalk, the center of it would be 4½ feet from the curbing, wouldn't it?

"A. Yes, sir.

"Q. And if he was a little past that, he might be 5 or 6 feet from the curbing. What do you estimate, in feet, he was from the curbing when you called his name?

"A. I would say that he was 5 or 6 feet, if the curbing,

if the street, the pavement, is 9 feet wide; yes, if that is the accurate measurement of it.

"Q. Well?

"A. And he had his pistol, had it in his hand during that passage. He was between this man and woman, Mrs. Eastman and Mr. Eastman, and myself, until the movement was—

"Q. I don't understand you. You say he was between Mrs. Eastman and yourself?

"A. After he drew his pistol, yes, sir. He got behind Mrs. Eastman, and had Mrs. Eastman and the man between he and I. He passed in front of them.

"Q. Well, that is what I want to know.

"A. (Continuing). And between us. And the movement was very quick and fast. They at once—Mrs. Eastman became wildly excited; she grabbed this gentleman. I couldn't describe accurately their movement; my mind and eyes were more upon Mr. Carmack than any other incident at the moment. I had addressed him just as I would any one. I made no movement of any character that was hostile in the world. This occurred, and he got behind Mrs. Eastman—

"Q. What did you say when he got behind the woman?

"A. Well, I made some remark, 'Damn cowardly to get behind a woman with a pistol in his hand'—something on that order, the exact words I couldn't say exactly; about that, as near as I could say. They moved then to the right and he on to the left.

"Q. Well, before we get to that—

"A I thought you wanted me—

"Q. Did you say before he moved in front of Mrs. Eastman, or at any time, 'I have got the drop on you,' 'Well, I have got the drop on you,' or words to that effect?

"A. No words equivalent to it, for I didn't have the drop.

"Q. Did you make any overt act, or do anything, except as you have stated, with your arm in the position of gesticulation?

"A. Nothing whatever. I didn't have my hands in my pockets.

"Q. Did you draw or attempt to draw any weapon?

"A. I did not, at that time.

"Q. Did you have any purpose in addressing him, 'Mr. Carmack,' of shooting him or killing him?

"A. I had no purpose of shooting or killing him; none.

"Q. When he was moving down, just state what then occurred as he moved down?

"A. Well, it was all very rapid. The mind almost itself could hardly keep up. I can tell you just the impressions that occurred. He passed these people that were between us; passed to the right—he passed to the left, having still his gun in his hand, to these posts, and got behind—went behind the posts, passing the south post, not north, but passing around the south post, and about that moment, as he got around, Robin came in practically between Mr. Carmack and myself, or between those posts and myself, and quicker than I have been talking Mr. Carmack fired through between the posts,

and very quickly thereafter fired another shot; and in the meantime, Robin, going southwards still, got around the lower side of the southern post, and then for the first time I saw his weapon firing.

"Q. At the time Senator Carmack shot Robin, or before that time, did you have your pistol drawn or in your hand?

"A. I did not, nor an effort to it, until he did shoot Robin, and then I attempted—probably got my pistol partially out—the firing had ceased. I saw that Robin had been shot, and I put my pistol back in my pocket and went to Robin.

"Q. By the time or when Carmack had gotten beyond this old man, how close was he to the curbing?

"A. Well, it could not have been very many feet; three or four or five, maybe not over three or four feet, because the passage was there. I couldn't tell, I didn't measure it.

"Q. Well, the whole space was only five or six feet? . . .

"A. I have given it as I understand it, that it was just a step or so. I couldn't tell, the excitement was so intense. I give you just the best impression that came to me.

"Mr. Washington:

"Q. How many shots were fired?

"A. Five.

"Q. describe the reports?

"A. Oh, well—

Cooper v. State.

"Q. That is, with reference to sound—which where the louder reports, and which were the finer reports?

"A. Well, Mr. Carmack's shots were the first, and were louder than the shots of the pistol of Robin.

"Q. Yes, sir. When you—immediately after the shooting you said Robin attracted your attention. What was there about Robin that attracted your attention?

"A. Well, Robin leaned at once aginst the southern post at the—from the southern side of that post—the lower side, and I saw that he was shot; at least, every indication that he was shot. I didn't see where he was shot, or how; but I saw—my mind—that he was faint, leaned up against the post. I then went right immediately to him and asked if he was hurt. He said he was. I asked if he was badly hurt. He said, 'I don't know; am shot through the shoulder.' I couldn't tell beyond that. I then assisted him to the—what flashed upon me as the nearest place for assistance, which was Dr. Fort's, that I knew of, had been there, and I took him just in."

We will not undertake to set out literally the testimony of Robin Cooper as to what occurred at this unfortunate meeting of the parties, but will content ourselves with giving in substance its salient parts. This witness states that when his father got on the sidewalk, and was walking south in the direction from which Mr. Carmack was approaching, he (Robin) walked in a diagonal direction across Seventh avenue in the direction of the two poles, so frequently mentioned; that when his father reached a point just a

little north of these poles he stopped; that at that instant of time Mr. Carmack, as it seemed, was just in the act of passing the couple, who proved to be Mr. and Mrs. Eastman; that then, while still a little bit in front of Mrs. Eastman, his father said, "Senator Carmack," and immediately the latter looked and drew his pistol. He further testified that Mr. Carmack crossed the sidewalk, backing slightly towards the two poles, and that "intuitively" he "jumped forward on the sidewalk between" his "father and Senator Carmack"; that at this point of time the latter "was getting behind the poles," while the witness "had hardly gotten on the sidewalk, probably two or three feet inside, or toward the lot fence from the north post." He testified that then, as he was facing south, a shot exploded, it seemed to him, almost in his face, and coming from "between the two posts"; that he could see the pistol and Senator Carmack's arm, and that the latter "was standing right in the gutter, at the lower or south post." He states that this shot passed through his necktie and went into his shoulder, and at this point he drew his pistol from the pocket of his overcoat and started quickly toward the south pole, and as he did so a second shot came between the posts, which passed though his left sleeve. What then happened will be told in the words of the witness: "I stopped—as I stepped to the south pole, I put my hand on it, and stepped around to the curbing—and instantly, when I stepped around, Senator Carmack had stepped back, it seemed to me, two or three steps, or four or five, I don't know how

far, from where he was, and was facing me in about that position (illustrating), his pistol pointing at me, and looking toward me, and his side slightly towards me, and I fired as quick as I could."

He states that there were nine loads in his pistol, though he only fired three of them, but these in quick succession, and that he ceased firing because he saw that Mr. Carmack was hit and his "knees giving way."

The witness further testifies that his father did not say to Senator Carmack, "Now, I've got the drop on you," or anything else "in substance" like this, but that, when Mr. Carmack, drawing his pistol, stepped in front of Mrs. Eastman, his father did call "him a coward for getting behind a woman, or words to that effect." This witness was asked if his attention was fixed on "any particular thing or person, after seeing the pistol drawn by Mr. Carmack," and he answered: "I was on a terrible nervous tension, excitement and strain, and I didnt see anything after I intuitively jumped forward between papa and Senator Carmack. I just have a recollection of seeing Mrs. Eastman pulling the old man with her down the street, and the first thing I knew was this shot through the posts into my collar. My attention was fixed on Senator Carmack entirely . . . The whole thing was over almost in an instant." He further states that up to the time Senator Carmack drew his pistol he is certain his father had not drawn one, and agrees with his father in his statement that only five shots were fired.

In its main features, as to what occurred at the time of the homicide, as to the drawing of weapons, the movement and location of the parties to the tragedy, and the order in which firing was done by Mr. Carmack and Robin Cooper, the testimony of Col. Cooper and Robin is corroborated by John D. Sharp and S. J. Benning, who were some distance away, but still near enough, as they say, to see what was transpiring.

We do not deem it necessary to examine the criticism made on the testimony of these two last-named witnesses, as our only purpose now is to present the respective theories of the State and the plaintiffs in error, as to the circumstances immediately connected with the killing, and not to settle them.

In the charge of the trial judge it is stated, as one of the contentions of the State in the trial below, that while Col. Cooper was addressing Mr. Carmack in a threatening manner, "Robin Cooper came up in the rear of Mr. Carmack and began to fire on him." We are unable to find any evidence in the record to warrant this contention, save as it is found in the bullet wound in the back of his neck.

We think it may be taken as established, without any real conflict, that five shots were fired—two of them by Mr. Carmack and three by Robin Cooper. The friend who loaned Mr. Carmack a 38-caliber, double-action, five-shooting Smith & Wesson pistol, the night before, and instructed him in its use, says all of its chambers were loaded at that time. This gentleman is of the highest professional and personal character.

Withn a few minutes after the killing, this pistol, thoroughly ·identified as the one so lent, was picked up by Lieut. Winston Pilcher, a retired army officer, from the ground where the lifeless body of Mr. Carmack lay, and about eight or ten inches from his hand. He immediately unbreeched it and found shells in all the chambers, two of which were empty, and these were "damp looking," while the muzzle of the pistol "showed the effects of gas explosion, all of which evidenced it had been recently fired."

While this testimony corroborated Robin Cooper and other witnesses for the defense that Mr. Carmack fired twice, it did not tend to fix the order of time in which the five shots were fired. It is insisted that this is found among the other evidence, particularly in that of Dr. Glasgow, a surgeon of high standing in Nashville, who caused the body of Mr. Carmack to be exhumed, a short time after it was buried, and made a careful autopsy. This was done at the instance of the State; but, the State failing to use him as a witness, he was introduced by the defense. The witness, immediately after making this autopsy, set down its result in writing, which he used in refreshing his recollection. This autopsy disclosed three wounds—one of which was 2½ inches below the left nipple and 1½ inches to the inner side. The bullet which made this wound entered between the fifth and sixth ribs, passing through the heart and other vital organs, and, ranging backward and downward, lodged under the skin between the eighth and ninth ribs. Another wound was made by a bullet, which,

passing through the arm, "2½ inches below the acromion process," entered the chest between the fourth and fifth ribs, and then, passing through the heart and other vital organs, lodged under the skin between the sixth and seventh ribs. The range of this bullet was downward and forward. The third and last wound was in the back of the neck. The bullet making this wound entered the spinal canal, cutting the spinal cord, severing the spinal column, and ranged forward and slightly upward.

It was and is insisted by the plaintiffs in error that these wounds corroborated Robin Cooper in his claim that Mr. Carmack was, at the time of their infliction, standing in the street, which was a few inches below the curb of the pavement, from which he states he shot, and that at the time Mr. Carmack received the shot below the left nipple he was in the act of firing a third time, with his left front exposed, and the impact of this shot served to expose his left side still more, when he received the second shot; and the force of these two drove his body still further around, so that in receiving the last shot his back was exposed.

It is further insisted that either of these wounds was mortal, and, having received any one of them, it is impossible to conceive that Mr. Carmack fired his shots thereafter. In other words, the contention is their nature tends strongly to corroborate the witnesses for plaintiffs in error, who state that it was only after Mr. Carmack fired his two shots at Robin Cooper that the latter fired his pistol.

Cooper v. State.

It is unnecessary to proceed further in detailing other testimony which bore with more or less directness on the contention in the court below, or on that presented in this court. The record showing that in the court below the plaintiffs in error were put to trial upon the theory of conspiracy, which was not sustained by any material evidence, and that in this court a different theory is pressed for affirmance of the judgment against them, it is apparent that to this end this court should be satisfied the verdict of the jury was reached without serious and prejudicial errors.

We will now consider some of the assignments of error directed to the action of the court in the trial of the cause.

As has already been said by us, it was not criminal per se for Col. Cooper to cross the street for the purpose, as avowed by him in his testimony, of having a personal interview with Mr. Carmack and protesting against the further offensive use of his name in the *Tennessean.* Unquestionably, he had the legal and moral right to do this. It was, no doubt, inconsiderate, in view of the fact that Mr. Craig had reported to him the night before that he left Mr. Carmack in an ugly mood. It would have been much wiser for him to have left this matter for adjustment in the hands of a prudent counsellor like Mr. Bradford, where only just before he had placed it. Still, inconsiderateness is not criminal intent, nor was the act itself, inspired by the motive claimed by Col. Cooper, either "aggressive" or

"being in fault," in the sense in which these terms are used in the law.

This general rule is conceded by the attorney-general. His insistence, however, is "that no one has the right to approach another for an interview, or for any other purpose, in such manner and under such circumstances as would justify the other party in believing himself in danger of death or great bodily harm," and that this principle is controlling as applied to the facts of the present case.

It is true that Col. Cooper had no right to approach Mr. Carmack in a manner to *"justify"* the latter in believing his life or limb was in danger, and if he did, if his approach was so aggressive in its nature as to reasonably warrant such belief, then Mr. Carmack would have been guilty of no crime had he slain him, or, being the victim, Col. Cooper could not avail himself of the plea of self-defense, nor could Robin Cooper, if he slew Mr. Carmack to protect his father from impending danger. The contention, however, of the plaintiffs in error, is that there was nothing of menace or aggressiveness in the action of Col. Cooper. They deny absolutely that Col. Cooper said, when he approached, with Mr. and Mrs. Eastman standing between Mr. Carmack and himself, either literally or in substance or effect, "Well, here you are, all right; I have the drop on you now." They affirm with equal positiveness that, having reached the place, and when in the positions mentioned, Col. Cooper addressed him as "Mr. Carmack," and in an instant Mr. Carmack drew his pistol

and assumed the offensive. If these were the facts (and whether they were or not was for the jury to determine, under proper instructions), then this case is not within the principle stated by the attorney-general, or the authority of excerpts from the text of Wharton on Homicide, found in the early part of this opinion, or of *Irvine* v. *State,* 104 Tenn., 132, 56 S. W., 845, or kindred cases.

To cut off the plea of self-defense in a case of homicide, attempted or accomplished, there must be legal aggression or fault. As is said in *Foutch* v. *State,* 95 Tenn., 711, 34 S. W., 423, 45 L. R. A., 687, "in order to make a man guilty of murder, who is the 'aggressor,' or 'in fault,' or 'who provokes a difficulty,' in which his adversary is killed, he must have provoked it with the intent to kill his adversary, or do him great bodily harm, or to afford him a pretext for wreaking his malice upon his adversary [citing authorities]. In order to deny to such party the right to rely on the plea of self-defense, it must appear that he was the 'aggressor,' or 'in fault,' or 'provoked the difficulty,' in such a way and with such intent as the law contemplates in the use of these terms."

We believe this is a sound exposition of the law. And we are also satisfied that the fact that Col. Cooper had the night before made threats, and was armed at this time, if he made no hostile demonstration, and that Robin Cooper at this moment had on his person a pistol, which earlier in the day he had secured for the purpose of protecting his father from a deadly assault by Mr. Car-

mack, if one should be made, could not affect the right of either to rely on the plea of self-defense. *Young* v. *State,* 53 Tex. Cr. R., 416, 110 S. W., 445, 126 Am. St. Rep., 792; *Patterson* v. *State,* 75 Miss., 671, 23 South., 647; *State* v. *Evans,* 124 Mo., 410, 28 S. W., 8; *Gourko* v. *United States,* 153 U. S., 183, 14 Sup. Ct., 806, 38 L. Ed. 680.

The theory of the plaintiffs in error was that neither had been guilty of anything that would in law cut them off from this right, and certainly, supported as this theory was by testimony, it was the duty of the trial judge to give it distinctly to the jury in charge. In order that their theory might thus be given, it was embraced in the following special request:

"Gentlemen of the jury, it is insisted by the State in this case that the difficulty in which the deceased, Carmack, lost his life, was provoked or brought on by the fault or contrivance of the defendants, or some one of them, and particularly of the defendant D. B. Cooper, and consequently that these defendants, although they may have been assaulted and shot by Senator Carmack, had no right to shoot him; for, having provoked the difficulty, having produced the necessity for Carmack shooting at them, under the law they would not have the right to shoot at Carmack, and would be deprived of the doctrine of self-defense. Now in this connection, I charge you this: In order for this doctrine to apply, and before these defendants can be deprived of the right of self-defense, if you find that the deceased, Carmack, at the time he was killed, was making a deadly assault

upon Robin Cooper, or upon D. B. Cooper, it must
appear to your satisfaction, and beyond a reasonable
doubt, that these defendants, or some one of them, must
have sought or provoked this difficulty with the de-
ceased with the intent of killing him, or doing him
some great bodily harm.   In order to deny the defend-
ants the right to rely on the plea of self-defense, it must
appear that they were the aggressors, or in fault, or
provoked the difficulty in such way and with such intent
as the law contemplates in the use of these terms; and
in this connection I charge you, gentlemen of the jury,
that the defendant D. B. Cooper had a right under the
law to seek out, or had a right under the law, when he
saw deceased, Carmack, approaching him, to go across
the street and meet him and have a talk with him, and
to protest, and, if necessary, to demand that the said
Carmack should cease the offensive use of his name in
his paper; and I charge you further in this connection
that the fact that Cooper and his son both may have
been armed, and the fact that Cooper may have the
night before, through Ed Craig, said that one or the
other of them, either he or Carmack, had to die if his
name was used any more in an offensive way, and the
fact that after he had sent this threat to Carmack his
name had again appeared in the paper in such a way
as to be offensive to Cooper, that nevertheless, and
without regard to all this, Cooper still had the right
under the law to approach Carmack, and to make the
demand upon him that his name be no longer offensively
used in the paper, and the mere fact that he did ap-

proach him for this purpose, if this was his purpose, would not be such an aggression upon Cooper's part, or such provocation by Cooper of a difficulty, that would deprive either Cooper or his son and codefendant, Robin Cooper, of exercising the right of self-defense and of shooting and of killing Carmack, if. when they approached him for this purpose they had no intention of killing Carmack, or shooting except in their necessary self-defense, and all that they did was simply to walk across the street to meet him, and, as they approached him, defendant, D. B. Cooper, with his empty hand extended, addressed him as 'Mr. Carmack.' If under these circumstances Carmack immediately drew his pistol, he himself put these defendants upon the defensive, and in that event either or both of these defendants had a right to kill him, if it appeared necessary to kill him in order to save either of them from death or great bodily harm at his hands; and this would be none the less true, although it may appear to you from the evidence that defendant D. B. Cooper said in substance: 'Well, here you are, all right; I have the drop on you,' if at that time it appeared, or should have appeared, to the deceased that the defendant D. B. Cooper did not have the drop on him, and had his empty hand only extended."

This request was declined, for the reason, as stated by the trial judge, that it was substantially embraced in the general charge.

It is admitted by the counsel for the plaintiffs in error that in the abstract much of this request was given in the charge. They concede that in this sense the trial

judge did tell the jury that, in order to deprive the plain-
tiffs in error of the right to rely on their plea of self-
defense, the jury must be satisfied beyond a reasonable
doubt that they were the "aggressors," or "in fault," or
"provoked the difficulty," in such way and with such
intent as the law contemplates in the use of these terms,
but nowhere does he tell them the legal meaning or
sense of these terms.

It is further insisted that he did not apply the ab-
stract proposition of law to the facts as claimed by the
plaintiffs in error, and altogether omitted the vital part
of their theory and of their request; that is, he failed
to say to the jury "that D. B. Cooper had the right to
cross the street for the purpose of talking with Mr.
Carmack, and if, when these defendants approached him
for this purpose and without any intention of killing
him, except for their necessary self-defense, and if they
committed no assault upon him, nor menaced an assault
upon him by an overt act, that the mere fact that he
crossed the street for the purpose indicated would not
be such a provocation of a difficulty" as would deprive
either him or Robin Cooper of the right of self-defense.

The charge of the court, in which is stated hypothet-
ically the theory of the plaintiffs in error, covers sixteen
printed pages. It is admitted, in this very extensive
statement, that the trial judge in its concluding part
does—not directly, but inferentially—tell the jury that
Col. Cooper had the right to cross the street for the
purpose of talking with Mr. Carmack, provided he
"went on a mission of peace and for the purpose of

having a conversation, and for no other purpose," and Robin Cooper had the right to go with his father, if such was his sole purpose, in order to protect him, if on this account Mr. Carmack made a dangerous assault on his father. But the complaint is, not only was this merely inferentially stated, but this inference was to be drawn from the entire case of the plaintiffs in error, thus hypothetically stated, and could not be drawn unless the jury believed that all the preceding hypothetical statements were true.

Without further following the criticism of the action of the trial judge, we will content ourselves with saying that in failing to give this request he committed error.

It will be recalled that in the course of her testimony Mrs. Eastman stated, when she saw Mr. Carmack fall, being in a state of great excitement, she denounced Col. Cooper as a brutal murderer, who had taken advantage of her presence to kill his adversary without giving him "a single chance," and, though standing near, he made no reply. As bearing on this testimony, and the weight to be given it, the following request was submitted and declined:

"Among the other evidence the court has permitted you to hear in this case is the testimony of Mrs. Eastman as to certain accusations and denunciations she made against the defendant D. B. Cooper, immediately after the shooting, while she was standing in the Shanklin yard, to the effect that he (Cooper) had murdered Carmack. This evidence has been admitted for your consideration as a circumstance tending to show the

Cooper v. State.

guilt of the accused, provided you believe in the first place that, if this language was used or accusation made by Mrs. Eastman, Cooper heard and understood it at the time; and, second, that it was incumbent upon D. B. Cooper, under all the circumstances surrounding the parties at the time, to make a denial of her statement. If you have a reasonable doubt in your mind, even though you may be satisfied that Mrs. Eastman made such a statement, as to whether D. B. Cooper heard it, or understood its import, or if it appears that D. B. Cooper simply regarded what she was saying as the exclamation and outburst of an excited woman, then, under these circumstances, he would not be called on to deny it, even if he heard it, and the fact that he made no denial could not be looked to as a circumstance tending to show his guilt, and even if he heard it, if in view of all the circumstances, the condition of his son, the fact that he was wounded, the fact that D. B. Cooper at that time did not know the extent of the injury to his son, the further fact, if such be a fact, that D. B. Cooper had not shot Carmack, if in view of all these conditions, and the general excitement which prevailed at the time, D. B. Cooper could not reasonably be expected to make any denial of these charges, then the fact that he remained silent would not be a circumstance tending to show his guilt in this case, and in either one of these aspects of his testimony, any such accusation or denunciation that Mrs. Eastman made would be absolutely immaterial."

We think under the circumstances, there was prejudicial error in declining this request. A refusal to grant a similar request was made the principal ground for reversal in the case of *Phelan* v. *State*, 114 Tenn., 483, 88 S. W., 1040.

It is also assigned as error the refusal of the court to grant the following request:

"In determining the credibility of witnesses and the weight to be given their testimony, you, gentlemen of the jury, should look not only to the integrity of the witnesses and their purpose and intention to testify truthfully, but you should also look to all the circumstances immediately surrounding the witness at the time the events about which he or she testifies transpired. It is no impeachment of the integrity of a witness to state that his or her memory is defective, or that, by reason of the exciting circumstances with which the witness was surrounded, he or she incorrectly understood or remembered the words used. Now, it is not insisted by the defendants in this case that Mrs. Eastman, in undertaking to state what occurred, has testified corruptly or intentionally false; but it is insisted that the suddenness with which the encounter occurred between the deceased and the defendants, the fact that that encounter was not anticipated or expected by Mrs. Eastman, the very short time in which the whole transaction occurred, her excitable and nervous disposition, are all circumstances that can be and should be looked to by you upon this question—not whether Mrs. Eastman had intended to tell the truth, but whether she

Cooper v. State.

has been able to correctly understand what was said by D. B. Cooper, or has been able to remember accurately what he did say. .I instruct you, gentlemen of the jury, that it is the law that the testimony of any witness, in undertaking to repeat the words or language of a third person, especially when heard under exciting circumstances and conditions, is the most unsatisfactory evidence known to the law, by reason of the fact that they are always liable to be mistaken and misremembered, and their meaning is liable to be misunderstood and exaggerated; and therefore the court instructs you that evidence of this character should be received with great care and caution."

That this request contains a sound statement of a legal rule cannot be denied, and no satisfactory reason can be assigned for its refusal, unless it was elsewhere sufficiently covered, or else that it was improper to single out her testimony from that of all other witneses and make it the subject of a special charge.

As to the first of these suggestions, it is said that, while the trial judge did give the general cautionary charge as to extrajudicial conversations, this did not meet the requirement of the present case, resting so largely upon the testimony of Mrs. Eastman, as to what was said, under conditions which not only excited her to the highest degree, but would have unsteadied one of iron nerve, steeled by experience to confront sudden danger. It can hardly be said that this was a case to be satisfied with an academic instruction whch was in these general terms: "The court further instructs you

that it is insisted on by counsel that extrajudicial conversations are the weakest of all contradictory processes; that is, conversations had by one of the court witneses not under oath and spoken in a general way— the reason being, first, the fallibility of human memory as to the exact language and in a particular conversation. The slightest change in the language may alter the whole sense of the conversation, or a portion of it. But you will take these, if any appear in the proof, and consider them along with the other evidence, and, after having done so, give them such weight as they deserve."

It is objected that not only do these general observations fail to meet the necessity of this case, but that, while telling the jury that the counsel "insisted" on the infirmity of such testimony, he fails altogether to tell them that this insistence was warranted in law. The text-writers and the courts alike have said such evidence is the weakest of all evidence. In a civil case, involving rights of property (*Earp* v. *Edington,* 107 Tenn., 23, 64 S. W., 40), this court so held. While it might be going too far to say as much to the jury, still we have no doubt he should have unmistakably laid down rules of law for their guidance in considering such testimony.

As to the second suggestion, it may be said that ordinarily it is improper to single out the testimony of a single witness and call the attention of the jury to it; but we think the cross-examination of Robin Cooper made this an exceptional case; for, over the objection of his counsel, he was asked to state if he knew of any

reason why Mrs. Eastman would perjure herself in order to deprive him of his life or his liberty, and his answer was he "knew of no such reason." The State thus having singled out this witness and her testimony, we think it made this an exception to the general rule. In declining to grant the request, the trial judge erred.

It is further insisted by counsel that the trial judge, in his statement of the theory of the case and in his declaration of the law which he regarded as applicable, indissolubly "linked and bound together by a joint and common intent" father and son, and the latter's right of self-defense was made absolutely "dependent upon the action and intent" of the father. It is said, and properly so, that nowhere in the charge was the jury instructed upon the independent purpose and intent of Robin Cooper. He had testified that he followed his father across the street, because he was afraid that Mr. Carmack, resenting the message his father had sent, might attack him, and that he had no thought or apprehension that his father would attack Mr. Carmack; in fine, believing, if attacked, his father would be, by age and infirmity of his hand, unable to protect himself, he followed to give him protection in that contingency. He further testified that it was only after Mr. Carmack had drawn his pistol did he leap upon the pavement between him and his father, and then only after Mr. Carmack had wounded him by his first shot, fired so close as to powder-burn his face, and had followed that up with a second shot, the ball passing through his sleeve, that he drew his pistol and fired three times

fatally—not to "help" or protect his father from deadly assault—but to save himself from threatened death or great bodily harm. Assuming these to be facts, we know of no law, human or divine, which required him to elect between the loss of life or limb, and the forfeit of the right to rely on the plea of self-defense, or that absolutely linked his fate with that of his father. Certainly, it is not to be found in the cases of *Irvine* v. *State*, supra, or *Smith* v. *State*, 105 Tenn., 305, 60 S. W., 145. To give Robin Cooper the benefit of independent purpose and intent, and of his fears and apprehensions of death or great bodily harm, at the time he fired, requests Nos. 4 and 10 were presented by his counsel and refused by the trial judge. Request No. 4 was as follows:

"If you believe, from all that transpired during that day, as well as what occurred at the corner when Robin first discovered the deceased, that Robin in good faith believed, when his father left him and started down to meet Carmack, that defendant D. B. Cooper was going for no other purpose than that purpose for which said D. B. Cooper said he was going, to wit, to have a talk with him, and if in this belief Robin accompanied his father, and when they met Carmack, at or about the poles, Carmack immediately began firing upon Robin, Robin Cooper, under the law, had the right to shoot and kill Carmack, if necessary, for his own protection, although defendant D. B. Cooper may have gone there for the purpose of provoking the difficulty."

Request No. 10 was this:

"If you find from the evidence that Robin Cooper crossed the street and went to where the deceased was without any intention of killing the deceased or doing the deceased great bodily harm, or without any intention of bringing on a difficulty with the deceased, for the purpose of killing the deceased or doing the deceased great bodily harm, that is, if Robin went to the place of the meeting without any criminal intent, and if you further find from the evidence that the deceased, without any hostile demonstration on the part of Robin Cooper, drew a pistol and fired at Robin, or made any hostile demonstration such as would reasonably induce the belief in Robin's mind that the deceased intended to do him great bodily harm, and if you further find that Robin then killed the deceased, a case of self-defense is made out, and you should find all the defendants not guilty."

These requests should have been granted, and their refusal was error.

The State, over the objection of the plaintiffs in error, permitted Dr. J. A. Witherspoon, one of its witnesses, to testify that on the morning of the day of the homicide Mrs. Dr. Burch, daughter of Col. Cooper, telephoned him that her father had made certain threats against Mr. Carmack, and he had communicated the fact to Mr. Lander, the kinsman and business associate of Senator Carmack. Mr. Lander was then called, and he stated that about 12 o'clock on the day of the killing, and just after his interview with Dr. Witherspoon, he saw Mr. Carmack, and what he then said is given as

follows: "I told Senator Carmack that Dr. Wither-spoon told me that Mrs. Burch had called him over the telephone, and had asked him to find Dr. Burch, and in that conversation she told him that her father was armed and very angry at Senator Carmack, and intended to kill him on sight."

This was purely hearsay evidence, and clearly incompetent for that reason; but the record is in no condition to permit the error in its admission to be taken advantage of on this appeal.

We also think the trial judge erred in permitting the representative of the State, in his cross-examination of Robin Cooper, over the objection of the latter's counsel, to ask him if he knew of any reason that John Tindall, the newsboy, and certain other witnesses, whose testimony was contradictory of his own, had for committing perjury in order to rob him of his life or liberty. As an illustration of this course of examination, we give the following:

"Question: Do you know of any motive why that boy (John Tindall) should come in here and perjure himself to deprive you of your life or your liberty?

"Answer: Of my own knowledge, I do not, sir."

With all the latitude allowed in cross-examination, yet we think that this should not have been permitted, if for no other reason, because it forced the accused indirectly, and we think prejudicially to himself, to pass on the credibility of these witnesses against him. Counsel for plaintiffs in error insist "the impression that the jury were bound to get from Robin's answer was

that, as he himself knew no reason why they should perjure themselves, of course, none could exist, and, therefore, as Robin had failed to give them any reason why they should reject their evidence, although contrary to his own, that they for that reason alone should accept it as the truth." It is unnecessary for us to agree with counsel "that the jury were bound" to get this impression. It is sufficient for us to say that probably this would be the effect of the answer of the witness. We do not think it in accord with the principles of a wise and humane administration of the criminal law that one whose life or liberty is at stake should be required to undergo such an ordeal.

A further assignment of error is that the State, over objection, in the cross-examination of Col. Cooper, asked him about his administration of his office as the clerk and master of the chancery court of Maury county, and what were assumed to be defalcations therein, occurring at some time between December, 1870, and Janury, 1881, at which latter date he retired from the office. This assignment rests on two grounds: Its remoteness in point of time; and, second on the methods pursued in getting this part of the case to the jury.

It is true that, when the accused saw proper to go on the witness stand, he became subject to all the rules which prevail in the matter of elicting testimony. It is also true, as to the scope of a cross-examination, much must be left to the sound discretion of the trial court, and that unless it is discovered that there has been an

abuse of this discretion, its action will not be interferred
with.   As a general proposition it may be said that it is
legitimate to ask the witness with regard to anything
which bears upon the particular issue, or which tends
to show his moral character, in so far as it will enable
the jury to determine the question of his reliability—
in other words, the measure of faith or credit his state-
ment under oath is entitled to.   But the moral character
involved, and with which the court and jury have con-
cern, is that the witness has at the time he testifies.   This
character, though, is not made all at once, but is a mat-
ter of growth; so it has been held that those experiences
or incidents in the life of the witness, which in natural
sequence form a part of that growth and serve to illus-
trate his moral nature when called to testify, are within
the scope of a cross-examination.

But a fact irrelevant to the issue on trial, sporadic in
its nature, and remote in point of time, the uncovering
of which will serve no other purpose than to besmirch
the witness, we think is beyond the limits of legitimate
cross-examination.   The public has an interest in good
citizenship, and the courts should therefore encourage,
by enforcement of reasonable rules, everything which
contributes to its establishment, and discourage that
which would be a hindrance.   Nothing would prove a
surer hindrance than keeping alive the remembrance of
some long past error or wrong, and nothing would so
contribute to perpetuate this remembrance than to com-
pel the party to make confession of it every time he went
upon the witness stand.

In *Zanone* v. *State*, 97 Tenn., 101, 36 S. W., 711, 35 L. R. A., 556, this court quoted approvingly the following language from Greenleaf on Evidence (15th Ed.), vol. 1, sec. 459: "The examination being general and kept within bounds by the discretion of the judge, all inquries into transactions of remote date will, of course, be suppressed; for the interest of justice does not require that errors of any man's life, long since repented of and forgiven by the community, should be recalled to remembrance and their memory perpetuated in judicial documents, at the pleasure of any future litigant. The State has a deep interest in the inducements of reformation held out by the protecting veil, which is thus cast over the past offenses of the penitent. But, where the inquiry relates to transactions comparatively recent, bearing directly upon the present character and moral principle of the witness, and therefore essential to the due estimation of the testimony by the jury, learned judges of late have been disposed to allow it." To the same general effect is Wharton on Evidence, vol. 2, sec. 540. In recognition of this rule, it was held in *People* v. *Gotshall*, 123 Mich., 474, 82 N. W., 274, that offenses thirty-two years and even fifteen years before the trial were too remote. In *Baker* v. *Com.*, 106 Ky., 222, 50 S. W., 54, it was ruled that it was not competent to interrogate the accused as to a transaction which took place when he was a young man. On this point the court said: "It is true . . . that, when a defendant in a criminal prosecution voluntarily goes upon the witness stand in his own behalf, he is subject to cross-examination like any

other witness. . . . But we do not understand that
the entire past lives of witnesses are liable to be ransack-
ed and exposed, and the whole history of their lives laid
bare. We are of the opinion that the period concerning
which the inquiry is made should bear some reasonable
relation to the time at which the testimony is given, and
that the period of fifteen years is too remote. . . ."

See, also, *Bowers* v. *State* (Tex. Cr. App.), 71 S. W.,
284; *State* v. *Houx*, 109 Mo., 654, 19 S. W., 35, 32 Am.
St. Rep., 686; *Dyer* v. *State*, (Tex. Cr. App.), 77 S. W.,
456.

It is not insisted that evidence as to the management
by the accused of his office of clerk and master reflected
upon the issue in this case. Its competency was placed
on the ground that it tended to impeach his character
as a witness; but did it follow that, because he mis-
manged the affairs of this office thirty years before, he
could not be relied upon to recognize the sanction of an
oath then? If the State had been prepared to show in
his cross-examination a series of moral delinquencies,
approaching to a point of time near to that of the trial,
as in *Zanone* v. *State*, supra, then this one, being a part
of that series, and of the same general character, would
have been within its legitimate scope. Mere remoteness
would not have been ground for its rejection; but offered
as it was, and especially when it is taken in connection
with the explanation given by the witness, that his de-
faults were "from the absence of business methods," and
not from "willful misappropriation, or dishonesty in
office," we think it only served to besmirch the witness

and prejudice him in the minds of the jury, without tending to show that he was unworthy of belief. Thus, without comment on the measure in which ancient records of the chancery court of Maury were used by the State in the cross-examination of the accused in bringing out this testimony, we are content to say that it was improperly admitted.

Error is also assigned upon the action of the court in excluding certain parts of the testimony of Gov. Patterson. It will be recalled that he stated that, upon being advised of the pendency of the trouble between Col. Cooper and Senator Carmack, with Mr. Scruggs he started out in search of the former, and finally found him at the Maxwell House; that Mr. Bradford was sent for, and Robin Cooper came in, and that the interview that then occurred resulted in a promise on the part of Col. Cooper to turn the note which he had prepared for Mr. Carmack into the possession of Mr. Bradford and to go to his office at 3 o'clock that afternoon with a view to a possible adjustment. Having accomplished this much, Gov. Patterson departed for his own home; Robin Cooper accompanying him on the way and into the Arcade, where they separated. As to Robin Cooper's attitude in that conference, and up to the time of their separation, Gov. Patterson testified as follows:

"Q. What was Robin's actions and bearing? Was he active in bringing about the result at the Maxwell House?

"A. What result do you refer to, Judge?

"Q. Agreeing to allow Mr. Bradford to take hold of this matter, and his father not to send the note—to turn it over to Mr. Bradford to settle?

"A. Yes; Robin was anxious for it to be done, and expressed himself so.

"Q. What was his manner there about that—in walking down from the Maxwell House?

"A. Why, Robin's manner and demeanor were very quiet and pacific, so far as I could see.

"Q. Displayed anxiety to have the matter settled that way?

"A. Yes; he did.

"Q. Now, when he left you at the Arcade, and thanking you for what you had done, did he display any emotion about it?

"A. Yes; his eyes filled with tears."

The governor further testified that in separating he made this remark to him: "Robin, if I was in your place, I would stay with my father as much as I could today."

This testimony, although brought into the record, was not permitted to go to the jury. We think error was committed in this action of the trial judge. As has been already stated, this case was tried in the lower court upon the theory that there was a conspiracy at that very time to murder Senator Carmack, and that this young man was a party to this conspiracy. This testimony, as to his actions and his demeanor at a time when the conference closed, which strongly indicated that a hostile meeting between his father and Mr. Carmack

Cooper v. State.

would be averted, certainly was competent to rebut so much of the theory as embraced him as a conspirator. In addition, we think that it was especially important that the jury should have been permitted to hear the statement of Gov. Patterson that, upon parting with Robin Cooper at the Arcade, he suggested to him that it would be well for him to be with his father during the day, inasmuch as it explained his persistency in urging his father that he be permitted to accompany him on his fateful trip to the Governor's Mansion.

For the reasons mentioned, the case must be reversed and remanded for a new trial.[2]

---

[2] NOTE.—The opinion of Chief Justice Beard is published just as it was submitted by him to his associates, in consultation; and when it was not concurred in by them, he, doubtless by inadvertence, omitted to correct or modify the last paragraph, so as to make it conform to the direction and order of the court as stated in the last paragraph but one of the opinion of the court as announced by Mr. Justice Shields. Judge Beard died on December 7, 1910.

Duncan B. Cooper, against whom this judgment of conviction was affirmed, was pardoned by Gov. M. R. Patterson while the court was still sitting.—Reporter.